**FILED UNDER SEAL**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **PLAINTIFFS UNDER SEAL** | ) | **Civil Action No. 08 CA 11318 DPW** |
| | ) | |
| v. | ) | |
| | ) | **FILED UNDER SEAL** |
| | ) | |
| **DEFENDANTS UNDER SEAL** | ) | **JURY TRIAL DEMANDED** |
| | ) | |

## FIRST AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## 31 U.S.C. § 3729, ET SEQ.

Paul F. Lynch
65 Franklin Street, Suite 500
Boston, MA 02110
Telephone: 617- 426-1120
Facsimile: 617-348-2147

W. Scott Simmer
Thomas J. Poulin
Blank Rome LLP
Watergate
600 New Hampshire Ave., NW
Washington DC 20037
Telephone: 202-772-5967
Facsimile:  202-572-8412

David B. Krangle
Parker Wachman Alonso LLP
111 Great Neck Road
Great Neck, NY 11021
Telephone: 516-466-6500
Facsimile: 516-466-6665

*Counsel for Relator*

129894.00601/35873664v.4

129894.00601/35873664v.4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA
*ex rel.* MARK R. WESTLOCK, and on
behalf of the STATES of ARKANSAS,
CALIFORNIA, DELAWARE, DISTRICT
OF COLUMBIA, FLORIDA, GEORGIA,
HAWAII, ILLINOIS, INDIANA,
LOUISIANA, MASSACHUSETTS,
MICHIGAN, MONTANA, NEW
HAMPSHIRE, NEW JERSEY, NEW
MEXICO, NEW YORK, NEVADA,
OKLAHOMA, RHODE ISLAND,
TENNESSEE, TEXAS AND VIRGINIA,

    Plaintiffs,

v.

PFIZER, INC., DR. NEIL S. KAYE, M.D.,
NATIONAL ALLIANCE FOR THE
MENTALLY ILL, NAMI SAINT LOUIS
and JOHN DOES
#1-100, FICTITIOUS NAMES,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 08 CA 1318 DPW

FILED UNDER SEAL

JURY TRIAL DEMANDED

# TABLE OF CONTENTS

Page

I.     JURISDICTION AND VENUE ....................................................................................... 2

II.    PARTIES ........................................................................................................................... 2

       A.   PLAINTIFF/RELATOR MARK R. WESTLOCK ................................................. 2

       B.   DEFENDANT PFIZER, INC. .................................................................................. 4

       C.   DEFENDANT DR. NEIL S. KAYE, M.D. .............................................................. 5

       D.   DEFENDANTS NATIONAL ALLIANCE FOR THE MENTALLY ILL AND NAMI ST.
            LOUIS (COLLECTIVELY "NAMI") ...................................................................... 7

       E.   DEFENDANTS JOHN DOES #1-100. ..................................................................... 8

III.   SUMMARY OF DEFENDANTS' ILLEGAL CONDUCT ........................................... 9

       A.   THE PLAN AND PURPOSE OF THE FRAUDULENT MARKETING SCHEME. ........... 9

       B.   THE MANNER AND MEANS OF EXECUTING THE SCHEME. .................................. 9

IV.    BACKGROUND ON PROMOTING GEODON® FOR OFF-LABEL USES. ............. 10

       A.   THE DEVELOPMENT OF "ATYPICAL" ANTIPSYCHOTIC MEDICATIONS TO TREAT
            SCHIZOPHRENIA AND BIPOLAR DISORDER. ..................................................... 10

       B.   PFIZER MARKETING OF GEODON®. .................................................................. 13

            1.   Drug Maker Detailing of Doctors and Health Care Professionals. ........ 14

            2.   Biased Clinical Trials Funded By Drug Makers. ................................... 16

            3.   Drug Maker Sponsored CME Courses Using Paid "Thought Leaders." ...18

            4.   Drug Maker Sponsored Journal Articles to Promote Drug Products. ......20

            5.   Dr. Kaye's Off-Label Journal Articles Touting Geodon®. ..................... 22

            6.   Pfizer and Other Drug Maker Funding of NAMI ................................... 23

129894.00601/35873664v.4

7.   NAMI's Off-Label Promotion of Geodon®. ..................25

8.   Drug Maker Influence and the Exploding Off-Label Use of SGAs in Children and Adolescents. ..................26

9.   Burgeoning Off-Label Use of SGAs to Treat Dementia. ..................29

10.  Funding State Medicaid Adoption of Algorithms to Make Geodon® First Line Treatment. ..................30

C.   THE LIMITED ROLE OF THE FDA IN REGULATING OFF-LABEL PROMOTION OF DRUGS. ..................32

1.   New Drug Approvals By the FDA. ..................32

2.   FDA Regulation After Approval. ..................34

3.   DDMAC's Limited Ability to Regulate Drug Maker Marketing and Promotion. ..................35

4.   Use of an Approved Drug Beyond Its Labeling Is Off-Label. ..................37

D.   GEODON® FDA APPROVAL ONLY FOR LIMITED INDICATION AS AN ATYPICAL ANTIPSYCHOTIC TO TREAT SCHIZOPHRENIA. ..................38

1.   1998: FDA Refuses to Approve Geodon®. ..................38

2.   February 5, 2001: FDA Approves Geodon®. ..................41

3.   September 19, 2005: CATIE Study Shows SGAs No More Effective Than FGAs. ..................41

E.   PFIZER MISLEADS THE PUBLIC, HEALTHCARE PROVIDERS, AND THE FDA ABOUT GEODON®. ..................42

1.   September 3, 2002: Pfizer Receives Warning Letter From DDMAC. ..................43

2.   September 13, 2002: Pfizer's Legal Position On Off-Label Marketing. ..................44

3.   July 16, 2007: Pfizer Receives Second Geodon® Warning Letter From DDMAC. ..................45

V.   PFIZER'S FRAUDULENT MARKETING SCHEME. ..................45

Filed Under Seal
12989A.00601/35873664v.4

A.  PFIZER ANNOUNCES ITS POLICY TO GROW THE GEODON® MARKET RAPIDLY THROUGH ILLEGAL MARKETING SCHEME. ...................................................46

B.  PFIZER SPONSORED AND FACILITATED PRESENTATIONS PROMOTING THE OFF-LABEL USE OF GEODON®. ...................................................48

C.  PFIZER'S "BIG GUN" SPEAKER: DEFENDANT DR. NEIL S. KAYE, M.D. ............49

    1.  Dr. Kaye's October 16, 2002 Off-Label Presentation of Geodon®. .......50

    2.  Dr. Kaye's Off-Label Materials Were Provided to Pfizer Sales Representatives Nationwide. ...................................................52

D.  PFIZER PAID MULTIPLE SPEAKERS TO UNLAWFULLY PROMOTE GEODON®. ......53

E.  USE OF PFIZER REGIONAL MEDICAL RESEARCH SPECIALISTS ("RMRSS") TO PROMOTE GEODON® OFF LABEL. ...................................................55

    1.  Dr. Barry Herman. ...................................................55

    2.  Dr. Douglas Geenens. ...................................................57

F.  PFIZER CONSPIRED WITH DEFENDANT NAMI TO ACT AS A FRONT ORGANIZATION IN THE OFF-LABEL PROMOTION OF GEODON®. ...................................................59

G.  PFIZER PROMOTED GEODON® FOR UNAPPROVED USES AND MADE UNSUBSTANTIATED SUPERIORITY CLAIMS. ...................................................61

    1.  Promotion in Nursing Homes for Unapproved Dementia and Agitation-Type Behavior. ...................................................61

    2.  Promotion of Geodon® for Unapproved Dosages. ...................................................62

H.  PFIZER SALES REPRESENTATIVES MARKETED GEODON® TO DOCTORS TREATING PATIENTS WHO WOULD NOT USE GEODON® FOR ANY APPROVED INDICATION. ..63

I.  USING QUOTA AND CREDIT PROGRAMS TO INDUCE SALES TO DOCTORS AND FACILITIES WHO DO NOT USE GEODON® ON-LABEL. ...................................................64

iii

Filed Under Seal
129894.00601/35873664v.4

J.    PFIZER PROMOTED GEODON® FOR UNAPPROVED USES AS A MAINTENANCE MEDICATION IN THE LONG TERM TREATMENT OF BIPOLAR DISEASE. ..............66

K.    PFIZER MADE UNSUBSTANTIATED COMPARISON CLAIMS OF THE SUPERIORITY OF GEODON®. ..............68

1.    August 17, 2006 Abilify® "Compare and Win Strategy". ..............69

2.    November 10, 2006 "Competing to Win" POA. ..............70

VI.    PFIZER KNEW THE LEGAL RISKS RELATED TO OFF-LABEL PROMOTION OF GEODON®. ..............71

VII.    PFIZER'S FRAUDULENT MARKETING SCHEME VIOLATED FEDERAL PROGRAM LIMITATIONS. ..............73

VIII.    PFIZER'S PROMOTION OF GEODON® CAUSED SUBMISSION OF OFF-LABEL CLAIMS TO FEDERAL PROGRAMS AND THE *QUI TAM* STATES. ..............75

VIII.    PFIZER'S RETALIATION AGAINST RELATOR WESTLOCK. ..............77

COUNT I VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729, ET SEQ. ..............80

COUNT II VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729, *et seq*. ..............81

COUNT III VIOLATION OF FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(3) AS AGAINST ALL DEFENDANTS. ..............82

COUNT IV VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3730(h) (AS AGAINST PFIZER). ..............82

COUNT V INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (AS AGAINST PFIZER). ..............83

COUNT VI ARKANSAS MEDICAID FRAUD FALSE CLAIMS ACT, ARK. CODE ANN. § 20-77-901, *et seq*. ..............83

COUNT VII VIOLATION OF THE STATE OF CALIFORNIA FALSE CLAIMS ACT, CAL GOVT CODE § 12650, *et seq*. ..............85

COUNT VIII VIOLATION OF THE STATE OF DELAWARE FALSE CLAIMS AND REPORTING ACT, DEL. CODE ANN. TIT. 6 § 1201, *et seq*. ..............86

COUNT IX VIOLATION OF THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT, D.C. CODE A § 2-308.13, *et seq*. ..............88

COUNT X VIOLATION OF THE STATE OF FLORIDA FALSE CLAIMS ACT, FLA. STAT. 68-081, *et seq*. ..............89

COUNT XI VIOLATION OF STATE OF GEORGIA MEDICAID FALSE CLAIMS ACT, GA. CODE ANN. § 49-4-168 (2007), *et seq*. ..............90

COUNT XII VIOLATION OF THE STATE OF HAWAII FALSE CLAIMS ACT FALSE
    CLAIMS TO THE STATE, HAWS REV. STAT. § 661-21, et seq. ..........92

COUNT XIII VIOLATION OF THE STATE OF INDIANA FALSE CLAIMS AND
    WHISTLEBLOWER PROTECTION ACT, IND. CODE § 5-11-5.5, et seq.93

COUNT XIV VIOLATION OF THE STATE OF ILLINOIS WHISTLEBLOWER REWARD
    AND PROTECTION ACT, 740 ILL. COMP. STAT. ANN. 175/1, et seq. .94

COUNT XV VIOLATION OF THE STATE OF LOUISIANA MEDICAL ASSISTANCE
    PROGRAMS INTEGRITY LAW, LA. REV. STAT. § 46:437.1, et seq. ...96

COUNT XVI VIOLATION OF THE COMMONWEALTH OF MASSACHUSETTS FALSE
    CLAIMS ACT, MASS LAWS ANN. Ch. 12, § 5A, et seq. ..................97

COUNT XVII VIOLATION OF THE STATE OF MICHIGAN MEDICAID FALSE CLAIMS
    ACT, MICH. COMP. LAWS SERV. § 400.601, et seq. ..........................98

COUNT XVIII VIOLATION OF STATE OF MONTANA FALSE CLAIMS ACT, MONT.
    CODE ANN. § 17-8-401, et seq. ..............................................................100

COUNT XIX VIOLATION OF STATE OF NEW HAMPSHIRE MEDICAID FALSE CLAIMS
    ACT, N.H. REV. STAT. ANN. § 167:61-b, et seq. ..................................101

COUNT XX VIOLATION OF STATE OF NEW JERSEY FALSE CLAIMS ACT, N.J. STAT.
    ANN. § 265 (2007), et seq. .......................................................................102

COUNT XXI VIOLATION OF STATE OF NEW MEXICO MEDICAID FALSE CLAIMS
    ACT, N.M STAT. ANN. § 27-14-1, et seq. ..............................................104

COUNT XXII VIOLATION OF THE STATE OF NEW YORK FALSE CLAIMS ACT, N.Y.
    CLS. ST. FIN. § 187 et seq. ......................................................................106

COUNT XXIII VIOLATION OF THE STATE OF NEVADA SUBMISSION OF FALSE
    CLAIMS TO STATE OR LOCAL GOVERNMENT ACT, NEV. REV.
    STAT. ANN. § 357.010, et seq. ..............................................................107

COUNT XXIV VIOLATION OF STATE OF OKLAHOMA MEDICAID FALSE CLAIMS
    ACT, OKLA. STAT. tit. 63, § 5053 (2007), et seq. ..............................108

COUNT XXV VIOLATION OF STATE OF RHODE ISLAND FALSE CLAIMS ACT, R.I.
    GEN. LAWS § 9-1.1-1 (2008), et seq. ....................................................110

COUNT XXVI VIOLATION OF THE STATE OF TENNESSEE MEDICAID FALSE
    CLAIMS ACT, TENN. CODE ANN. § 71-5-181 et seq. ..........................111

COUNT XXVII VIOLATION OF THE STATE OF TEXAS HUMAN RESOURCES CODE,
    TEX. HUM. RES. CODE § 36.001 et seq. ................................................113

COUNT XXVIII VIOLATION OF THE COMMONWEALTH OF VIRGINIA FRAUD
    AGAINST TAXPAYERS ACT, VA CODE ANN. § 8.01-216.1, et seq. ....114

v

**FIRST AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS,
31 U.S.C. § 3729, *ET SEQ.* AND STATE LAW COUNTERPARTS**

This is an action brought on behalf of the United States of America by Mark R. Westlock,

by and through his attorneys pursuant to the qui tam provisions of the Federal

Civil False Claims Act, 31 U.S.C. § 3729, *et seq.*; the Arkansas Medicaid Fraud False Claims

Act, ARK. CODE ANN. § 20-77-901 (2007), *et seq.*; the California False Claims Act, CAL.

GOV'T CODE § 12650 (Deering 2000), *et seq.*; the Delaware False Claims and Reporting Act,

DEL. CODE ANN. Tit. 6, § 1201 (2000), *et seq.*; the District of Columbia False Claims Act,

D.C. CODE ANN. § 2-308.13 (2000), *et seq.*; the Florida False Claims Act, FLA STAT. 68-081

(2000), *et seq.*; the Georgia False Medicaid Claims Act, GA. CODE ANN.§ 49-4-168 (2007), *et*

*seq.*; the Hawaii False Claims Act, HAW. REV. STAT. § 661-22, (2006) *et seq.*; the Illinois

Whistleblower Reward and Protection Act, 740 ILL. COMP. STAT. ANN. § 175/1 (2000), *et*

*seq.*; the Indiana False Claims and Whistleblower Protection Act, INDIANA CODE § 5-11-5.5,

(2007) *et seq.*, the Louisiana Medical Assistance Programs Integrity, LA. REV. STAT. ANN. §

46.439.1 (2006), *et seq.*; the Massachusetts False Claims Act, MASS. ANN. LAWS ch. 12, §

5(A), (2007) *et seq.*; the Michigan Medicaid False Claims Act, MICH. COMP. LAWS SERV. §

400.601, (2007) *et seq.* (2007); the Montana False Claims Act, MONT. CODE ANN. § 17-8-401

(2005), *et seq.*; the New Hampshire Medicaid False Claims Act, N.H. REV. STAT. ANN. §

167:61-b (2005), *et seq.*; the New Jersey False Claims Act, N.J. STAT. ANN. § 265 (2007); the

New Mexico Medicaid False Claims Act, N.M. STAT. ANN. § 27-14-1 (2007), *et seq.*; the New

York False Claims Act, N.Y. CLS ST. FIN. § 190.6, (2007), *et seq.*; the Nevada Submission of

False Claims to State or Local Government Act, NEV. REV. STAT. § 357.010 (1999), *et seq.*;

the Oklahoma Medicaid False Claims Act, OKLA. STAT. tit. 63, § 5053 (2007), *et seq.*; the

Rhode Island False Claims Act, R.I. GEN. LAWS § 9-1-1 (2008), *et seq.*; the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-181(c) (2006), *et seq.*; the TEX. HUM. RES. CODE § 36.001 (2006), *et seq.*; and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 (2006), *et seq.*, ("State *qui tam* statutes" or "*Qui Tam* States").

## I.   JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.   The Court has original jurisdiction of the State law claims pursuant to 31 U.S.C. § 3732(b) because this action is brought under State laws for the recovery of funds paid by the *Qui Tam* States, and arises from the same transaction or occurrence brought on behalf of the United States under 31 U.S.C. § 3730.

2.    This Court has personal jurisdiction over the Defendants because, among other things, Defendants transact business in this District, and engaged in wrongdoing in this District.

3.    Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c). Defendants transact business within this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

4.    The causes of action alleged herein are timely brought because, among other things, of efforts by the Defendants to conceal from the United States their wrongdoing in connection with the allegations made herein.

## II.   PARTIES

### A.   PLAINTIFF/RELATOR MARK R. WESTLOCK

5.    Plaintiff/Relator Mark R. Westlock ("Relator Westlock") is a resident of 618 Winter View Circle, Fenton, MO 63026.   Relator Westlock was employed by Pfizer, Inc. ("Pfizer") for sixteen years, from October 1991 through September 14, 2007.   Relator

Westlock holds a Bachelor of Science degree in applied mathematics and a Masters in Business Administration. He also served in the United States Navy as a decorated Supply Officer and presently serves in the American Legion. Relator Westlock began his career at Pfizer in October 1991 as an Office Services Manager responsible for leading the accounts payable and receivable group and other personnel in Pfizer's largest distribution center, the Hoffman Estates distribution center, near Chicago, Illinois.

6.      Relator Westlock earned a position as a sales representative with Pfizer in November 1992 in the Columbia, Missouri area. As a Pfizer sales representative, he promoted several products, including Lipitor®, Zyrtec®, and Glucotrol XL®, to various specialists, primary care clinics and hospitals such as the VA Hospital in Columbia, Missouri, University of Missouri Hospital and Whiteman Air Force Base.

7.      Relator Westlock earned multiple awards over the next five years in this role, and was named the district sales representative of the year in 1993 for his district, and obtained the number one regional sales ranking for selling the product Glucotrol XL®.

8.      In 1997, Relator Westlock was offered a promotion and accepted a new position as lead Specialist sales representative selling Zoloft® and Aricept®, and was assigned to make sales calls on psychiatry and neurology clinics covering an area from Milwaukee to Green Bay, Wisconsin. During the period, Relator Westlock ranked number five (1999) and number seven (2001) nationally (out of 400 sales representatives), earning two Circle-of-Excellence Awards and two Vice-President's Cabinet Awards – Pfizer's highest sales reward.

9.      In 2002, Relator was offered another promotion and accepted a position as Assistant-to-the-Sales Director in Parsippany, New Jersey. In 2003, he was offered another promotion as District Sales Manager in Pittsburgh, Pennsylvania. In this position he was responsible for twelve sales

3

representatives within the Central Nervous Systems ("CNS") district covering Western Pensylvania and the Buffalo and Rochester areas of New York. This group was responsible for selling four Pfizer drugs: Aricept®, Zoloft®, Xanax® and Geodon®. After leaving this position, he returned to St. Louis, Missouri as a Senior Professional Healthcare Consultant, selling Pfizer products Geodon®, Zoloft®, Celebrex®, Bextra®, and subsequently Aricept®, Relpax® and Lyrica®.

10.     Relator Westlock is an original source of the Fraudulent Marketing Scheme allegations in this Complaint, and the allegations in the Fraudulent Marketing Scheme are not based upon publicly disclosed information. He has provided the government with information prior to the filing of this Complaint in accordance with 31 U.S.C. § 3730(b)(2). Prior to filing this complaint, Relator Westlock brought the wrongdoing described in this Complaint to the attention of Pfizer.

### B.     DEFENDANT PFIZER, INC.

11.     Defendant Pfizer, Inc. ("Pfizer") is incorporated under the laws of Delaware, with its principal place of business in New York, New York. Pfizer is engaged in the development, manufacture, distribution, and sale of pharmaceutical and health care products throughout the United States. Throughout the relevant period, Pfizer manufactured and sold substantial quantities of its drugs products, including Geodon®, in the Commonwealth of Massachusetts and in the United States. Pfizer's pharmaceutical sales accounted for $44.4 billion (91.8 percent) of its total 2007 revenue of $48.3 billion.

12.     Pfizer manufactures, markets and sells brand-name prescription drug products, including Geodon®, paid or reimbursed by various governmental programs, including health benefit carriers offering benefits under the Federal Employees Health Benefits ("FEHB") program under a prime contract with the Blue Cross Blue Association ("BCBSA"), the Health

4

Insurance Program for the Elderly and Disabled, more commonly referred to as the Medicare Program, 42 U.S.C. § 1395, *et seq.* via Medicare Part C, also known as Medicare+Choice, patients covered by Medicare Part D, the Indian Health Service, Medicaid, the Mail Handler's Health Benefit Plan ("MHHBP"), the U.S. Secret Service Employees Health Association ("SSEH") Health Benefit Plan, the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS," now known as "TRICARE") and the Veteran's Health Administration ("VHA") (collectively, the "Federal Programs").

13.    Pfizer conspired with Defendants Dr. Neil S. Kaye, M.D., NAMI and others to commit the unlawful acts described in this complaint. As a result of Pfizer's actions, the *Qui Tam* States and Federal Programs have suffered financial harm.

14.    Pfizer has as many as thirty-one (31) sales offices located in the Commonwealth of Massachusetts out of which it employs numerous sales representatives, who call on health care professionals throughout Massachusetts in order to sell Geodon®.

15.    At all times material hereto, Pfizer employed as many as 12,000 sales representatives/sales managers located across the United States whose function it was to promote, market or otherwise sell Pfizer drugs, including its drug Geodon®.

**C.    DEFENDANT DR. NEIL S. KAYE, M.D.**

16.    Defendant Dr. Neil S. Kaye, M.D. ("Defendant Dr. Kaye") conducts business at 5301 Limestone Road, Suite 103, Wilmington, Delaware.  Dr. Kaye is Assistant Clinical Professor of Psychiatry and Human Behavior and Assistant Clinical Professor of Family Practice at Jefferson Medical College and a Special Guest Lecturer at Widener University School of Law. Dr. Kaye is Board Certified in General Psychiatry, Geriatric Psychiatry, Pain Management, Forensic Psychiatry and as Senior Disability Analyst.

17.   Dr. Kaye specializes in forensic psychiatry, infanticide, neuropsychiatry, psychopharmacology and psychiatric research, and has performed over 10,000 psychiatric evaluations. Dr. Kaye is a paid Pfizer consultant, a frequent paid speaker for Geodon®, and conspired with Pfizer to unlawfully promote and market Geodon® as described in this complaint.

18.   Dr. Kaye offered multiple presentations in the Commonwealth of Massachusetts supporting the off-label use of Atypical Antipsychotic Medications, specifically Geodon®. Dr. Kaye's presentations included:

- "Atypical Antipsychotics: Efficacy, Safety and Dosing: Clinical and Forensic Issues," McLean Hospital, Belmont, Massachusetts, 2002.

- "Atypical Antipsychotics: Child and Adolescent Issues," Northampton, Massachusetts, 2002.

- "Atypical Antipsychotics: Efficacy, Safety and Dosing: Clinical and Forensic Issues," Prescott Health Care Center, Worcester, Massachusetts, 2002.

- "Atypical Antipsychotics: Efficacy, Safety and Dosing: Clinical and Forensic Issues," Framingham, Massachusetts, 2002.

- "Atypical Antipsychotics: Efficacy, Safety, and Dosing: Clinical and Forensic Issues," Lowell, Massachusetts, 2002

Defendant Dr. Kaye's presentations promoted the off label use of Geodon® in adolescents; in patients with illnesses Geodon® is not approved to treat including, but not limited to, ADHD, bipolar disorder, dementia, and agitation; and at doses both higher and lower than approved by

6

Filed Under Seal
129894.00601/35873664v.4

Filed Under Seal
129894.00601/35873664v.4

the FDA. The aforementioned presentations occurred while Dr. Kaye was licensed to practice medicine in the Commonwealth of Massachusetts.

19.    As a result of Dr. Kaye's actions, the *Qui Tam* States and Federal Programs have suffered financial harm.

**D.    DEFENDANTS NATIONAL ALLIANCE FOR THE MENTALLY ILL AND NAMI ST. LOUIS (COLLECTIVELY "NAMI")**

20.    The National Alliance for the Mentally Ill ("NAMI") conducts business at Colonial Place Three, 2107 Wilson Blvd., Suite 300, Arlington, VA 22201-3042. NAMI is a national umbrella organization for more than 1,200 local support and advocacy groups for families and individuals affected by serious mental illnesses. NAMI support groups are located in all 50 states as well as in the District of Columbia, Puerto Rico, and Canada.    NAMI bills itself as "a grassroots organization of individuals with brain disorders and their family members."

21.    NAMI St. Louis conducts business at 134 West Madison Avenue, St. Louis, Missouri, and is a private, non-profit organization doing business in St. Louis, Missouri and is a local affiliate of NAMI.   Collectively, these organizations will be referred to herein as "NAMI." NAMI conspired with Pfizer to unlawfully promote and market Geodon® as described in this complaint.

22.    Defendant NAMI currently operates with a local affiliate, NAMI Massachusetts (www.namimass.org), which conducts business at 400 West Cummings Park, Suite 6650, Woburn, MA 01801. NAMI Massachusetts claims that its primary functions are "support, education, and advocacy for consumers and their families; for research and services; and for the education of all professionals, providers, and the general public." However, the organization operates through significant financial support from Defendant Pfizer and other

drug makers. Defendant NAMI reciprocates Defendant Pfizer's support by the promotion of the off-label use of Pfizer products, including Geodon®.

23.    A newsletter sent through the U.S. mail and/or the wires through internet communications to members of NAMI Massachusetts on or about April 14, 2004, from Kara Sweeny, Director of Affiliate Development, to NAMI members solicited participants for a Pfizer-sponsored study being conducted to test using Geodon® on adolescents with bipolar disorder, which is a non-approved use of Geodon®.

24.    As a result of NAMI's actions, the *Qui Tam* States and Federal Programs have suffered financial harm.

### E.    DEFENDANTS JOHN DOES #1-100.

25.    John Does #1-100, fictitious names, are individuals, corporations, limited liability companies, or other lawful business entities through which Defendants do business in the United States and internationally, and who are unknown co-conspirators who conspired with Pfizer to perpetuate the scheme as described herein.  To the extent that any of the conduct or activities described in this Complaint were not performed by Defendants, but by the individuals or entities described herein as John Does #1-100, fictitious names, any reference herein to Defendants under such circumstances, and only under such circumstances, refers also to John Does #1-100 and/or other co-conspirators who conspired with Defendants to perpetrate the schemes described herein.

26.    As a result of actions of John Does #1-100, the *Qui Tam* States and Federal Programs have suffered financial harm.

Filed Under Seal
129894.00601/35873664v.4

Filed Under Seal
129894.00601/35873664v.4

III.   **SUMMARY OF DEFENDANTS' ILLEGAL CONDUCT**

A.   THE PLAN AND PURPOSE OF THE FRAUDULENT MARKETING SCHEME.

27.   It was the plan and purpose of the Defendants' scheme to illegally market Geodon® beginning at least as early as 2002 and continuing to the present in order to fraudulently obtain governmental reimbursement by causing false and fraudulent claims to be submitted for payment in order to maximize Pfizer's profits.

B.   THE MANNER AND MEANS OF EXECUTING THE SCHEME.

28.   It was part of the scheme that Pfizer illegally promoted the off-label sales and use of Geodon® in order to obtain reimbursement for non-medically accepted indications and other off-label treatments in order to maximize profits by making false and fraudulent statements to the public, healthcare providers and the Food and Drug Administration ("FDA").

29.   Each Defendant's unlawful promotion of Geodon® involved the unlawful making of a false record or statement for the purpose of getting the false record or statement to bring about the Government's payment of a false or fraudulent claim.

30.   Each Defendant's individual conduct had a material effect on the governments' decision to pay for Geodon®.   Had the government known that reimbursements were being made for Geodon® caused by each Defendant's unlawful promotion, the government would not have made such reimbursements.

31.   It was further part of the scheme that Pfizer attempted to conceal and cover up the off-label marketing of Geodon® by making false statements to the FDA and directing employees to conceal evidence.

32.   The unlawful promotion of Geodon® that the conspirators agreed upon involved the unlawful making of a false record or statement for the purpose of getting the false record or statement to bring about the governments' payment of a false or fraudulent claim.

33.   The conspiracy had a material effect on the governments' decision to pay for Geodon®. Had the governments known that reimbursements were being made for Geodon® caused by Defendants' unlawful promotion, the governments would not have made such reimbursements.

34.   The scheme, described below, is referred to herein as the "Fraudulent Marketing Scheme."

## IV.   BACKGROUND ON PROMOTING GEODON® FOR OFF-LABEL USES.

### A.   THE DEVELOPMENT OF "ATYPICAL" ANTIPSYCHOTIC MEDICATIONS TO TREAT SCHIZOPHRENIA AND BIPOLAR DISORDER.

35.   Geodon®, with a chemical name of ziprasidone hydrochloride, is one of a class of medications known as "atypical" or "second generation" antipsychotics ("SGA") that treat schizophrenia and bipolar disease. Geodon® was initially approved by the FDA to treat schizophrenia in February 2001.   In July 2002, the FDA approved Geodon® IM® to treat acute agitation in schizophrenic patients.   On August 19, 2004, Geodon® was approved to treat Acute Bipolar Mania including both manic and mixed episodes.   The approval of Geodon® for treating Acute Bipolar Mania was based primarily on two peer reviewed double-blind placebo controlled studies in which patients were evaluated for 21-days.

36.   The following chart includes the various package sizes, strengths and drug codes for Geodon®:

10

Filed Under Seal
129894.00601/35873664v.4

Filed Under Seal
129894.00601/35873664v.4

37.    Schizophrenia is a severe, debilitating mental illness that afflicts over one percent of the general population—2.5 million Americans—often beginning in late adolescence or early adulthood. One of the most complex and challenging of psychiatric disorders, schizophrenia is a heterogeneous syndrome of disorganized and bizarre thoughts, delusions, hallucinations, inappropriate affect, impaired psycho-social functioning, cognitive dysfunction and profound mood disorders. See DSM-IV-TR 298-302. The illness occurs when a patient suffers two or more of the following characteristic symptoms: (1) delusions, (2) hallucinations, (3) disorganized speech, (4) grossly disorganized or catatonic behavior, and (5) negative symptoms, see id., or has bizarre delusions or hallucinations of voices commenting on the person's behavior or thoughts. Research has shown a variety of abnormalities in schizophrenic brain structure and function.

| Package Configuration | Capsule Strength (mg) | NDC Code | Imprint |
| --- | --- | --- | --- |
| GEODON® Capsules NDCs | | | |
| Bottles of 60 | 20 | NDC-0049-3960-60 | 396 |
| Bottles of 60 | 40 | NDC-0049-3970-60 | 397 |
| Bottles of 60 | 60 | NDC-0049-3980-60 | 398 |
| Bottles of 60 | 80 | NDC-0049-3990-60 | 399 |
| Unit dose/80 | 20 | NDC-0049-3960-41 | 396 |
| Unit dose/80 | 40 | NDC-0049-3970-41 | 397 |
| Unit dose/80 | 60 | NDC-0049-3980-41 | 398 |
| Unit dose/80 | 80 | NDC-0049-3990-41 | 399 |

| Package | Concentration | NDC Code |
| --- | --- | --- |
| GEODON® for Injection NDCs | | |
| Single Use Vials | 20 mg/mL | NDC-0049-3920-83 |

38.    Bipolar disorder is a serious, lifelong mental illness marked by dramatic shifts in mood, from abnormally elevated, expansive, or irritable moods to states of extreme sadness

and hopelessness, often with periods of normal mood in between. Bipolar I, characterized by the occurrence of one or more manic episodes or mixed episodes, often with major depressive episodes, and Bipolar II, characterized by one or more major depressive episodes accompanied by at least one hypomanic episode, are separate disease states. *See* DSM-IV-TR 382-92. Because of its complexity, bipolar disease can be difficult to diagnose; between seven and ten years of mis-diagnoses and incorrect treatment is typical for bipolar patients.

39.    In the past five years there has been an extensive amount of research into diagnosing and recommending treatments for bipolar disorder, funded in part by pharmaceutical manufacturers.    There has been a corresponding growth of bipolar diagnoses— correct *and* incorrect—leading to an increase in patients and greater awareness of the disease; many patients labeled "bipolar" are mentally ill but, upon detailed psychiatric exam, not bipolar. An estimated 5.7 million American adults are affected by the disorder, and at least 800,000 children in the United States have been diagnosed as bipolar, no doubt some of them wrongly.

40.    Geodon® is generally known as a "second generation antipsychotic" or "SGA" to differentiate it from older, first-generation antipsychotics ("FGAs"), which were the common drug therapy for schizophrenia until the 1990s.    FGAs include chlorpromazine (Thorazine®), fluphenzine (Proxiline®), haloperidol (Haldol®), molindone (Moban®), thioridazine (Mellaril®), loxapine (Loxitane®), mesoridazine (Serentil®), perphenazine (Trilafon®), thiothixene (Navane®), and trifluoperazine (Stelazine®), some of which have been in use since the 1950s.    FGAs are sometimes referred to as "typical" antipsychotics and SGAs "atypical." Although many different FGAs exist, they share similar levels of efficacy. They are, generally speaking, post-synaptic dopamine-receptor antagonists -- *i.e.*, they target dopamine receptors in

Filed Under Seal
129894.00601/35873664v.4

Filed Under Seal
129894.00601/35873664v.4

the brain. A troubling side effect of typical antipsychotics is that the blockage of dopaminergic neurotransmission causes extrapyramidal syndromes ("EPS") such as Parkinsonian effects or tremors. Tardive Dyskinesia ("TD"), a long-lasting movement disorder, also frequently occurs with prolonged treatment.

41.     During the 1990s pharmaceutical companies, building on the "atypical" hypothesis, developed newer, second-generation antipsychotic drugs ("SGAs") attempting to capture the enhanced therapeutic effect of clozapine without its toxicity and, they hoped, without the side effects, such as EPS and TD, caused by traditional antipsychotics. The introduction of atypical antipsychotic medications was trumpeted by the manufacturers of these pharmaceutical agents as a major advance in the treatment of schizophrenia with improved symptomatic control of the psychosis and a reduction in both tardive dyskinesia and extra pyramidal side effects.

42.     SGAs now account for about ninety percent of all antipsychotic drugs prescribed for all psychiatric purposes, regardless of whether they were approved for those indications or not. While the two primary uses of SGAs remain the treatment of schizophrenia and bipolar disorder, SGAs are prescribed "off label" to treat symptoms related to agitation, anxiety, psychotic episodes, obsessive behavior, behaviors related to dementia, depression, obsessive compulsive disorder ("OCD"), Post Traumatic Stress Disorder ("PTSD"), personality disorders and Tourette's Syndrome. Although there is only mixed evidence about their efficacy for these purposes (as well as for their indications), SGAs have become a booming business.

B.     PFIZER MARKETING OF GEODON®.

43.     Marketing and advertising have been critical to the success of the pharmaceutical industry in the last two decades, and particularly at Pfizer. Whether via increasingly common direct-to-consumer ("DTC") advertising or one-on-one physician detailing, drug companies

spend billions on drug promotion. Gardiner Harris, *Group Urges Ban on Medical Giveaways*, N.Y. Times, April 28, 2008. In 2000, for example, total national prescription drug promotion expenditures totaled more than $15.7 billion. Of that amount, $4.8 billion is spent on drug detailing alone.

44. It is undisputable that expenditures for drug marketing increase sales. Intense pharmaceutical marketing saturates the pharmaceutical industry and appears in many forms—some of which some people would call disguised. To accomplish these goals and raise sales, Pfizer utilized all the various channels of information through which pharmaceutical companies can market their products to propel Geodon®'s brand message. Those channels—today highly susceptible to industry influence—are described below.

45. The most obvious source of information about a medication is its own prescription label. Although a pharmaceutical company must obtain the FDA's approval for its drug's label, the label is the property of the manufacturer, not the FDA. Initially drafted by the manufacturer, labels are then subject to negotiations between the federal agency and the manufacturer. Because the FDA, however, depends solely on drug safety and efficacy information provided by pharmaceutical companies, it cannot object to a label's shortcomings if it never received the data from the manufacturer showing the drug's drawbacks.

**1.** **Drug Maker Detailing of Doctors and Health Care Professionals.**

46. "Detailing" is the one-on-one promotion of drugs to physicians by pharmaceutical sales representatives, usually through regular office visits, free gifts, and friendly advice, when "drug reps go to doctors' offices to describe the benefits of a specific drug." Daniel Carlat, *Dr. Drug Rep.*, N.Y. Times Mag., Nov. 25, 2007, at 67.

Filed Under Seal
129894.00601/35873664v.4

47.    Medical detailing is a large field, employing over 90,000 sales representatives, or one detailer for every 4.5 doctors. The vast majority of doctors—eighty-five to ninety percent—do speak with drug detailers, and most consider them and the information they provide helpful and accurate. Drug representatives ostensibly provide useful information for physicians as they address "difficult problems in treating patients." Jonna Perala et al., *Lifetime Prevalence of Psychotic and Bipolar I Disorders in a General Population*, 64 Archives of Gen. Psychiatry 19, 1892 (2007).

48.    But drug company-controlled and -produced information has great potential to mislead. One article published in the Journal of General Internal Medicine shows that nearly half (forty-two percent) of the material given to doctors by drug reps made claims in violation of FDA regulations. And only thirty-nine percent of the material provided by drug reps provided scientific evidence to back up the claims being made.

49.    On May 30, 2007, the Tacoma News Tribune reported an expose of drug manufacturer detailing of atypical antipsychotics at Western State Hospital, the Washington state psychiatric hospital in Lakewood, Washington. *See* Otto, *Ability And Other Newer Drugs May Cause Increased Violence*, Tacoma News Tribune (May 30, 2007). The article studied the use of atypical antidepressants in the hospital since 1999. According to the News Tribune, SGAs, which were far more expensive compared with older, generic alternatives, had been heavily promoted at the hospital by the pharmaceutical companies that make them. Sales representatives for those companies had logged about 1,200 visits to Western in just four years since late 2003, when administrators began tracking their activity:

[Atypical antipsychotic drugs] are expensive, some more than $15 per pill, compared with less than a dollar per pill for the older medications. In 2006, the hospital spent more than $5 million on atypical antipsychotics, according to Western's pharmacy. Promoted by drug companies as safer

Filed Under Seal
129894.00601/35873664v.4

Filed Under Seal
129894.00601/35873664v.4

and more effective, atypicals are widely used at Western and most psychiatric hospitals. Their growing use, coupled with the continued use of some of the older drugs, has resulted in an increase since 1999 of about 30 percent in the amount of antipsychotic medication being given to patients at Western, The News Tribune found.

*Id.* Pfizer's sales representatives were among the most frequent visitors at Western. "Asked why Pfizer representatives have made almost 200 visits to Western since December 2003, company spokesman Bryant Haskins said, 'That's where our customers are.'" *Id.*

### 2.   Biased Clinical Trials Funded By Drug Makers.

50.    Clinical trials provide the empirical data upon which the FDA determines a drug's safety and efficacy and doctors make professional judgments about the relative risks and benefits of a drug—and whether it is appropriate to prescribe it for their patients. The pervasive commercial bias found in today's research laboratories, however, means studies are often lacking in essential objectivity, with the potential to lead to misinformation, skewed results, or cover-ups. According to Harold Sox, M.D., editor of *Annals of Internal Medicine*, and Drummond Rennie, M.D., deputy editor of the *Journal of the American Medical Association*, the following are indicia of marketing masquerading as science:  an open-label design, no control group, a very large projected enrollment relative to the importance of the question, a short-term study of a chronic disease, or a study of an already approved drug.

51.    Such bias is a recent phenomenon. Before 1980, the National Institute of Health ("NIH") funded most clinical trials. During the 1980s, its budget was slashed; in response, drug industry funding went up six-fold from 1977 to 1990. By 1991, drug companies funded 70 percent of all clinical trials, though eighty percent of commercially funded trials were still performed at universities. By 2004, only twenty-six percent of commercially funded trials took place at universities.

Filed Under Seal
129894.00601/35873664v.4

52.     Today, eighty percent to ninety percent of all trials are commercially funded; between sixty-six percent and seventy-five percent of the clinical studies published in the most prestigious medical journals are commercially funded. Study design and control are increasingly in the hands of drug companies. Published studies often do not, however, reflect their commercial ties or authorship; they may be "ghostwritten" by company employees, use proprietary data not accessible to the scientific community, or simply not acknowledge their authors' financial ties to drug makers.

53.     Sponsorship is not insignificant. Even those trials performed at academic institutions are often partly to almost wholly controlled by the sponsor.  Sponsorship significantly affects chance whether trial will support drug; the odds are 5.3 times greater that commercially funded studies will conclude that the sponsor's drug is the treatment of choice compared to non-commercially funded studies of exactly the same drug.

54.     Odds of a trial favoring a drug also greatly increase if the trial's researchers had a financial conflict of interest with manufacturer. Not only does commercial bias affect the probable outcome of a study, but it also often controls whether and when a study is published. Because drug manufacturers often delay or suppress negative results from clinical trials they or their affiliated research institutions conduct, doctors, formulary committees, and policy makers had based their decisions on an unrepresentative fraction of the available scientific evidence when deciding if antidepressants in children were safe (only six out of the fifteen studies completed until then had been published).  *See* Benedict Carey, *Researchers Find Bias in Drug Trial Reporting*, N.Y. Times, Jan. 17, 2008, at A20 ("The makers of antidepressants like Prozac and Paxil never published the results of about a third of the drug trials that they conducted to win government approval, misleading doctors and consumers about the drugs'

17

Case 1:09-cv-11480-DPW   Document 1-2   Filed 09/08/09   Page 25 of 67

true effectiveness, a new analysis has shown."); Alex Berenson, *Accusations of Delays in Releasing Drug Results*, N.Y. Times, April 1, 2008, at C7 (reporting a lead investigator's accusations against his study's commercial sponsors of deliberately delaying the release of his trial results, which reflected substantially negatively for the sponsor's drug, for two years "to hide something.").

### 3. Drug Maker Sponsored CME Courses Using Paid "Thought Leaders."

55.    Another key source of drug information for doctors is continuing medical education ("CME") courses, usually medical lectures held locally featuring prominent "thought leaders" as speakers. Required to maintain medical licenses and to stay current with new developments to give patients the best medical care, many CME courses provide expert syntheses of clinical trial information.

56.    CMEs that are commercially funded have increased sharply, from forty-eight percent in 1998 to fifty-eight percent in 2002. Sixty percent of CMEs have direct commercial sponsorship; indirect sponsorship (e.g., via non-profits funded by company money) accounts for a large portion of the remainder. Total industry contributions towards continuing medical education is estimated to be seventy percent or higher and in the hundreds of millions of dollars.

57.    Studies have shown that commercial sponsorship does result in biased CMEs. Drug company-sponsored lectures are two-and-a-half to three times more likely to mention the sponsor's drug in a positive light and the competitors' drugs in a neutral or negative light than are non-commercially sponsored lectures. Increased formulary requests, the prescribing of new brand-name drugs instead of older generic products, and the prescribing of the specific product

Filed Under Seal
129894.00601/35873664v.4

promoted have all been demonstrated to increase after exposure to pharmaceutical promotion and company-sponsored CMEs.

58.     Pfizer and other drug makers employ recognized clinical experts, well-known and respected in their field and referred to as "thought leaders" or "key opinion leaders," to join company "speakers bureaus" and conduct CMEs and product promotional programs in exchange for often significant lecture fees.  One recent study indicates that at least twenty-five percent of all doctors in the United States (approximately 200,000 physicians) receive drug money for lecturing to physicians or for helping to market the drugs in other ways.  Daniel Carlat, *Dr. Drug Rep*, N.Y. Times Mag., at 67; *see also* Gina Kolata, *Citing Ethics, Some Doctors Are Rejecting Industry Pay*, N.Y. Times, April 15, 2008 (reporting that a small number of prominent academic scientists have decided to stop accepting payments from food, drug and medical device companies in response to accusations of ethical conflicts inherent in these arrangements).  In many of these presentations, the slides used have been "created by drug makers, not the speakers.  That's like ghost-talking." Gardiner Harris, *Group Urges Ban on Medical Giveaways*, N.Y. Times, April 28, 2008 ("Speakers' bureaus and drug samples are pillars of the industry's marketing operations").

59.     Paying lucrative speaker fees is a key part of Pfizer's marketing of Geodon® to psychiatrists.  As a group, psychiatrists earn less in base salary than any other medical specialists.  Benedict Carey and Gardiner Harris, *Psychiatric Group Faces Scrutiny Over Drug Industry Ties*, New York Times, July 12, 2008.  In 2007, for example, median compensation for psychiatrists was $198,653, less than half of the $464,420 earned by diagnostic radiologists and barely more than the $190,547 earned by doctors practicing internal medicine.  But many psychiatrists supplement this income with consulting arrangements with drug makers, traveling

the country to give dinner talks about drugs to other doctors for fees generally ranging from $750 to $3,500 per event, for instance.    While data on industry consulting arrangements are sparse, state officials in Vermont reported that in the 2007 fiscal year, drug makers gave more money to psychiatrists than to doctors in any other specialty. *Id.*  Eleven psychiatrists in the state received an average of $56,944 each.

### 4.    Drug Maker Sponsored Journal Articles to Promote Drug Products.

60.    Clinical trials are published via research and review articles in medical journals. Doctors value keeping up-to-date with medical literature, as journal articles are their primary source of best practices and current developments.  Research articles describe individual primary clinical trials; review articles summarize results from multiple trials on the same subject.  Both are subject to systemic industry bias.

61.    Because of the increase in commercially-funded trials, the number of commercially funded journal publications has likewise dramatically increased. Today, two-thirds to three quarters of trials published in the four most respected medical journals are commercially funded.  Several editors of preeminent medical journals have gone so far as to say that their publications have devolved into information-laundering operations for the pharmaceutical industry.

62.    Drug makers also advertise their drug products through articles and "supplements" which are published in medical journals often as an addition to an issue.  These supplements are typically not peer-reviewed, and offer drug makers another venue to market drug products beyond their approved labeling.  These supplements are frequently prepared in conjunction with a CME set up for the drug maker by a Medical Education and

Filed Under Seal
129894.00601/35873664v.4

Communication Company ("MECC") to present information that appears to be—but in actuality is not—free from drug maker influence.

63.     MECCs are typically for-profit businesses that receive money from pharmaceutical companies to develop educational programs favorable to the product. Typically, these programs are offered live and/or telephonically. Physician attendees used these educational programs to obtain CME credits, which are a requirement of all medical subspecialties. Drug makers use MECC programs discussing the disease states relevant to their products, presenting information that appeared less promotional than that offered through FDA-regulated promotional talks.

64.     FDA-regulated promotional talks must comply with the approval data of the product. Programs offered by MECCs often present new information about a product, typically representative of off-label (non-FDA approved) use of the product. Key opinion leader ("KOL") experts like Defendant Dr. Kaye presented these programs. Therefore, the information appeared to be purely educational and from a trusted source, when in fact it is simply a well-disguised marketing message for the drug product.

65.     On April 25, 2007, the Senate Finance Committee released the results of a Committee inquiry into drug company grants to fund continuing education for medical providers. The Committee found that "drug companies have used educational grants as a way to increase the market for their products in recent years. This practice is of particular concern when the companies use educational grants to encourage physicians to prescribe products for uses beyond their FDA approval." *See* Use Of Educational Grants By Pharmaceutical Manufacturers, Committee Staff Report To The Chairman And Ranking Member, 110th Cong., Sen. Prt., 110-121, April 2007. The report found that drug company corporate policies "allow

Filed Under Seal
129894.00601/35873664v.4

Filed Under Seal
129894.00601/35873664v.4

this industry to walk a fine line between violating rules prohibiting off-label promotion and awarding grant money in a manner likely to increase sales of their products, including sales for off-label uses." According to the Committee, risks exist for kickbacks, veiled advertising of drugs, efforts to bias clinical protocols, and off label promotion.

66.    On July 3, 2008, Pfizer announced that it would no longer directly fund medical education and communication companies (MECCs).  Pfizer is making this move, in part, because of the widespread perception among the healthcare community and the public that MECCs blur the line between education and promotion. *See Pfizer Cuts Off Funding for Medical Education Companies*, Medical Meetings, July 2, 2008.  Pfizer will, however, continue to *indirectly* fund MECCs, as long as the grant money goes first to a medical society or medical center.

### 5.    Dr. Kaye's Off-Label Journal Articles Touting Geodon®.

67.    Pfizer regularly used "key opinion leaders" like Defendant Dr. Kaye to promote off-label uses of Geodon® in journal articles.  One such presentation sponsored by a MECC is Dr. Kaye's article "A Primary Care Approach to Bipolar Disorder," in the Johns Hopkins Advanced Studies in Medicine, Vol. 6A, June 2006.  This article is not peer-reviewed, and purports to publish "proceedings" presented at a drug manufacturer-sponsored CME round table symposium in Baltimore, Maryland held on November 12, 2005.  Dr. Kaye's disclosure for this article states he is a consultant to various drug makers, including Pfizer, and that he receives honoraria from drug makers, including Pfizer.  In his paper, among his other off-label statements, Dr. Kaye argues that Geodon® should be dosed off-label as high as 240 mg to 320 mg per day for acute mania, and includes a "sidebar" discussing "thoughts on off-label use of prescription drugs," including the following quote from the CATIE study:  "The dose range

approved by the FDA for quetiapine and ziprasidone [Geodon®] may be below their optimal therapeutic doses . . . ." *Id.* at S452.

68.    Yet another paper co-authored by Dr. Kaye, *Challenges in Recognition, Clinical Management, and Treatment of Bipolar Disorder at the Interface of Psychiatric Medicine and Primary Care*, was published as a supplement in Current Psychiatry, 2007, which has a readership of over 40,000 psychiatrists, residents, and advanced practice nurses. This supplement was sponsored by a MECC, Health and Wellness Partners, and is "a supported educational activity by Pfizer, Inc." In addition, the supplement discloses in the fine print that the authors received an honorarium from Pfizer, and that it was ghost-written by someone at Health and Wellness Partners.

**6.    Pfizer and Other Drug Maker Funding of NAMI.**

69.    Among the strategies intentionally designed to obscure the actual sources and amounts of funding for promotional activities, drug manufacturers have developed relationships with front organizations—industry-funded grassroots, consumer advocacy, research, and educational organizations whose primary goal is to promote marketing, influence regulations, or advance other industry interests.

70.    NAMI is a national association of mental health organizations in every state and bills itself as "the nation's largest grassroots mental health organization dedicated to improving the lives of persons living with serious mental illness and their families."

71.    NAMI's 2000 Form 990 (the last year NAMI listed its contributors) states that it has a supporting organization, the NAMI Anti-Stigma Foundation ("NASF"), which for the year ended June 30, 2000, provided it with financial support in the form of "undesignated grants and funding for specific programs and programs" totaling $2,698,602. Pfizer is listed as

23

one of the ten drug makers who contributed to NASF. NASF has been renamed the Mind of America Foundation.

72.   According to NAMI, because some of its sponsors "may have a vested interest in NAMI decision-making," it adopted certain "safeguards to ensure there is no such influence." In reality, this not-for profit organization readily accepts donations offered by pharmaceutical manufacturers while "cooperat[ing] with these entities to 'grow the market' by making persons aware of the issues ... by bringing into treatment persons who are not being served, and by helping persons to adhere to their treatment plans."

73.   NAMI has been a key recipient of drug company generosity. Drug firms gave NAMI a total of $11.72 million between 1996 and mid-1999. These include Janssen ($2.08 million), Novartis ($1.87 million), Pfizer ($1.3 million), Abbott Laboratories ($1.24 million), Wyeth-Ayerst Pharmaceuticals ($658,000), and Bristol-Myers Squibb ($613,505). *See* Ken Silverstein, *An Influential Mental Health Nonprofit Finds Its 'Grassroots' Watered By Pharmaceutical Millions,* Mother Jones, November/December 1999.

74.   In 2002 and 2003, NAMI accepted over $4 million each year in corporate donations from the pharmaceutical industry. Alison Bass, Side Effects: A Prosecutor, A Whistleblower and A Bestselling Antidepressant on Trial (2008) at 131.

75.   During the time he was president of NAMI, James McNulty received thousands of dollars for regularly speaking on behalf of Pfizer and other drug makers at various company-sponsored events.  In an arrangement ethicists say is highly irregular, McNulty would process the "grants" through NAMI Rhode Island.  In order to reduce paperwork, according to McNulty, the drug maker would then give NAMI Rhode Island a check and NAMI Rhode Island would in turn give McNulty a check.  At no time did McNulty disclose to the audiences

**Filed Under Seal**
129894.00601/35873664v.4

at his various speaking engagements, or to NAMI's membership, that he was being paid to speak by drug makers. According to medical ethicist and Tufts University professor, Sheldon Krimsky: "Here is someone who's acting as a citizen advocate, and he's getting paid by the pharmaceutical companies and not disclosing it. Most people would question whether he's truly a citizen advocate after that." *Id.*

76.   McNulty's relationship with Pfizer was particularly cozy. On October 2, 2002, he attended a Pfizer presentation, and was quoted in a Pfizer press release as talking up the drug industry: "For people with brain disorders, such as mental illness, patient care has been revolutionized by new generations of pharmaceutical therapies. The scientific possibilities for breakthroughs are exciting. But it is also clear that medical progress depends upon public policy that encourages high-risk investment."

77.   NAMI's 2007 Annual Report lists Pfizer as one of thirteen pharmaceutical company "corporate partners." *See* http://www.nami.org/Content/NavigationMenu/ InformYourself/About_NAMI/Annual_Reports/2007NAMIannualReport.pdf (last checked on July 26, 2008). NAMI continues to receive millions of dollars from drug makers, but its annual reports no longer break out the amount of money given by its corporate partners.

### 7.   NAMI's Off Label Promotion of Geodon®.

78.   For its part, NAMI has been outspoken in its support of SGAs, including Geodon®. Laurie Flynn, former executive director of the NAMI, even went so far as to claim that with the advent of atypical antipsychotic medicines "the long-term disability of schizophrenia can come to an end."

79.   Pfizer became one of the largest contributors among pharmaceutical manufacturers to NAMI, turning Defendant NAMI into a Trojan Horse for the illegal marketing scheme to promote Geodon®. As but one example, NAMI's website unabashedly

goes so far as to promote the off-label use of Geodon® in children and the elderly, as well as for long-term use in the treatment of bipolar disease, a potential violation of NAMI's stated policy against endorsing any drug product:

> While not approved by the FDA for other uses, ziprasidone may be used alone or with other medications to treat other symptoms such as agitation or other behavior problems in older persons with memory loss or people with developmental disabilities, children with mental illnesses like schizophrenia or bipolar disorder, or depression. It may also be used for long-term management of bipolar disorder.

*See* http://www.nami.org/Content/ContentGroups/Helpline1/Geodon®(ziprasidone).htm (last checked on July 21, 2008).

80.    Likewise, when the CATIE trial was published in 2005, the results of which suggested that Geodon® and the other SGAs were no better than the older antipsychotic drugs (only a lot more expensive), NAMI came to Pfizer's and the other drug makers' defense. From the minute CATIE's results were announced, NAMI defended its favorite drugs: the most profitable ones. NAMI responded to CATIE in predictable fashion, blaming the study's unexpected results on patients who participated in the study. NAMI's then Medical Director, Ken Duckworth, spun the CATIE results:

> General findings cannot be substituted for specific choices made in treating individuals with schizophrenia. One size does not fit all. It is critical that the study's limitations be recognized...

### 8.    Drug Maker Influence and the Exploding Off-Label Use of SGAs in Children and Adolescents.

81.    Off-label use of SGAs among children and adolescents has exploded despite little research into the long terms effects on children's brains. Doctors under the influence of pharmaceutical company propaganda and financial "incentives" to prescribe these drugs are putting children's lives at risk by prescribing these highly toxic drugs. Dr. Ronald Brown, who

Filed Under Seal
129894.00601/35873664v.4

Filed Under Seal
129894.00601/35873664v.4

headed an American Psychological Association committee that evaluated the issue, put it succinctly: "The bottom line is that the use of psychiatric medications far exceeds the evidence of safety and effectiveness."

82.    There was a 40-fold increase over nine years in the number of children diagnosed with bipolar disorder, fueling an explosion in the use of antipsychotic meds made by Pfizer and other drug makers. *See* C. Moreno, et al., "National Trends in the Outpatient Diagnosis and Treatment of Bipolar Disorder in Youth," Archives of General Psychiatry, Vol. 64(9): 1032-1039, September 2007.  The number of scripts written for children doubled to 4.4 million between 2003 and 2006.  The expanded use of bipolar disorder as a pediatric diagnosis has made children the fastest-growing part of the $11.5 billion US market for antipsychotic drugs.  The study noted that the number of children diagnosed with bipolar disorder during outpatient visits to doctors skyrocketed to 800,000 in 2003 from 20,000 in 1994.  The numbers have continued to climb even amid reports that more physicians are influenced to prescribe off-label by drug company inducements.

83.    In 2005 alone, 251,000 Geodon® scripts were written for children in the United States, up from 89,000 in 2003, according to data from Wolters Kluwer.  All of these prescriptions are off-label.

84.    A recent report by the University of South Florida found the most common diagnosis for antipsychotic treatment for children in Florida's Medicaid program between July and December 2005 was for ADHD.  Fifty-four percent involved children 5 years of age and younger, while forty-nine percent involved kids between ages 6 and 12.  *See* Robert Farley, *The 'atypical' dilemma Skyrocketing numbers of kids are prescribed powerful antipsychotic drugs. Is it safe? Nobody knows*, St. Petersburg Times, July 29, 2007.  According to the study,

27

the Florida Medicaid bill for these drugs jumped from $9 million in 1999 to nearly $30 million in 2006. Florida Medicaid records show the number of children - some just months old - who were prescribed SGAs went from 9,364 in 1999 to 18,137 in 2006.

85.    A New York Times analysis of records from Minnesota, the only state that requires public reports of all drug company marketing payments to doctors, documents how financial relationships between doctors and drug makers correspond to the growing use of atypicals in children. Gardiner Harris, Benedict Carey and Janet Roberts, *Psychiatrists, Children and Drug Industry's Role*, N.Y. Times, May 10, 2007. From 2000 to 2005, drug maker payments to Minnesota psychiatrists rose more than six fold, to $1.6 million while prescriptions of antipsychotics for children in Minnesota's Medicaid program rose more than nine fold.

86.    In 2006, Dr. Arnold Mech, a psychiatrist in Plano, Texas, diagnosed 13-year-old Brian Sherry with bipolar, obsessive-compulsive, social anxiety, generalized anxiety and attention-deficit hyperactivity disorders. *See* Rob Walters, *J&J, Pfizer Profit on 'Juvenile Bipolar Juggernaut'*, Bloomberg.com, http://www.bloomberg.com/apps/news?pid= 20601109&sid=aBYgkHznuux0&refer=home. Dr. Mech prescribed Geodon® and the Pfizer antidepressant Zoloft®, along with Lilly's Strattera®, a stimulant. To counteract the sedating effect of Geodon®, he added Cephalon's Provigil®, a drug that promotes wakefulness. Over the next seven months, Brian had only fleeting relief from anxious, angry moods and rages. The drugs made him so tired he could barely function.

87.    Dr. Mech was a paid participating physician in a pediatric study of Geodon® on behalf of Pfizer and has done research sponsored by eleven (11) other drug companies and has

served on the advisory boards or speakers' bureaus of eighteen (18) drug and medical device makers.

88.    According to Dr. Steven E. Hyman, the provost of Harvard University and former director of the National Institute of Mental Health, the influence of drug maker money on the growing use of atypicals in children is most troubling: "There's an irony that psychiatrists ask patients to have insights into themselves, but we don't connect the wires in our own lives about how money is affecting our profession and putting our patients at risk." *Id.*

## 9.    Burgeoning Off-Label Use of SGAs to Treat Dementia.

89.    Nearly 1.7 million elderly and disabled Americans live in 17,000 nursing home facilities across the country. Combined Medicare and Medicaid payments for nursing home services total an estimated $70 billion annually.  In 2005, the most recent year for which total expenditure figures are available, Medicaid spent $5.4 billion on atypical antipsychotic drugs, or 13.7 percent of all Medicaid expenditures on prescription drugs.

90.    The off-label use of SGAs to tamp down the agitation, combative behavior and outbursts of dementia patients has soared, especially in the elderly. Part of this increase can be traced to prescriptions in nursing homes.  Laurie Tarkan, *Doctors Say Medication Is Overused in Dementia*, N.Y. Times, June 24, 2008.  Researchers estimate that as much as 30 percent of all nursing home patients have been given antipsychotic drugs, particularly SGAs.  *Id.*

91.    According to CMS, nearly twenty-one percent of nursing-home patients who do not have a psychosis diagnosis are on antipsychotic drugs. *See* Lucette Lagnado, *Prescription Abuse Seen In U.S. Nursing Homes: Powerful Antipsychotics Used to Subdue Elderly: Huge Medicaid Expense*, Wall Street Journal, December 4, 2007; Page A1.

92.    There is little evidence supporting the off-label use of SGAs to treat dementia.  A 2006 study of Alzheimer's patients found that for most patients antipsychotics provided no

Filed Under Seal
129894.00601/35873664v.4

significant improvement over placebos in treating aggression and delusions. *Id.* In 2005, the Food and Drug Administration ordered that the SGAs (including Geodon®) carry a "black box" label warning of an increased risk of death.

### 10. Funding State Medicaid Adoption of Algorithms to Make Geodon® First Line Treatment.

93.    One way drug companies have marketed their products is by funding the implementation of guidelines, or algorithms – decision trees that spell out which drugs should be used for different psychiatric conditions, much as other health care algorithms guide the treatment of diabetes or heart disease.

94.    The Texas Medication Algorithm Project ("TMAP") is a particularly controversial algorithm project. It was rolled out in 1997, and provided a set of psychiatric management guidelines for doctors treating certain mental disorders within Texas' publicly-funded mental health care system, along with manuals relating to each of them.

95.    TMAP was designed to create overwhelming use of SGAs by producing a set of treatment algorithms approved as first and second line treatments for schizophrenia, bipolar disorder, and depression. The guidelines TMAP developed mandated the use of the most expensive antipsychotics on the market, the SGAs, by physicians treating Texas Medicaid patients.

96.    The choice of SGAs as first line treatment by the TMAP was not accidental. The initial creation of the TMAP guidelines was underwritten by state funds, along with grants from foundations and gifts from pharmaceutical companies who marketed (or in the case of Pfizer, were seeking approval to market) SGAs. All totaled, the drug companies contributed $1.3 million to TMAP from 1997 to July 2004, at least $834,000 of which was earmarked for TMAP. Pfizer contributed at least $146,500 for TMAP.

**Filed Under Seal**
1298941.00601/35873664v.4

97.   The original TMAP recommendations, made for adults, were extended unchanged to become recommendations for medicating children - with the same drugs - as TCMAP or Texas Children's Medication Algorithm Project. No studies and no research were performed. The original TMAP "experts" simply met and agreed that it would be a good idea to treat children with the same drugs as adults.

98.   At the time of the original TMAP, Geodon® was not included because it had not yet received approval from the FDA to be marketed.   However, at the Schizophrenia Algorithm Update Conference held in January 2002, the expert panel (many of whom were receiving undisclosed monies as speakers, researchers and consultants for drug makers, including Pfizer) decided to include Geodon® (ziprasidone) as a first-line medication in the TMAP antipsychotic algorithm.

99.   Once TMAP produced the result that was intended (SGAs as first line treatment for both on-label and off-label promotion), Pfizer and other drug makers provided major funding to export the TMAP results to other states.   Pfizer and the other drug makers sponsored TMAP staff through unrestricted educational grants as they provided 71 presentations for groups of clinical providers, professional groups, administrators, payors, Medicaid officials, and other stakeholders in order to drum up interest in similar algorithms in other states.

100.   In so doing, Pfizer and the other drug makers bypassed governmental safeguards and scientific review by promoting TMAP and the related child and adolescent algorithms as treatment models developed by a panel of "experts."   Pfizer and the other drug makers relied upon paid consultants on their expert consensus panels to approve adoption of TMAP-like programs in states throughout the country.

Filed Under Seal
129894.00601/35873664v.4

101.  NAMI was one of the key participants in the TMAP process, including the addition of Geodon® to the list of first line SGAs in the treatment algorithm.

102.  Pfizer regularly used the TMAP algorithms in its marketing, and experienced a significant increase in prescriptions and sales of Geodon® throughout Texas and nationwide as a result of TMAP and TMAP-like treatment algorithms encouraging SGAs as first line therapy.

103.  In November 2007, TMAP issued a revised consensus judgment by leading experts suggesting that there is no advantage for chronic schizophrenics of SGAs over FGAs— reversing its earlier judgment on the basis of CATIE and other studies.

C.     **THE LIMITED ROLE OF THE FDA IN REGULATING OFF-LABEL PROMOTION OF DRUGS.**

1.     **New Drug Approvals By the FDA.**

104.  Under the Food, Drug, and Cosmetics Act ("FDCA"), new pharmaceutical drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the satisfaction of the Food and Drug Administration ("FDA") that the drug is safe and effective for each of its intended uses. 21 U.S.C. §§ 355(a), (d). A drug receives FDA approval only for treatment of specified conditions, referred to as "indications." 21 U.S.C. §§ 352, 355(d). For each indication sought a manufacturer must provide condition-specific safety and efficacy information. *Id.* The FDA also determines the particular dosage (or range of dosages) considered safe and effective for each indication.

105.  To determine whether a drug is "safe and effective," the FDA relies on information provided by a drug's manufacturer; it does not conduct any substantial analysis or studies itself. Applications for FDA approval (known as New Drug Applications or "NDAs") must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether or not such drug is effective in use." 21 U.S.C. § 355

(b)(1)(A). FDA approval of prescription drugs is wholly dependent upon the accuracy of information provided by drug manufacturers. *See generally* Wayne A. Ray & Michael Stein, *Reform of Drug Regulation—Beyond an Independent Drug-Safety Board*, 354(2) NEJM 194 (Jan. 12, 2006).

106.   FDA approval does not require that a new drug be more effective or safer than other drugs approved to treat the same condition. Neither does it require that the drug be cost-effective.  A drug must only be shown to be more effective than a placebo in treating a particular condition, without any statistically significant safety findings.  Comparative data showing performance as compared to existing drugs is not required; the FDA has no basis for determining that one drug is better than another drug.

107.   Because short-term studies are accepted, drug applications often do not contain long term data on the safety or efficacy of the drug. Approval of a new drug generally contains a requirement that the manufacturers pursue further long-term studies, but two thirds of the promised studies never materialize and the FDA lacks any enforcement authority to require the manufacturer to complete these studies.  Many of the effects of newly-approved drugs could not possibly be known at the time of FDA approval, particularly the long-term effects of taking a medication, given the short length of and relatively few participants in the clinical trials conducted for approval. *See AP Analysis: How a Drug's Risks Emerge*, N.Y. Times, May 23, 2007. There is no systematic provision requiring drug companies to conduct—or provide results from—post-marketing studies.

108.   The FDA often finds itself in a quandary: "Safety and speed are the yin and yang of drug regulation. Patients want immediate access to breakthrough medicines but also want to believe the drugs are safe. These goals can be incompatible." Gardiner Harris, *Potentially*

*Incompatible Goals at F.D.A.: Critics Say a Push to Approve Drugs Is Compromising Safety,*
N.Y. Times, June 11, 2007, at A14.

109. The drug's label, included as a printed insert in the drug's packaging, must also be approved by the FDA as part of the original New Drug Application ("NDA"). The approved indications and respective dosage information appear on the package insert ("the label"), 21 U.S.C. §§ 352, 355(d). Labels are the primary means of providing prescribing physicians and their patients with important information on a drug's risks and benefits.

### 2. FDA Regulation After Approval.

110. After a drug is approved, the FDA continues to exercise control over the product labeling. To protect patients from safety concerns, the FDA may require a label change to reflect the increased risk of various side effects or interactions, restrict a drug's indications, or, in extreme cases, force a withdrawal from the market. *See* 21 C.F.R. § 201.57(3).

111. FDA regulations restrict how drug companies may market and promote approved drugs. *See* 21 U.S.C. §§ 331, 352; 21 C.F.R. § 314.81. Drug labels—"labels" includes all marketing and promotional materials relating to the drug—may not describe intended uses for the drug that have not been approved by the FDA. 21 U.S.C. §§ 331, 352. Illegal "misbranding" can result in criminal penalties. *See* § 333.

112. The same general requirements about the promotion of prescription drugs apply to both professional and consumer-oriented marketing. In particular, promotional materials may only make claims that are supported by "substantial" scientific evidence (according to strict scientific procedures) and they may not be false or misleading. FDA oversight helps ensure a "fair balance" in all promotional claims and materials. Federal regulations require that the risks as well as the benefits must be clearly identified and given appropriate prominence.

Promotional materials must be consistent with the FDA-approved product labeling. This

34

Filed Under Seal
129894.00601/35873664v.4

restriction pertains to the clinical indications for which the drug has been approved as well as the dosing regimen that is supported by the clinical trials that were undertaken to establish safety and efficacy.

113.  A manufacturer like Pfizer, wishing to market or otherwise promote an approved drug for uses other than those listed on the approved label, must resubmit the drug for a series of clinical trials similar to those required for the initial FDA approval. *See* Food and Drug Administration Modernization Act of 1997 ("FDMA"), 21 U.S.C. §§ 360aaa(b), (c); *see also* 21 C.F.R. § 314.54 (outlining the administrative procedure for filing an application for a new indication); 21 U.S.C. §§ 301 *et seq*. A supplemental NDA must be filed. Unless and until an additional indication is approved by the FDA, the unapproved use is considered to be "off-label."

114.  Off-label information can only be distributed at the request of a health care provider. 21 U.S.C. §§ 360aaa-366.

### 3.     DDMAC's Limited Ability to Regulate Drug Maker Marketing and Promotion.

115.  The FDA's Division of Drug Marketing, Advertising and Communications ("DDMAC") is charged with overseeing the marketing and promotion of approved drugs to ensure that advertisements are not false or misleading, provide a fair balance between the benefits and risks of the drug, and do not include off-label uses. *See* Statement by Janet Woodcock, M.D. (Director Center for Drug Evaluation and Research, FDA) Before the Senate Special Committee on Aging.

116.  DDMAC's effectiveness in regulating off-label promotion is limited. In 2003, the entire staff consisted of forty members, with twenty-five reviewers responsible for reviewing all drug advertisements and promotional materials. Moreover, drug materials do not have to be

pre-approved. FDA review of promotional materials occurs, if it does at all, after the materials have already appeared in public. Woodcock Statement, *supra*. Upon finding a violation, DDMAC generally requests, but does not require, the company to stop using the promotional materials. *Id.* Sponsors occasionally are required to publicly correct product misimpressions created by false, misleading, or unbalanced materials. *Id.*

117. Once a drug has been approved, the FDA's statutory authority is limited to requesting label changes, negotiating restrictions on distribution with the manufacturer, and petitioning for the withdrawal of the drug from the marketplace. Title 21 of the Code of Federal Regulations requires that "as soon as there is reasonable evidence of a serious hazard with a drug," the "Warnings" section of the label should be revised to reflect this hazard.

118. FDA's ineffectiveness in policing off-label promotion was confirmed in a July 28, 2008 U.S. General Accountability Office Report, which found that the FDA took an average of seven (7) months to issue letters in response to off-label promotions. *See Drugs: FDA's Oversight of the Promotion of Drugs for Off-Label Uses* (GAO 08-835),

http://www.gao.gov/new.items/d08835.pdf.

119. Among the Report's findings: (1) FDA does not have separate oversight activities to specifically capture off-label promotion; (2) FDA is unable to review all promotional submissions because of the volume of materials it receives and prioritizes its reviews in order to examine those with the greatest potential impact on human health; (3) FDA is hampered by the lack of a system that consistently tracks the receipt and review of submitted materials; (4) FDA conducts limited monitoring and surveillance to identify violations that would not be identified through its review of submitted material—for instance, discussions between doctors and sales representatives; (5) during calendar years 2003 through 2007, FDA issued 42

36

regulatory letters in response to off-label promotions requesting drug companies to stop dissemination of violative promotions.

120.   Pfizer is among the companies cited in the GAO Report, cited for the July 20, 2005 Zyvox® Warning Letter, which had been approved only for treatment of nosocomial pneumonia and specific skin infections.  Despite the limited indication, Pfizer was warned that it was improperly marketing Zyvox® for treatment of all infections caused by staphylococcus infections.

### 4.      Use of an Approved Drug Beyond Its Labeling Is Off-Label.

121.   Any use of an approved drug for a purpose other than those indicated in the labeling is considered to be "off-label." *See* David C. Radley, *Off-Label Prescribing Among Office-Based Physicians*, 166 Archives of Internal Medicine 1021 (May 8, 2006). Physicians may prescribe drugs for off-label uses at their discretion. It is generally agreed that off-label prescribing can benefit both individual patients and patient populations as clinical experience leads to the formation of hypotheses to be tested in structured clinical trials.  The FDA does regulate, however, off-label promotion by drug manufacturers.

122.   Off-label uses of approved medications have not been subjected to the baseline FDA scrutiny that approved uses have been, and are thus riskier.  The lack of an indication in the label should not be an issue, however, in the physician's managing of patients and prescribing a medication "off-label."  Physicians and the community recognize that many drugs effective for a condition may not be labeled for that condition and may not have a strong body of evidence for or against their use.

123.   When considering off-label prescribing, physicians depend on the patient-specific evidence they have available to them. This includes the particular patient, the severity of his

37

Case 1:09-cv-11480-DPW   Document 1-2   Filed 09/08/09   Page 45 of 67

problems, the successfulness of prior treatment, and the risks of not treating. Whether contemplating on- or off-label use, physicians also rely on personal experience, recommendations from colleagues and academics, educational seminars, and clinical trials evidence. Much of what physicians rely on is information (or, as the case may be, misinformation) provided by sales representatives from drug makers, drug company sponsored CMEs and speaker programs, and drug company sponsored clinical trials.

**D.** **GEODON® FDA APPROVAL ONLY FOR LIMITED INDICATION AS AN ATYPICAL ANTIPSYCHOTIC TO TREAT SCHIZOPHRENIA.**

**1.** **1998: FDA Refuses to Approve Geodon®.**

124.  Pfizer first submitted Geodon® for approval to the FDA in March 1997. At the time, the FDA refused to approve Geodon® because of concerns it did not offer sufficient new benefits for patients with schizophrenia to outweigh its potential for serious, potentially fatal side effects.

125.  According to the FDA's "not approvable" letter, dated June 17, 1998, the agency was concerned that Geodon® lengthened a particular period of the cardiac cycle during which the heart is resetting its electrolytes, sodium, potassium, and calcium, making it more vulnerable to rhythm disturbances ("the QT/QTc interval"). The effect is common to antipsychotic medications; however, the delay seen in clinical trials was longer for Geodon® than other then marketed antipsychotic agents.

126.  In 1998, FDA noted that there was no evidence of any superior antipsychotic efficacy for Geodon® compared with any other antipsychotic drugs, either in typical schizophrenic patients or in those shown refractory to standard antipsychotic therapy.

38

127. Pfizer responded to the FDA's rejection of its application by conducting further clinical trials, pitting Geodon® against other leading "atypical" antipsychotic medications, haloperidol, olanzapine, risperidone, and quetiapine. The cardiac effects of each of the drugs were measured and monitored at optimum doses. Each drug was then compared with thioridazine, the older antipsychotic known to exhibit the strongest cardiac effect, and designated by FDA as a second-line drug due to its strong potential for cardiac arrhythmias.

128. The Pfizer study revealed that the prolonging cardiac effect interval for Geodon® was longer than the four comparison atypical antipsychotics, but was shorter than that seen with thioridazine. As a result, the FDA's eventual approval only gave approved labeling of Geodon® and included extensive language warning of the potential for Geodon® to cause cardiac arrhythmias. In fact, the label's "Indications" section included the following wording:

> When deciding among the alternative treatments available for this condition [schizophrenia], the prescriber should consider the finding of ziprasidone's greater capacity to prolong the QT/QTc interval compared with several other antipsychotic drugs.

129. In addition to prolonging the QTc interval, the Pfizer study demonstrated that Geodon® exhibited other potential side effects common to the other atypical antipsychotic agents. In clinical trials, for example, the most commonly reported emergent adverse events were somnolence (14 percent), extrapyramidal syndrome (5 percent), and "respiratory disorder"—described as "cold symptoms and upper respiratory infection"—(5 percent). Other reported side effects included nausea, dry mouth, constipation, and dyspepsia.

130. In its presentation to the FDA Center For Drug Evaluation And Research Psychopharmacologic Drugs Advisory Committee ("FDA Drug Advisory Committee") meeting on July 19, 2000, Pfizer explained why the FDA should approve Geodon®. Among the representations made by Pfizer was the following statement by Edmund P. Harrigan, M.D.,

Filed Under Seal
129894.00601/35873664v.4

Pfizer Global Research and Development, Executive Director, CNS Therapeutics, concerning the appropriate dosing for Geodon® (then being referred to as "Zeldox") should be no more than 160 mg per day:

> One word about dose. I'll be stating total daily dose, which the label would recommend be divided into two equal doses and taken with meals, as was done in nearly all ziprasidone clinical trials. First, a summary graphic of the treatment effects in the short-term studies. This figure illustrates the placebo-corrected change from baseline with 95 percent confidence intervals for each fixed-dose treatment group studied in these trials. It is proposed that the 40 milligram daily dose is insufficient to treat acute exacerbation. Efficacy has clearly been demonstrated at daily doses of 80 to 160 milligrams. The 200 milligram per day dose appeared to offer no advantage in terms of efficacy. It was associated with increased adverse events. So the recommended effective dose range is 80 to 160 milligrams daily.

131.   Also present at the hearing before the FDA Drug Advisory Committee speaking in favor of the FDA approval of Geodon® were NAMI representatives, including Jacqueline Shannon, then NAMI President, and Rex Cowdry, M.D., then NAMI Medical Director. The NAMI representatives were the only public witnesses to testify at the FDA Advisory Committee meeting.

132.   On July 19, 2000, the FDA Drug Advisory Committee issued a report stating that it had reviewed the Pfizer study and concluded: "We are . . . in general agreement with Pfizer on the antipsychotic efficacy of ziprasidone based on the short-term, fixed dose, placebo-controlled phase 2/3 studies. Of note, however, we are not aware of any evidence from these or any other studies of any superior antipsychotic efficacy for ziprasidone compared to any other antipsychotic drugs, either in typical schizophrenic patients or in those shown refractory to standard antipsychotic therapy."

Case 1:09-cv-11480-DPW   Document 1-2   Filed 09/08/09   Page 48 of 67

2.  **February 5, 2001: FDA Approves Geodon®.**

133.  In the eventual approval letter for Geodon® dated February 5, 2001 for 20, 40, 60, and 80 mg capsules, 160 mg BID, the FDA required Pfizer to complete post-marketing clinical studies including a dose response study for the drug's effect on the QTc interval, a study of sudden unexpected death with Geodon® and other atypical antipsychotics, and further studies to demonstrate possible advantages for Geodon® over other currently marketed antipsychotic medications.  In addition, the FDA required Pfizer to submit three copies of the introductory promotional materials for Geodon® to the DDMAC.

134.  Despite extensive studies in adults by Pfizer in order to garner FDA approval for Geodon®, no studies were completed by Pfizer in children although FDA regulations required all applications for new active ingredients, new dosage forms, new indications, or new dosage regimens to contain an assessment of the safety and effectiveness of the product in pediatric patients.  The FDA, in its approval letter for Geodon®, granted a waiver of the pediatric requirement pending the collection and review of additional safety data.  Pfizer has never applied to the FDA for pediatric use.

3.  **September 19, 2005:  CATIE Study Shows SGAs No More Effective Than FGAs.**

135.  On September 19, 2005, the results of the most comprehensive comparative study ever conducted – *i.e.*, the National Institute of Mental Health ("NIMH") Clinical Antipsychotic Trials of Intervention Effectiveness (the so-called "CATIE" study) –- were published in the New England Journal of Medicine, finding that SGAs like Geodon® were no more effective and no safer in the treatment of schizophrenia than an older, cheaper drug that has been largely discontinued.  *See* Vedantam, *New Antipsychotic Drugs Criticized: Federal Study Finds No Benefit Over Older, Cheaper Drug*, Washington Post, September 20, 2005, A01.

Filed Under Seal
129894.00601/35873664v.4

Case 1:09-cv-11480-DPW   Document 1-2   Filed 09/08/09   Page 49 of 67

136.   Older antipsychotics are known to cause involuntary muscle movements, and the newer drugs were heralded for not causing that problem. Jeffrey Lieberman, lead author of the CATIE study, noted that earlier comparisons with older drugs, largely funded by drug manufacturers, had mostly used a highly potent drug called Haldol®, whereas the CATIE study did not find the same degree of movement problems with perphenazine, a less potent drug.

## E.    PFIZER MISLEADS THE PUBLIC, HEALTHCARE PROVIDERS, AND THE FDA ABOUT GEODON®.

137.   Pfizer has engaged in a deliberate pattern of false and misleading promotion of numerous of its drugs, including Geodon®, to the public and to healthcare providers by making false representations and omitting material facts regarding its approved indications; overstating its drugs' efficacy; concealing critical safety information; and by fraudulently promoting its drugs for off-label uses.

138.   As a result, the Division of Drug Marketing, Advertising, and Communications ("DDMAC"), the FDA division responsible for oversight of drug marketing, initiated numerous warnings to Pfizer in an effort to compel Pfizer to stop these illegal promotional practices.   Not only did Pfizer fail to comply with DDMAC's demands, on information and belief it falsely assured DDMAC that it would cease all misleading promotion when, in truth and fact, Pfizer had been flagrantly engaged in a nationwide campaign to illegally promote the off-label use of its products to generate additional profits.

139.   Despite Federal laws prohibiting this conduct, at all times relevant hereto, Pfizer had a corporate policy to promote off-label uses of its drugs, including Geodon®, and made false and misleading statements to the public, healthcare providers, and hospitals, falsely

42

stating and/or implying that the drug could be used in certain settings for which it was not approved.

### 1.   September 3, 2002:  Pfizer Receives Warning Letter From DDMAC.

140.  On September 3, 2002, Pfizer received a DDMAC Warning Letter, concerning misleading promotional materials and misleading oral statements for Geodon®.  According to the Warning Letter, Pfizer's sales representatives had promoted Geodon® "in a manner that is misleading and lacking fair balance because it minimizes the important risk information regarding the capacity of Geodon® to cause QT prolongation, and the potential to cause torsade de pointes-type arrhythmia and sudden death."  With regard to the oral representations, the Warning Letter stated that Pfizer sales representatives had "minimized the important risk information regarding the greater capacity of Geodon® to cause QT prolongation and the potential to cause sudden death, and misrepresented Geodon® as having antidepressant effects similar to serotonin reuptake inhibitors (SSRIs)."

141.  The DDMAC Warning Letter requested that Pfizer immediately cease the dissemination of violative promotions, and respond to the FDA stating that Pfizer has complied with the FDA's request.  On information and belief, Pfizer falsely informed the FDA that all violative promotion had ceased, when in fact Pfizer had no intention of complying with the FDA's request and continued the unlawful promotion of Geodon®.  For example, the following month, in October, 2002, Defendant Dr. Neil Kaye, a paid Pfizer national speaker, promoted Geodon® for non-approved uses in a presentation to psychiatrists with Pfizer's support and knowledge.  Defendant Dr. Neil Kaye's role in Pfizer's unlawful promotion is more fully described below.

Case 1:08-cv-11318-DPW   Document 3   Filed 08/21/2008   Page 51 of 134

Filed Under Seal
129894.00601/35873664v.4

## 2.     September 13, 2002: Pfizer's Legal Position On Off-Label Marketing.

142.   Only ten days after receiving the DDMAC Warning Letter, on September 13, 2002, Pfizer sent the FDA an explanation of its corporate position whether it could legally off-label market its drugs. *See Request for Comment on First Amendment Issues, Docket No. 02N-0209.  According to Pfizer:*

> There may be circumstances where the flow of information from the manufacturer, taken together with other conduct, establishes a covert endorsement notwithstanding the absence of any overt promotional statements. In those selected instances, or in cases where the information circulated is false or misleading, FDA should reserve the right to take improper shipment or misbranding enforcement action. In all other cases, however, Pfizer believes that the First Amendment constrains FDA from taking action against the dissemination of off-label information accompanied by disclosures which make clear that: (a) FDA has not approved the use discussed; (b) the manufacturer is not recommending or prescribing the use discussed; and (c) the information is provided for the information of, and to promote dialogue with, the prescribing community, which must make its own determination with respect to the use discussed.

As such, Pfizer argued it was only impermissible to engage in off-label promotion when there was a "covert endorsement" of the promotional statements or when the information it circulated was "false or misleading." In all other instances, Pfizer believed it was legal to promote its drugs off-label.

143.   It is thus not surprising that over the next five years Pfizer would receive nine additional DDMAC Warning Letters, including for Covera® (October 24, 2003); Camptosar® (November 17, 2003); Zyrtec® (April 22, 2004); Viagra® (November 10, 2004); Celebrex® and Bextra® (January 10, 2005); Zyrtec® (April 13, 2005); Zoloft® (May 6, 2005); and Zyvox® (July 20, 2005).

44

### 3. July 16, 2007: Pfizer Receives Second Geodon® Warning Letter From DDMAC.

144.  Pfizer's blatant disregard for the law governing off-label promotion was once again made clear in a DDMAC Warning Letter dated July 16, 2007 regarding a misleading Geodon® journal advertisement. According to the DDMAC, the advertisement omitted important risk information and included unsubstantiated superiority claims in a journal advertisement for Geodon® injection. In addition, the Geodon® Injection advertisement falsely claimed that Geodon® was twice as effective as haloperidol IM without any support or proof.

145.  The Geodon® off-label campaign has paid off for Pfizer. Geodon® is one of the fastest growing antipsychotic medications in the U.S. with sales in 2005 of some $589 million, up 29 percent over 2004 sales. By 2007, sales for Geodon® had grown to $854 million, and helped offset a slowdown in Pfizer's sales of the cholesterol fighter Lipitor® and the loss of U.S. exclusivity for its hypertension pill Norvasc®. George E. Jordan, *Pfizer Profit Down But Tops Forecasts*, Newark Star-Ledger, January 24, 2008.

146.  As much as seventy-five percent of sales for atypical antipsychotic drugs like Geodon® comes from Medicaid. *See* Mark Duggan and Fiona M. Scott Morton, *The Distortionary Effects Of Government Procurement: Evidence From Medicaid Prescription Drug Purchasing*, p. 16 (2005).

### V. PFIZER'S FRAUDULENT MARKETING SCHEME.

147.  At all relevant times, Pfizer knew that Geodon® was and is being paid or reimbursed by Federal Programs, including Medicaid and Medicare Part D, as well as by the *Qui Tam* States.

Filed Under Seal
129894.00601/35873664v.4

148.   Pfizer knew, or it was reasonably foreseeable, that its promotion of Geodon®
would lead to the submission by physicians, pharmacists and government-funded health plans
of Geodon® prescriptions ineligible for payment by Federal Programs.

149.   When Pfizer decided to employ these illegal marketing practices, it knew or
should have known that physicians, pharmacists, and federally-funded health programs would
routinely and necessarily file claims with Federal Programs for reimbursement for Geodon®
prescriptions.   But for Pfizer's illegal promotion, these off-label and misbranded prescriptions
for Geodon® would not have been written.   As a result, Pfizer caused the submission of false
claims to Federal Programs for reimbursement of Geodon®.   Pfizer was the beneficiary of
these false claims for reimbursement of Geodon® prescriptions.

A.      **PFIZER ANNOUNCES ITS POLICY TO GROW THE GEODON®**
**MARKET RAPIDLY THROUGH ILLEGAL MARKETING SCHEME.**

150.   At the time it was finally approved in 2001, Geodon® became the fourth atypical
antipsychotic drug on the market.   Already on the market were:  Janssen's Risperdal® (1993),
Ely Lily's Zyprexa® (1996), and Astra Zeneca's Seroquel® (1998).   Bristol-Myers Squibb's
Abilify® (2002) was approved by the FDA shortly after Geodon®'s approval.

151.   The long delay in FDA approval placed Pfizer at an initial disadvantage in the
growing market for schizophrenia drugs such as Eli Lilly's Zyprexa®, which was already on
the market.   Another disadvantage was that at the time Zyprexa® had relatively few reported
side effects.

152.   Pfizer had expected Geodon®'s annual sales to reach $1 billion by 2004.   But,
sales lagged far behind that pace. Geodon®'s revenues were only $150 million during 2001,
and had only reached $128 million at the end of the third quarter of 2002.   With the $1 billion
goal seemingly out of reach, Pfizer needed a way to boost sales.

46

153. Pfizer sales managers held a crucial meeting in November, 2002, during which Pfizer's national head of Geodon® marketing announced at the National Sales Meeting (located at the Disney Complex in Orlando, Florida), that Pfizer's goal was to grow the Geodon® market by promoting its use beyond the current market of schizophrenia. This promotion was to include unapproved uses. On information and belief, the head of Pfizer's Geodon® marketing at that meeting who made the announcement was Efren Olivares.

154. This National Sales Meeting was attended by Pfizer sales managers, including District Managers, Regional Managers, Regional Medical Research Specialists ("RMRSs") and Vice Presidents from Pfizer corporate sales. In his presentation, Olivares recited a list of the unapproved uses the Pfizer sales force were directed to promote including: borderline personality disorder, refractory mood disorders (depression, obsessive compulsive disorder, post traumatic stress disorder), dementia in the elderly, bipolar mania, bipolar maintenance, pediatric/adolescent conduct disorders. These unapproved uses were subsequently cited by Pfizer-sponsored speakers and in Pfizer-sponsored literature.

155. Olivares' presentation at this National Sales Meeting did not include any reference to Geodon®'s significant risk profile. The only emphasis was on increasing sales wherever possible.

156. Given the widespread use of SGAs off-label, Pfizer knew that it could significantly increase sales of Geodon® by increasing marketing to a larger patient population for which Geodon® could be prescribed. Pfizer thus set into motion its Fraudulent Marketing Scheme to bolster Geodon® sales.

Filed Under Seal
129894.00601/35873664v.4

157. Pfizer's announcement at its November 2002 national meeting that Geodon® was to be promoted for multiple off-label uses was implemented nationwide. Off-label promotion of Geodon® thus became ingrained in the sales force and Pfizer management.

158. For example, Pfizer's District Manager in Chicago, John Hutt, rolled out the Pfizer corporate Geodon® directive by training his sales representatives on off-label promotion. Hutt directed sales representative Bob Burrell to conduct an off-label presentation for other sales representatives to demonstrate the promotion of Geodon® for depression, mood disorders, post traumatic stress disorder, bipolar disorder and adolescent use.

**B.     PFIZER SPONSORED AND FACILITATED PRESENTATIONS PROMOTING THE OFF-LABEL USE OF GEODON®.**

159. One prong of Pfizer's Fraudulent Marketing Scheme involved using promotional speaker programs, employing medical specialists, or "thought leaders," to promote Geodon®, even in instances when those speakers made presentations that approved of off-label use of Geodon®. According to the *Field Guide*, the Pfizer compliance bible: "Pfizer is held responsible for the conduct and content of its promotional speaker programs." *Field Guide* at 97. In addition, the *Field Guide* states that:

[a]ll information proactively presented must be consistent with labeling. A physician speaking for Pfizer at a promotional program represents Pfizer and must follow the same promotional policies as a member of the Pfizer sales force, with two exceptions:

- He or she may provide off-label information only in response to a specific, unsolicited questions;

- He or she may not create and use his or her own non-product disease state and case study slides for a promotional program; and

- Since the unapproved clinical reprint contains off-label information, the speaker may not include the study in his or her presentation, but may cite it only if appropriate in response to a specific unsolicited question.

Filed Under Seal
129894.00601/35873664v.4

Filed Under Seal
129894.00601/35873664v.4

160. Pfizer recruited a nationwide network of paid speakers to promote Geodon®, maintained lists of these speakers, tracked each speaker's effectiveness, including each speaker's off-label presentations, and provided these lists to its sales force.

161. At all times material hereto, although it was Pfizer's stated policy that investigational or unapproved uses could not be presented by a Pfizer-sponsored speaker, its sales force regularly used contracted speakers to make presentations which included unsolicited materials concerning investigational and/or unapproved uses of Geodon®.

162. With Pfizer's knowledge and approval, Pfizer speakers touted unapproved uses for Geodon®, both verbally and in written materials, such as power point slides. Written materials that included unapproved uses were disseminated to Pfizer's sales force with Pfizer's knowledge and approval.

163. Pfizer's network of speakers included influential individuals who Pfizer knew would tout Geodon® for unapproved uses to audiences across the country as part of Pfizer's nationwide scheme to increase Geodon® sales. One of these key speakers, and a leading off-label proponent for Geodon®, who spoke nationally and commanded premium fees, was Defendant Dr. Kaye.

C.    **PFIZER'S "BIG GUN" SPEAKER: DEFENDANT DR. NEIL S. KAYE, M.D.**

164. Pfizer knew that a tried and true strategy to increase revenue was to engage in a nationwide illegal marketing campaign, which involved unlawful off-label promotion. One of the key champions of this nationwide Fraudulent Marketing Scheme was Defendant and co-conspirator Dr. Kaye who conducted hundreds of speeches throughout the United States in which he promoted the off-label use of Geodon®.

Filed Under Seal
129894.00601/35873664v.4

165.   Pfizer conspired with Defendant Dr. Kaye as early as 2001 to begin a nationwide Geodon® promotional campaign at locations across the United States.  In exchange for promoting Geodon® off-label, Defendant Dr. Kaye was paid up to $4,000 per day plus all his expenses.  Defendant Dr. Kaye became such a frequent speaker that he used his own private helicopter to fly to various locations throughout the United States, all at Pfizer's expense.

166.   Because the amounts of money being paid to Defendant Dr. Kaye were considerably more than Pfizer normally paid for such "thought leader" presentations, these payments had to be approved by a Pfizer Vice President.  That Kaye could command such premium fees is a testament to just how important he was to the off-label promotion of Geodon®.  In the year 2002 alone, Defendant Dr. Kaye embarked on an extraordinary schedule, speaking about Geodon® on behalf of Pfizer throughout the United States to numerous groups of psychiatrists who were treating, in many instances, Medicaid patients.

167.   Defendant Dr. Kaye was known to Pfizer sales representatives as a "big gun" hired by Pfizer to increase off-label sales of Geodon®.  Defendant Dr. Kaye gave these presentations at clinics, hotels, restaurants, physician offices and mental health facilities all across the country.

## 1.     Dr. Kaye's October 16, 2002 Off-Label Presentation of Geodon®.

168.   As but one example of Defendant Dr. Kaye's unlawful promotion, on Wednesday, October 16, 2002, he promoted Geodon® to physicians for non-approved uses, utilizing a PowerPoint presentation.  The Kaye presentation slides promoted Geodon® for non-approved uses or populations: borderline personality disorder; major depression augmentation, dosing in refractory patients, bipolar mania, bipolar depression, bipolar maintenance, dementia,

child/adolescent conduct/impulse explosive disorder/attention deficit disorder. In addition, Dr. Kaye recommended dosing Geodon® as much as four times a day at doses over the FDA approved 160 mg per day in refractory schizophrenic patients and in doses as low as 10 mg once daily (Geodon®'s lowest non-scorable capsule is 20 mg) in dementia patients.

169. Despite the fact that the patients that Geodon® is being used to treat are frequently suffering from acute psychosis, dementia, or being treated for substance abuse, as well as other "prominent negative symptoms," it was Dr. Kaye's view in his promotional presentations for Pfizer that off-label prescribing by psychiatrists was acceptable so long as there was informed consent.

170. At all times material hereto, Defendant Dr. Kaye knew that Geodon® was not approved for pediatric use, or with elderly patients with dementia. Despite this knowledge, Defendant Dr. Kaye made hundreds of presentations in which he made unsolicited promotions concerning the off-label use of Geodon®, touting its investigational and unapproved uses.

171. At all times material hereto, Pfizer knew that Defendant Dr. Kaye's promotion of Geodon® for use in pediatric and elderly populations would greatly increase Geodon® sales. Geodon®'s chief competition was Zyprexa®, which was considered safer and had obtained pediatric approval. Upon information and belief, Pfizer's strategy was thus to promote Geodon® for unapproved uses to populations for which similar products were already approved, and thus hope to garner the "halo" effect for such competitive products, which one expert has described as a "signal to the marketplace that they might be comfortable in trying these products in other [off-label] areas as well."

172. At all times material hereto, Pfizer knew Defendant Dr. Kaye was promoting, or with reckless disregard allowed Defendant Dr. Kaye to promote, Geodon® for off-label uses,

51

and paid hundreds of thousands of dollars to support this nationwide off-label campaign. Despite the fact that Pfizer senior management was aware of Defendant Dr. Kaye's off-label promotion of Geodon®, at no time did Defendant Pfizer instruct Dr. Kaye that Pfizer's guidelines required off-label information be provided only in response to specific, unsolicited questions. Nor at any time did Pfizer correct any off-label representations made by Defendant Dr. Kaye, either in person during one of his off-label presentations or through a Dear Doctor letter after the fact.

## 2.    Dr. Kaye's Off-Label Materials Were Provided to Pfizer Sales Representatives Nationwide.

173.    Dr. Kaye's off-label promotional materials were provided to hundreds of Pfizer sales representatives. On October 16, 2002, Pfizer Regional Manager Jim Reilly emailed Dr. Kaye's slides to Pfizer District Managers reporting directly to him, with the subject line referring to "Neil Kaye, MD." Pfizer District Manager Vincent C. Valentine also emailed copies of the Dr. Kaye presentation slides to all Pfizer District Managers in his region. Relator Westlock received these slides via email on October 21, 2002.

174.    Pfizer also used Defendant Dr. Kaye's off-label promotion by providing off-label "selling points" to thousands of sales representatives, summarizing his off-label presentation. In a document entitled "Neil Kaye, MD Geodon® Take Home Selling Points," the Pfizer sales force was provided off-label promotional points they could use to implement the off-label sales strategy. While this three-page document includes the annotation "DO NOT DETAIL FOR YOUR INFORMATION ONLY," Pfizer's inclusion of the annotation "do not detail" was at all times material hereto instead was understood by Pfizer's sales representatives to mean "do detail," particularly so since the document clearly was intended to be "selling points" sales representatives were to use in the off-label promotion of Geodon®.

Filed Under Seal
129894.00601/35873664v.4

175.  As such, at all times material hereto Defendant Dr. Kaye's "take home selling points" were sent to Pfizer's sales force with the intent and expectation that Pfizer's sales representatives would use these points in connection with unlawful off-label promotional activities for Geodon®.  These off-label marketing selling points include selling Geodon® for borderline personality disorder, dementia and major depression.  Not only were these selling points off-label, Dr. Kaye's presentation is specifically counter to the black box warning from the FDA due to increased mortality in elderly patients with dementia-related psychosis.  Geodon® Prescribing Information, pg. 15.

176.  At all relevant times material hereto, Defendant Dr. Kaye knew that his off-label promotional materials and speaking engagements were being used by Pfizer to increase sales of Geodon® by unlawful promotion for unapproved uses, and that Geodon® prescriptions he unlawfully promoted were being reimbursed by Federal Programs, including Medicaid.

### D.    PFIZER PAID MULTIPLE SPEAKERS TO UNLAWFULLY PROMOTE GEODON®.

177.  Pfizer paid influential speakers to promote its products, including speakers who influence prescribers.  Pfizer selected its speakers by their ability to influence prescribers.  Pfizer's nationwide promotion of Geodon® included such "thought leaders" and influential psychiatrists from across the country.

178.  For one such example, Pfizer invited and paid Dr. M. Michael Ishii, the Site Psychiatrist at the Dean Medical Center's Sun Prairie Clinic in Madison, Wisconsin, to speak to an audience of psychiatrists in April 2002.  Dr. Ishii is considered one of the most influential psychiatrists in the Madison, Wisconsin area.  Sun Prairie Clinic's patients include patients covered by Medicaid and Medicare.  Pfizer paid Dr. Ishii approximately $1,000 for each presentation.

Filed Under Seal
129894.00601/35873664v.4

179. For this Pfizer program, Dr. Ishii's topic was the "Practical Issues in Prescribing Geodon®." Dr. Ishii provided this lecture to multiple audiences in at least the states of Illinois and Wisconsin in 2001 and 2002. His presentation downplayed the side effects of Geodon®, and promoted Geodon® for non-indicated uses, including bipolar, aggression, ADHD, autism, dementia, depression, Tourette's Syndrome, ODD, conduct disorder, adjunctive OCD, trichotillomania and Prader-Willi syndrome. Dr. Ishii's slides included one titled "Geodon®'s Applications: Indication and Off Label," discussing blatant off-label use to treat psychosis, bipolar (no indication at this time), aggression, and depression. Dr. Ishii's also promoted Geodon®'s use in children, adolescents and the elderly, all off label.

180. Dr. Ishii's audience at these Pfizer-sponsored speeches typically consisted of psychiatrists who primarily worked at large state-funded clinics and county mental health facilities in Wisconsin and Illinois. The vast majority of the patients seen by the psychiatrists in his audience are covered by Medicaid. One such psychiatrist who attended Dr. Ishii's Geodon® presentation was Dr. David Holloway. Dr. Holloway practices psychiatry in Brookfield, Milwaukee, Glendale, Waukesha and Elm Grove, Wisconsin. He treats numerous patients enrolled in Medicaid, and prescribes medications to these patients, including Geodon® prescriptions. These prescriptions are reimbursed by Medicaid.

181. Pfizer sales managers approved of Dr. Ishii's presentations and following Pfizer policy built sales presentations around them. For example, Pfizer District Manager for the Wisconsin-Chicago CNS area John Hutt encouraged Pfizer sales representatives to take advantage of Dr. Ishii's presentation and off-label pitches.

182. Pfizer's intent in paying speaker honoraria to Dr. Ishii and other speakers was to unlawfully promote Geodon® for unapproved uses.

54

E.    **USE OF PFIZER REGIONAL MEDICAL & RESEARCH SPECIALISTS ("RMRSs") TO PROMOTE GEODON® OFF LABEL.**

183.    Another Pfizer strategy to promote Geodon® for non-approved uses is the use of Pfizer Regional Medical & Research Specialists ("RMRSs") as an end-around to sales representatives' duty to lawfully promote Geodon®. Pfizer's use of RMRSs in this manner was a way for Pfizer to make the unlawful promotional activities for Geodon® appear lawful.

184.    Pfizer employs RMRSs to engage in non-promotional medical activities, such as answering questions from doctors about Pfizer products and recruit/pre-screen medical clinics that have the capacity to support approved clinical studies. Although RMRSs are not to be engaged in product promotion, nonetheless RMRSs regularly accompany Pfizer sales representatives on sales calls, including on Geodon® sales calls.

1.    **Dr. Barry Herman.**

185.    One of Pfizer's most prominent RMRSs is Barry K. Herman, MD, MMM, CPE, FACPE, Senior Director of Regional Medical & Research Specialists for Pfizer Worldwide Pharmaceutical Operations. Dr. Herman has been employed by Pfizer since July, 2001. Dr. Herman's Pfizer-related work as an RMRS includes "access and advocacy that can accelerate CNS therapeutic area product uptake." His work was recognized by Pfizer in 2007 with the RMRS Recognition Award for Innovation, honoring a specific project that Herman developed in the previous year that "contributed to improving health and sustaining Pfizer's growth."

186.    Herman was recognized at the Pfizer RMRS National Meeting held in Seattle in May 2004 for his leadership in developing an innovative national program that "produced significant and sustained business impact" for Pfizer. On information and belief, Dr. Herman received this 2004 award based on his advocacy that increased Geodon® product market share, including off-label sales.

55

187.   Dr. Herman's creation of "opportunities for access and advocacy'" to increase Geodon® sales is evidenced by his close interaction with sales representatives and sales managers.   For example, in May, 2003, Dr. Herman sent an email trumpeting a poster that was approved for a presentation to be given at a May, 2003 New Clinical Drug Evaluation Unit of the National Institute of Mental Health ("NCDEU") meeting in Boca Raton, Florida by sending notice of the poster's acceptance to the Philadelphia District Manager and the Regional Manager in Virginia.   This poster promoted Geodon® for unapproved pediatric uses.   The poster was entitled:   "Ziprasidone Treatment in Adolescents:   A Pilot Study."   The presentation and poster were sent to Dr. Herman by Richard Malone, M.D., who was with the Eastern Pennsylvania Psychiatric Institute, whose patients were primarily on Medicaid.   The Malone paper was supported by an educational grant from Pfizer.

188.   Coincidentally, Dr. Malone had been a member of the FDA's Psychopharmacological Drugs Advisory Committee on July 19, 2000 when Pfizer's NDA 20-825 for ziprasidone was given Pfizer's post-marketing approval.

189.   Dr. Herman notes in his email to the Pfizer District Manager that Dr. Malone is also submitting the off-label poster to the October Annual Meeting of the American Academy of Child and Adolescent Psychiatry.

190.   In response to Dr. Herman's news of the approval of the poster, Pfizer Regional Sales Director Dwayne Wright sent an email asking Herman how the sales force could "leverage" the Malone pilot study.   Dr. Herman responded via email that, although the poster promoted Geodon® off-label, sales managers should refer their "influentials" to Dr. Herman.

191.   The Pfizer Regional Sales Director advised via email all subordinate Pfizer District Managers (roughly 1/3 of the national CNS District Managers)), regarding the

56

promotion of Geodon® for adolescent use by utilizing Dr. Herman to handle the promotion of any unlawful promotion of Geodon®.

192.  RMRSs' primary role was to respond to specific requests for detailed information about Pfizer products, and not product promotion.  RMRSs are only permitted to provide information outside Geodon® product labeling if the inquiry is unsolicited.  "Unsolicited" means that Pfizer has not encouraged a customer to ask the question.  Any other attempt to provide this information would be considered off-label promotion, and is prohibited no matter if a Pfizer RMRS provides the information.  Using RMRSs to promote Geodon® was ostensibly prohibited by Pfizer's *Field Guide* unless such communications used Pfizer-approved materials, were on-label, discussed only approved indications, and did not engage in any actual or perceived quid pro quo.  It is clear that the deliberate plan was to use Dr. Herman to promote off-label using the Malone poster presentation discussing Geodon®'s off-label use in adolescents.

## 2.    Dr. Douglas Geenens.

193.  Dr. Douglas Geenens is currently employed as a Pfizer RMRS who Pfizer utilizes to educate Pfizer's sales force on Geodon®'s unapproved uses, and to promote Geodon® for unapproved uses.  His responsibilities also include meeting with Psychiatrists in Missouri, Kansas and Oklahoma in which he discusses potential involvement in Pfizer clinical studies and also discusses Geodon clinical information.  Prior to his employment with Pfizer, Dr. Geenens was a well-paid, frequent speaker for Pfizer on Zoloft® and Geodon®.

194.  In November, 2006 Pfizer Regional Manager Curt McCallister asked Dr. Geenens, then an Overland Park, Kansas child psychiatrist, to speak about Geodon® at a Pfizer sales meeting.  This sales meeting (and other similar sales meetings at which all regional sales

Filed Under Seal
129894.00601/35873664v.4

representatives as well as Pfizer managers attend) are referred to by Pfizer as Plan of Attack meetings ("POA Meetings" or "POA's").

195.   Before he was hired as an RMRS, Dr. Geenens was a popular national speaker for Pfizer, having lectured on Zoloft® and Geodon®.  On November 9, 2006, Pfizer hosted a lecture by Dr. Geenens at the POA Meeting at the Westin Hotel in St. Louis, Missouri.  Pfizer sales managers and sales representatives were present from Missouri, Oklahoma, and Kansas.  At this POA Meeting, Dr. Geenens showed slides and discussed unapproved uses for Geodon®, including "conjectural indications" of Tourette's Syndrome, Autism, Post-Traumatic Stress Disorder ("PTSD"), obsessive compulsive disorder ("OCD"), depression and bipolar disorder.  Dr. Geenens also discussed unapproved use of Geodon® in children and adolescents.

196.   For this presentation, Dr. Geenens received no compensation from Pfizer, since his Pfizer-funded talks had reached the Pfizer annual maximum for speaker fees in 2006 (circa $150,000).  Up until this date, Dr. Geenens had given approximately 75 to 125 talks for Pfizer, primarily on Geodon®.

197.   Dr. Geenens was used by Pfizer sales representatives to give Geodon® presentations primarily because he readily spoke about off-label uses (although he did treat several patients with schizophrenia -- the majority of Dr. Geenens' practice was focused on child/adolescent Mood Disorders).

198.   Pfizer knew Dr. Geenens would discuss off-label uses of Geodon®, and intended for Dr. Geenens' off-label presentation to its sales representative as a not-so-subtle message on how to promote Geodon® for unapproved uses.

F.   **PFIZER CONSPIRED WITH DEFENDANT NAMI TO ACT AS A FRONT ORGANIZATION IN THE OFF-LABEL PROMOTION OF GEODON®.**

199.   Pfizer also utilized non-profit organizations such as Defendant NAMI as front organizations to further its own purposes of increasing market share for Geodon®. Pfizer's funding and partnering with the Defendant NAMI and/or its affiliates has been designed to accomplish through a non-profit organization what Pfizer could not on its own: giving the appearance of independent analysis and a grassroots movement encouraging FDA approval and expanding the use, including unapproved uses, for Geodon®.

200.   In yet another example of using Defendant NAMI influence in the off-label promotion of Geodon® is the quid pro quo speaking engagement between Pfizer and St. Louis, Missouri psychiatrist Dr. Darrin Friesen. NAMI wanted Dr. Friesen to speak at the NAMI Family Skills Workshop, and asked Pfizer to pay for the speech. Dr. Friesen is a child and adolescent psychiatrist and the Director at Epworth Children's Home and has been psychiatric consultant for the St. Louis Country Special School District, and practiced at Crider Center, Metropolitan St. Louis Psychiatric Center. While the stated purpose of the engagement was to retain Dr. Friesen to make a presentation at the NAMI meeting where he would speak on advances in the treatment of schizophrenia and the results of the CATIE trial, the unstated agreement was far more sinister. Not only was Dr. Friesen not qualified to speak on the CATIE trial (since he was a child psychiatrist and the CATIE trial only dealt with adult schizophrenic patients), the real aim of the speech was to secure continued Geodon® use by Dr. Friesen (who was a heavy Geodon® off-label prescriber with his child and adolescent patients), and to provide "back door" monies for NAMI's continued support.

201.   Under FDA regulations and Pfizer's own compliance policies, a speaker program is a promotional activity and must be controlled by Pfizer to ensure that the speaker's

presentation is truthful and accurate, consistent with product labeling, supported by substantiated and scientifically-sound data, and appropriately balanced on both benefits and risks.   The Friesen speech met none of these criteria.  It had been set up at the insistence of Pfizer District Manager, Cheryl Shaughnessy, who instructed one of the Pfizer sales representatives in her district, Regan Hobbs, to put this NAMI presentation together.  The audience for the presentation was NAMI members, including social workers and case workers, many of whom are treating Medicaid patients with chronic mental illness.

202.   Even though the paperwork between Dr. Friesen and CardinalHealth (the independent vendor Pfizer used to set up its speaker programs) appeared to fund a discussion of schizophrenia, the actual speech presented by Dr. Friesen on April 22, 2006, "Understanding and Coping With Child-Onset Brain Disorders," had nothing to do with schizophrenia and was little more than a Geodon® promotional program to market Geodon® off-label.   No one from Pfizer was in attendance, nor was there any attempt on Pfizer's part to control Dr. Friesen's content.

203.   This is but one example of the price tag for NAMI's support of Geodon®.   NAMI had insisted on receiving the backdoor monies from Pfizer to support programming on how to manage psychiatric disorders in children.  At all times material hereto, Pfizer knew that Geodon® was not indicated for children's psychotic needs, yet allowed Dr. Friesen to make this presentation nonetheless.

204.   Relator Westlock received a flyer for this Pfizer-funded Geodon® promotional presentation at NAMI from a co-worker on January 26, 2007.   Westlock called and emailed Tania Padilla, in Pfizer Corporate Compliance, to report this off-label marketing of Geodon® to an audience of people intent on addressing psychotic episodes in children.