**FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| _____ | ) | |
| | ) | |
| **PLAINTIFFS UNDER SEAL** | ) | **Civil Action No. 08 CA 11318 DPW** |
| | ) | |
| **v.** | ) | |
| | ) | **FILED UNDER SEAL** |
| | ) | |
| **DEFENDANTS UNDER SEAL** | ) | **JURY TRIAL DEMANDED** |
| _____ | ) | |

**FIRST AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**
**31 U.S.C. § 3729, ET SEQ.**

Paul F. Lynch
65 Franklin Street, Suite 500
Boston, MA 02110
Telephone: 617- 426-1120
Facsimile: 617-348-2147

W. Scott Simmer
Thomas J. Poulin
Blank Rome LLP
Watergate
600 New Hampshire Ave., NW
Washington DC 20037
Telephone: 202-772-5967
Facsimile: 202-572-8412

David B. Krangle
Parker Wachman Alonso LLP
111 Great Neck Road
Great Neck, NY 11021
Telephone: 516-466-6500
Facsimile: 516-466-6665

*Counsel for Relator*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **MARK R. WESTLOCK, and on behalf of the STATES of ARKANSAS, CALIFORNIA, DELAWARE, DISTRICT OF COLUMBIA, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MASSACHUSETTS, MICHIGAN, MONTANA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NEVADA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS AND VIRGINIA,** | ) ) ) ) ) ) ) ) ) ) ) ) |
| **Plaintiffs,** | ) ) ) |
| **v.** | ) **Civil Action No. 08 CA 11318 DPW** ) |
| **PFIZER, INC., DR. NEIL S. KAYE, M.D., NATIONAL ALLIANCE FOR THE MENTALLY ILL, NAMI SAINT LOUIS and JOHN DOES #1-100, FICTITIOUS NAMES,** | ) **FILED UNDER SEAL** ) ) ) ) ) |
| **Defendants.** | ) **JURY TRIAL DEMANDED** ) |

## TABLE OF CONTENTS

Page

I.     JURISDICTION AND VENUE ........................................................................2

II.    PARTIES ........................................................................................................2

       A.     PLAINTIFF/RELATOR MARK R. WESTLOCK ..............................................2

       B.     DEFENDANT PFIZER, INC. .........................................................................4

       C.     DEFENDANT DR. NEIL S. KAYE, M.D. .....................................................5

       D.     DEFENDANTS NATIONAL ALLIANCE FOR THE MENTALLY ILL AND NAMI ST.
              LOUIS (COLLECTIVELY "NAMI") ............................................................7

       E.     DEFENDANTS JOHN DOES #1-100. ...........................................................8

III.   SUMMARY OF DEFENDANTS' ILLEGAL CONDUCT ...............................9

       A.     THE PLAN AND PURPOSE OF THE FRAUDULENT MARKETING SCHEME. ...................9

       B.     THE MANNER AND MEANS OF EXECUTING THE SCHEME. ........................9

IV.    BACKGROUND ON PROMOTING GEODON® FOR OFF-LABEL USES.................10

       A.     THE DEVELOPMENT OF "ATYPICAL" ANTIPSYCHOTIC MEDICATIONS TO TREAT
              SCHIZOPHRENIA  AND BIPOLAR DISORDER. ..........................................10

       B.     PFIZER MARKETING OF GEODON®. ........................................................13

              1.     Drug Maker Detailing of Doctors and Health Care Professionals.............14

              2.     Biased Clinical Trials Funded By Drug Makers. ........................................16

              3.     Drug Maker Sponsored CME Courses Using Paid "Thought Leaders." ...18

              4.     Drug Maker Sponsored Journal Articles to Promote  Drug Products........20

              5.     Dr. Kaye's Off-Label Journal Articles Touting Geodon®. .......................22

              6.     Pfizer and Other Drug Maker Funding of NAMI. ....................................23

i

7.      NAMI's Off Label Promotion of Geodon®. .............................................25

8.      Drug Maker Influence and the Exploding Off-Label Use of SGAs in Children and Adolescents. .........................................................................26

9.      Burgeoning Off-Label Use of SGAs to Treat Dementia. .........................29

10.     Funding State Medicaid Adoption of Algorithms  to Make Geodon® First Line Treatment. ..........................................................................................30

C.    THE LIMITED ROLE OF THE FDA IN REGULATING OFF-LABEL PROMOTION OF DRUGS. ...........................................................................................................32

1.      New Drug Approvals By the FDA. ..........................................................32

2.      FDA Regulation After Approval. .............................................................34

3.      DDMAC's Limited Ability to Regulate Drug Maker Marketing and Promotion. ..................................................................................................35

4.      Use of an Approved Drug Beyond Its Labeling Is Off-Label. ................37

D.    GEODON® FDA APPROVAL ONLY FOR LIMITED INDICATION AS AN ATYPICAL ANTIPSYCHOTIC TO TREAT SCHIZOPHRENIA. ...........................................................38

1.      1998:  FDA Refuses to Approve Geodon®. ............................................38

2.      February 5, 2001:  FDA Approves Geodon®. ..........................................41

3.      September 19, 2005:  CATIE Study Shows SGAs  No More Effective Than FGAs. ................................................................................................41

E.    PFIZER MISLEADS THE PUBLIC, HEALTHCARE PROVIDERS,  AND THE FDA ABOUT GEODON®. ...........................................................................................................42

1.      September 3, 2002:  Pfizer Receives Warning Letter  From DDMAC. ....43

2.      September 13, 2002:  Pfizer's Legal Position On Off-Label Marketing. ..44

3.      July 16, 2007:  Pfizer Receives Second Geodon® Warning Letter From DDMAC. ....................................................................................................45

V.   PFIZER'S FRAUDULENT MARKETING SCHEME. ...................................................45

**Filed Under Seal**
129894.00601/35873664v.4

A.      PFIZER ANNOUNCES ITS POLICY TO GROW THE GEODON® MARKET RAPIDLY
        THROUGH ILLEGAL MARKETING SCHEME. ............................................................46

B.      PFIZER SPONSORED AND FACILITATED PRESENTATIONS PROMOTING THE OFF-
        LABEL USE OF GEODON®. ..................................................................................48

C.      PFIZER'S "BIG GUN" SPEAKER: DEFENDANT DR. NEIL S. KAYE, M.D.................49

        1.      Dr. Kaye's October 16, 2002 Off-Label Presentation of Geodon®. .........50

        2.      Dr. Kaye's Off-Label Materials Were Provided to Pfizer Sales
                Representatives Nationwide.......................................................................52

D.      PFIZER PAID MULTIPLE SPEAKERS TO UNLAWFULLY PROMOTE GEODON®. .........53

E.      USE OF PFIZER REGIONAL MEDICAL RESEARCH SPECIALISTS ("RMRSS") TO
        PROMOTE GEODON® OFF LABEL. ..........................................................................55

        1.      Dr. Barry Herman. ..................................................................................55

        2.      Dr. Douglas Geenens. .............................................................................57

F.      PFIZER CONSPIRED WITH DEFENDANT NAMI TO ACT AS A FRONT ORGANIZATION
        IN THE OFF-LABEL PROMOTION OF GEODON®. ....................................................59

G.      PFIZER PROMOTED GEODON® FOR UNAPPROVED USES AND MADE
        UNSUBSTANTIATED SUPERIORITY CLAIMS. ..........................................................61

        1.      Promotion in Nursing Homes for Unapproved Dementia and Agitation-
                Type Behavior...........................................................................................61

        2.      Promotion of Geodon® for Unapproved Dosages....................................62

H.      PFIZER SALES REPRESENTATIVES MARKETED GEODON® TO DOCTORS TREATING
        PATIENTS WHO WOULD NOT USE GEODON® FOR ANY APPROVED INDICATION. .63

I.      USING QUOTA AND CREDIT PROGRAMS TO INDUCE SALES TO DOCTORS AND
        FACILITIES WHO DO NOT USE GEODON® ON-LABEL. ..........................................64

**Filed Under Seal**
129894.00601/35873664v.4

J.      PFIZER PROMOTED GEODON® FOR UNAPPROVED USES AS A MAINTENANCE
        MEDICATION IN THE LONG TERM TREATMENT OF BIPOLAR DISEASE. .................66

K.      PFIZER MADE UNSUBSTANTIATED COMPARISON CLAIMS OF THE SUPERIORITY OF
        GEODON®...........................................................................................................68

        1.      August 17, 2006 Abilify® "Compare and Win Strategy". ........................69

        2.      November 10, 2006 "Competing to Win" POA. .......................................70

VI.    PFIZER KNEW THE LEGAL RISKS RELATED TO OFF-LABEL
       PROMOTION OF GEODON®.....................................................................................71

VII.   PFIZER'S FRAUDULENT MARKETING SCHEME VIOLATED FEDERAL
       PROGRAM LIMITATIONS. ......................................................................................73

VIII.  PFIZER'S PROMOTION OF GEODON® CAUSED SUBMISSION OF OFF-
       LABEL CLAIMS TO FEDERAL PROGRAMS AND THE QUI TAM STATES. .........75

VIII.  PFIZER'S RETALIATION AGAINST RELATOR WESTLOCK. ................................77

COUNT I VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729, ET SEQ. ....................80

COUNT II VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729, et seq........................81

COUNT III VIOLATION OF FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(3) AS AGAINST
        ALL DEFENDANTS ......................................................................................82

COUNT IV VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3730(h) (AS AGAINST
        PFIZER).........................................................................................................82

COUNT V INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (AS AGAINST
        PFIZER).........................................................................................................83

COUNT VI ARKANSAS MEDICAID FRAUD FALSE CLAIMS ACT, ARK. CODE ANN. §
        20-77-901, et seq. .........................................................................................83

COUNT VII VIOLATION OF THE STATE OF CALIFORNIA FALSE CLAIMS ACT, CAL
        GOV'T CODE § 12650, et seq. ...................................................................85

COUNT VIII VIOLATION OF THE STATE OF DELAWARE FALSE CLAIMS AND
        REPORTING ACT, DEL. CODE ANN. TIT. 6 § 1201, et seq. ...................86

COUNT IX VIOLATION OF THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT, D.C.
        CODE A § 2-308.13, et seq. .........................................................................88

COUNT X VIOLATION OF THE STATE OF FLORIDA FALSE CLAIMS ACT, FLA. STAT.
        68-081, et seq. ..............................................................................................89

COUNT XI VIOLATION OF STATE OF GEORGIA MEDICAID FALSE CLAIMS ACT, GA.
        CODE ANN. § 49-4-168 (2007), et seq. ......................................................90

iv

**COUNT XII** VIOLATION OF THE STATE OF HAWAII FALSE CLAIMS ACT FALSE CLAIMS TO THE STATE, HAWS REV. STAT. § 661-21, *et seq.* ............92

**COUNT XIII** VIOLATION OF THE STATE OF INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT, IND. CODE § 5-11-5.5, *et seq.*93

**COUNT XIV** VIOLATION OF THE STATE OF ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT, 740 ILL. COMP. STAT. ANN. 175/1, *et seq.* .94

**COUNT XV** VIOLATION OF THE STATE OF LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW, LA. REV. STAT. § 46:437.1, *et seq.* ....96

**COUNT XVI** VIOLATION OF THE COMMONWEALTH OF MASSACHUSETTS FALSE CLAIMS ACT, MASS LAWS ANN. Ch. 12, § 5A, *et seq.* ..........................97

**COUNT XVII** VIOLATION OF THE STATE OF MICHIGAN MEDICAID FALSE CLAIMS ACT, MICH. COMP. LAWS SERV. § 400.601, *et seq.* ...............................98

**COUNT XVIII** VIOLATION OF STATE OF MONTANA FALSE CLAIMS ACT, MONT. CODE ANN. § 17-8-401, *et seq.* .................................................................100

**COUNT XIX** VIOLATION OF STATE OF NEW HAMPSHIRE MEDICAID FALSE CLAIMS ACT, N.H. REV. STAT. ANN. § 167:61-b, *et. seq.* .....................................101

**COUNT XX** VIOLATION OF STATE OF NEW JERSEY FALSE CLAIMS ACT, N.J. STAT. ANN. § 265 (2007), *et seq.* ...........................................................................102

**COUNT XXI** VIOLATION OF STATE OF NEW MEXICO MEDICAID FALSE CLAIMS ACT, N.M STAT. ANN. § 27-14-1, *et seq.* ...................................................104

**COUNT XXII** VIOLATION OF THE STATE OF NEW YORK FALSE CLAIMS ACT, N.Y. CLS. ST. FIN. § 187 *et seq.* ...........................................................................106

**COUNT XXIII** VIOLATION OF THE STATE OF NEVADA SUBMISSION OF FALSE CLAIMS TO STATE OR LOCAL GOVERNMENT ACT, NEV. REV. STAT. ANN. § 357.010, *et seq.* ..................................................................107

**COUNT XXIV** VIOLATION OF STATE OF OKLAHOMA MEDICAID FALSE CLAIMS ACT, OKLA. STAT. tit. 63, § 5053 (2007), *et seq.* ......................................108

**COUNT XXV** VIOLATION OF STATE OF RHODE ISLAND FALSE CLAIMS ACT, R.I. GEN. LAWS § 9-1.1-1 (2008), *et seq.* ........................................................110

**COUNT XXVI** VIOLATION OF THE STATE OF TENNESSEE MEDICAID FALSE CLAIMS ACT, TENN. CODE *ANN.* § 71-5-181 *et seq.* ............................111

**COUNT XXVII** VIOLATION OF THE STATE OF TEXAS HUMAN RESOURCES CODE, TEX. HUM. RES. CODE § 36.001 *et seq.* ....................................................113

**COUNT XXVIII** VIOLATION OF THE COMMONWEALTH OF VIRGINIA FRAUD AGAINST TAXPAYERS ACT, VA CODE ANN. § 8.01-216.1, *et seq.* ...114

**FIRST AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS,**
**31 U.S.C. § 3729, *ET SEQ.* AND STATE LAW COUNTERPARTS**

This is an action brought on behalf of the United States of America by Mark R. Westlock, by and through his attorneys against Defendants pursuant to the qui tam provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.*; the Arkansas Medicaid Fraud False Claims Act, ARK. CODE ANN. § 20-77-901 (2007), *et seq.*; the California False Claims Act, CAL. GOV'T CODE § 12650 (Deering 2000), *et seq.*; the Delaware False Claims and Reporting Act, DEL. CODE ANN. Tit. 6, § 1201 (2000), *et seq.*; the District of Columbia False Claims Act, D.C. CODE ANN. § 2-308.13 (2000), *et seq.;* the Florida False Claims Act, FLA STAT. 68-081 (2000), *et seq.*; the Georgia False Medicaid Claims Act, GA. CODE ANN.§ 49-4-168 (2007), *et seq.*;  the Hawaii False Claims Act. HAW. REV. STAT. § 661-22, (2006) *et seq.*; the Illinois Whistleblower Reward and Protection Act, 740 ILL. COMP. STAT. ANN. § 175/1 (2000), *et seq.*; the Indiana False Claims and Whistleblower Protection Act, INDIANA CODE § 5-11-5.5, (2007) *et seq.*, the Louisiana Medical Assistance Programs Integrity, LA. REV. STAT. ANN. § 46.439.1 (2006), *et seq.;* the Massachusetts False Claims Act, MASS. ANN. LAWS ch. 12, § 5(A), (2007) *et seq.*; the Michigan Medicaid False Claims Act, MICH. COMP. LAWS SERV. § 400.601, (2007) *et seq.* (2007); the Montana False Claims Act, MONT. CODE ANN. § 17-8-401 (2005), *et seq.*; the New Hampshire Medicaid False Claims Act, N.H. REV. STAT. ANN. § 167:61-b (2005), *et seq.*; the New Jersey False Claims Act, N.J. STAT. ANN. § 265 (2007); the New Mexico Medicaid False Claims Act, N.M. STAT. ANN. § 27-14-1 (2007), *et seq.*; the New York False Claims Act, N.Y. CLS ST. FIN. § 190.6. (2007), *et seq.*; the Nevada Submission of False Claims to State or Local Government Act, NEV. REV. STAT. § 357.010 (1999), *et seq.*; the Oklahoma Medicaid False Claims Act, OKLA. STAT. tit. 63, § 5053 (2007), *et seq.*; the

Rhode Island False Claims Act, R.I. GEN. LAWS § 9-1.1-1 (2008), *et seq.*; the Tennessee

Medicaid False Claims Act, TENN. CODE ANN. § 71-5-181(c) (2006), *et seq.*; the TEX. HUM.

RES. CODE § 36.001 (2006), *et seq.*; and the Virginia Fraud Against Taxpayers Act, Va. Code

Ann. § 8.01-216.1 (2006), *et seq.*, ("State *qui tam* statutes" or "*Qui Tam* States").

## I.    JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §

3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.  The Court has original jurisdiction of the

State law claims pursuant to 31 U.S.C. § 3732(b) because this action is brought under State

laws for the recovery of funds paid by the *Qui Tam* States, and arises from the same transaction

or occurrence brought on behalf of the United States under 31 U.S.C. § 3730.

2.      This Court has personal jurisdiction over the Defendants because, among other

things, Defendants transact business in this District, and engaged in wrongdoing in this

District.

3.      Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§

1391(b) and (c). Defendants transact business within this District, and acts proscribed by 31

U.S.C. § 3729 occurred in this District.

4.      The causes of action alleged herein are timely brought because, among other

things, of efforts by the Defendants to conceal from the United States their wrongdoing in

connection with the allegations made herein.

## II.    PARTIES

### A.    PLAINTIFF/RELATOR MARK R. WESTLOCK

5.      Plaintiff/Relator Mark R. Westlock ("Relator Westlock") is a resident of 618

Winter View Circle, Fenton, MO 63026.   Relator Westlock was employed by Pfizer, Inc.

("Pfizer") for sixteen years, from October 1991 through September 14, 2007.  Relator

2

Westlock holds a Bachelor of Science degree in applied mathematics and a Masters in Business Administration. He also served in the United States Navy as a decorated Supply Officer and presently serves in the American Legion. Relator Westlock began his career at Pfizer in October 1991 as an Office Services Manager responsible for leading the accounts payable and receivable group and other personnel in Pfizer's largest distribution center, the Hoffman Estates distribution center, near Chicago, Illinois.

6.      Relator Westlock earned a position as a sales representative with Pfizer in November 1992 in the Columbia, Missouri area. As a Pfizer sales representative, he promoted several products, including Lipitor®, Zyrtec®, and Glucotrol XL®, to various specialists, primary care clinics and hospitals such as the VA Hospital in Columbia, Missouri, University of Missouri Hospital and Whiteman Air Force Base.

7.      Relator Westlock earned multiple awards over the next five years in this role, and was named the district sales representative of the year in 1993 for his district, and obtained the number one regional sales ranking for selling the product Glucotrol XL®.

8.      In 1997, Relator Westlock was offered a promotion and accepted a new position as lead Specialist sales representative selling Zoloft® and Aricept®, and was assigned to make sales calls on psychiatry and neurology clinics covering an area from Milwaukee to Green Bay, Wisconsin. During the period, Relator Westlock ranked number five (1999) and number seven (2001) nationally (out of 400 sales representatives), earning two Circle-of-Excellence Awards and two Vice-President's Cabinet Awards – Pfizer's highest sales reward.

9.      In 2002, Relator was offered another promotion as Assistant-to-the-Sales Director in Parsippany, New Jersey. In 2003, he was offered another promotion as District Sales Manager in Pittsburgh, Pennsylvania. In this position he was responsible for twelve sales

3

representatives within the Central Nervous Systems ("CNS") district covering Western

Pensylvania and the Buffalo and Rochester areas of New York. This group was responsible for

selling four Pfizer drugs: Aricept®, Zoloft®, Xanax® and Geodon®. After leaving this

position, he returned to St. Louis, Missouri as a Senior Professional Healthcare Consultant,

selling Pfizer products Geodon®, Zoloft®, Celebrex®, Bextra®, and subsequently Aricept®,

Relpax® and Lyrica®.

10.    Relator Westlock is an original source of the Fraudulent Marketing Scheme

allegations in this Complaint, and the allegations in the Fraudulent Marketing Scheme are not

based upon publicly disclosed information. He has provided the government with information

prior to the filing of this Complaint in accordance with 31 U.S.C. § 3730(b)(2). Prior to filing

this complaint, Relator Westlock brought the wrongdoing described in this Complaint to the

attention of Pfizer.

### B.    DEFENDANT PFIZER, INC.

11.    Defendant Pfizer, Inc. ("Pfizer") is incorporated under the laws of Delaware, with

its principal place of business in New York, New York. Pfizer is engaged in the development,

manufacture, distribution, and sale of pharmaceutical and health care products throughout the

United States. Throughout the relevant period, Pfizer manufactured and sold substantial

quantities of its drugs products, including Geodon®, in the Commonwealth of Massachusetts

and in the United States. Pfizer's pharmaceutical sales accounted for $44.4 billion (91.8

percent) of its total 2007 revenue of $48.3 billion.

12.    Pfizer manufactures, markets and sells brand-name prescription drug products,

including Geodon®, paid or reimbursed by various governmental programs, including health

benefit carriers offering benefits under the Federal Employees Health Benefits ("FEHB")

program under a prime contract with the Blue Cross Blue Association ("BCBSA"), the Health

4

Insurance Program for the Elderly and Disabled, more commonly referred to as the Medicare Program, 42 U.S.C. § 1395, *et seq*. via Medicare Part C, also known as Medicare+Choice, patients covered by Medicare Part D, the Indian Health Service, Medicaid, the Mail Handler's Health Benefit Plan ("MHHBP"), the U.S. Secret Service Employees Health Association ("SSEH") Health Benefit Plan, the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS," now known as "TRICARE") and the Veteran's Health Administration ("VHA") (collectively, the "Federal Programs").

13.    Pfizer conspired with Defendants Dr. Neil S. Kaye, M.D., NAMI and others to commit the unlawful acts described in this complaint.  As a result of Pfizer's actions, the *Qui Tam* States and Federal Programs have suffered financial harm.

14.    Pfizer has as many as thirty-one (31) sales offices located in the Commonwealth of Massachusetts out of which it employs numerous sales representatives, who call on health care professionals throughout Massachusetts in order to sell Geodon®.

15.    At all times material hereto, Pfizer employed as many as 12,000 sales representatives/sales managers located across the United States whose function it was to promote, market or otherwise sell Pfizer drugs, including its drug Geodon®.

## C.    DEFENDANT DR. NEIL S. KAYE, M.D.

16.    Defendant Dr. Neil S. Kaye, M.D. ("Defendant Dr. Kaye") conducts business at 5301 Limestone Road, Suite 103, Wilmington, Delaware.  Dr. Kaye is Assistant Clinical Professor of Psychiatry and Human Behavior and Assistant Clinical Professor of Family Practice at Jefferson Medical College and a Special Guest Lecturer at Widener University School of Law. Dr. Kaye is Board Certified in General Psychiatry, Geriatric Psychiatry, Pain Management, Forensic Psychiatry and as Senior Disability Analyst.

5

17.   Dr. Kaye specializes in forensic psychiatry, infanticide,  neuropsychiatry, psychopharmacology and psychiatric research, and has performed over 10,000 psychiatric evaluations.  Dr. Kaye is a paid Pfizer consultant, a frequent paid speaker for Geodon®, and conspired with Pfizer to unlawfully promote and market Geodon® as described in this complaint.

18.   Dr. Kaye offered multiple presentations in the Commonwealth of Massachusetts supporting the off label use of Atypical Antipsychotic Medications, specifically Geodon®. Dr. Kaye's presentations included:

- "Atypical Antipsychotics: Efficacy, Safety and Dosing: Clinical and Forensic Issues," McLean Hospital, Belmont, Massachusetts, 2002.

- "Atypical Antipsychotics: Child and Adolescent Issues," Northampton, Massachusetts, 2002.

- "Atypical Antipsychotics: Efficacy, Safety and Dosing: Clinical and Forensic Issues," Prescott Health Care Center, Worcester, Massachusetts, 2002.

- "Atypical Antipsychotics: Efficacy, Safety and Dosing: Clinical and Forensic Issues," Framingham, Massachusetts, 2002.

- "Atypical Antipsychotics: Efficacy, Safety, and Dosing: Clinical and Forensic Issues," Lowell, Massachusetts, 2002

Defendant Dr. Kaye's presentations promoted the off label use of Geodon® in adolescents; in patients with illnesses Geodon® is not approved to treat including, but not limited to, ADHD, bipolar disorder, dementia, and agitation; and at doses both higher and lower than approved by

6

the FDA. The aforementioned presentations occurred while Dr. Kaye was licensed to practice medicine in the Commonwealth of Massachusetts.

19.    As a result of Dr. Kaye's actions, the *Qui Tam* States and Federal Programs have suffered financial harm.

### D.    DEFENDANTS NATIONAL ALLIANCE FOR THE MENTALLY ILL AND NAMI ST. LOUIS (COLLECTIVELY "NAMI")

20.    The National Alliance for the Mentally Ill ("NAMI") conducts business at Colonial Place Three, 2107 Wilson Blvd., Suite 300, Arlington, VA 22201-3042.  NAMI is a national umbrella organization for more than 1,200 local support and advocacy groups for families and individuals affected by serious mental illnesses. NAMI support groups are located in all 50 states as well as in the District of Columbia, Puerto Rico, and Canada.   NAMI bills itself as "a grassroots organization of individuals with brain disorders and their family members."

21.    NAMI St. Louis conducts business at 134 West Madison Avenue, St. Louis, Missouri, and is a private, non-profit organization doing business in St. Louis, Missouri and is a local affiliate of NAMI.  Collectively, these organizations will be referred to herein as "NAMI."  NAMI conspired with Pfizer to unlawfully promote and market Geodon® as described in this complaint.

22.    Defendant NAMI currently operates with a local affiliate, NAMI Massachusetts (www.namimass.org), which conducts business at 400 West Cummings Park, Suite 6650, Woburn, MA 01801. NAMI Massachusetts claims that its primary functions are "support, education, and advocacy for consumers and their families; for research and services; and for the education of all professionals, providers, and the general public." However, the organization operates through significant financial support from Defendant Pfizer and other

7

drug makers.  Defendant NAMI reciprocates Defendant Pfizer's support by the promotion of
the off-label use of Pfizer products, including Geodon®.

23.    A newsletter sent through the U.S. mail and/or the wires through internet
communications to members of NAMI Massachusetts on or about April 14, 2004, from Kara
Sweeny, Director of Affiliate Development, to NAMI members solicited participants for a
Pfizer-sponsored study being conducted to test using Geodon® on adolescents with bipolar
disorder, which is a non-approved use of Geodon®.

24.    As a result of NAMI's actions, the *Qui Tam* States and Federal Programs have
suffered financial harm.

### E.    DEFENDANTS JOHN DOES #1-100.

25.    John Does #1-100, fictitious names, are individuals, corporations, limited liability
companies, or other lawful business entities through which Defendants do business in the
United States and internationally, and who are unknown co-conspirators who conspired with
Pfizer to perpetuate the scheme as described herein.  To the extent that any of the conduct or
activities described in this Complaint were not performed by Defendants, but by the
individuals or entities described herein as John Does #1-100, fictitious names, any reference
herein to Defendants under such circumstances, and only under such circumstances, refers also
to John Does #1-100 and/or other co-conspirators who conspired with Defendants to perpetrate
the schemes described herein.

26.    As a result of actions of John Does #1-100, the *Qui Tam* States and Federal
Programs have suffered financial harm.

8

## III.    SUMMARY OF DEFENDANTS' ILLEGAL CONDUCT

### A.    THE PLAN AND PURPOSE OF THE FRAUDULENT MARKETING SCHEME.

27.    It was the plan and purpose of the Defendants' scheme to illegally market Geodon® beginning at least as early as 2002 and continuing to the present in order to fraudulently obtain governmental reimbursement by causing false and fraudulent claims to be submitted for payment in order to maximize Pfizer's profits.

### B.    THE MANNER AND MEANS OF EXECUTING THE SCHEME.

28.    It was part of the scheme that Pfizer illegally promoted the off-label sales and use of Geodon® in order to obtain reimbursement for non-medically accepted indications and other off-label treatments in order to maximize profits by making false and fraudulent statements to the public, healthcare providers and the Food and Drug Administration ("FDA").

29.    Each Defendant's unlawful promotion of Geodon® involved the unlawful making of a false record or statement for the purpose of getting the false record or statement to bring about the Government's payment of a false or fraudulent claim.

30.    Each Defendant's individual conduct had a material effect on the governments' decision to pay for Geodon®.   Had the government known that reimbursements were being made for Geodon® caused by each Defendant's unlawful promotion, the government would not have made such reimbursements.

31.    It was further part of the scheme that Pfizer attempted to conceal and cover up the off-label marketing of Geodon® by making false statements to the FDA and directing employees to conceal evidence.

9

32.     The unlawful promotion of Geodon® that the conspirators agreed upon involved the unlawful making of a false record or statement for the purpose of getting the false record or statement to bring about the governments' payment of a false or fraudulent claim.

33.     The conspiracy had a material effect on the governments' decision to pay for Geodon®.   Had the governments known that reimbursements were being made for Geodon® caused by Defendants' unlawful promotion, the governments would not have made such reimbursements.

34.     The scheme, described below, is referred to herein as the "Fraudulent Marketing Scheme."

## IV.     BACKGROUND ON PROMOTING GEODON® FOR OFF-LABEL USES.

### A.     THE DEVELOPMENT OF "ATYPICAL" ANTIPSYCHOTIC MEDICATIONS TO TREAT SCHIZOPHRENIA AND BIPOLAR DISORDER.

35.     Geodon®, with a chemical name of ziprasidone hydrochloride, is one of a class of medications known as "atypical" or "second generation" antipsychotics ("SGA") that treat schizophrenia and bipolar disease. Geodon® was initially approved by the FDA to treat schizophrenia in February 2001.   In July 2002, the FDA approved Geodon® IM® to treat acute agitation in schizophrenic patients.  On August 19, 2004, Geodon® was approved to treat Acute Bipolar Mania including both manic and mixed episodes.   The approval of Geodon® for treating Acute Bipolar Mania was based primarily on two peer reviewed double-blind placebo controlled studies in which patients were evaluated for 21-days.

36.     The following chart includes the various package sizes, strengths and drug codes for Geodon®:

**Filed Under Seal**
129894.00601/35873664v.4

| GEODON® Capsules NDCs | | | |
|---|---|---|---|
| Package Configuration | Capsule Strength (mg) | NDC Code | Imprint |
| Bottles of 60 | 20 | NDC-0049-3960-60 | 396 |
| Bottles of 60 | 40 | NDC-0049-3970-60 | 397 |
| Bottles of 60 | 60 | NDC-0049-3980-60 | 398 |
| Bottles of 60 | 80 | NDC-0049-3990-60 | 399 |
| Unit dose/80 | 20 | NDC-0049-3960-41 | 396 |
| Unit dose/80 | 40 | NDC-0049-3970-41 | 397 |
| Unit dose/80 | 60 | NDC-0049-3980-41 | 398 |
| Unit dose/80 | 80 | NDC-0049-3990-41 | 399 |
| GEODON® for Injection NDCs | | | |
| Package | Concentration | NDC Code | |
| Single Use Vials | 20 mg/mL | NDC-0049-3920-83 | |

37.    Schizophrenia is a severe, debilitating mental illness that afflicts over one percent of the general population—2.5 million Americans—often beginning in late adolescence or early adulthood. One of the most complex and challenging of psychiatric disorders, schizophrenia is a heterogeneous syndrome of disorganized and bizarre thoughts, delusions, hallucinations, inappropriate affect, impaired psycho-social functioning, cognitive dysfunction and profound mood disorders. *See* DSM-IV-TR 298-302. The illness occurs when a patient suffers two or more of the following characteristic symptoms: (1) delusions, (2) hallucinations, (3) disorganized speech, (4) grossly disorganized or catatonic behavior, and (5) negative symptoms, *see id.*, or has bizarre delusions or hallucinations of voices commenting on the person's behavior or thoughts. Research has shown a variety of abnormalities in schizophrenic brain structure and function.

38.    Bipolar disorder is a serious, lifelong mental illness marked by dramatic shifts in mood, from abnormally elevated, expansive, or irritable moods to states of extreme sadness

11

and hopelessness, often with periods of normal mood in between. Bipolar I, characterized by the occurrence of one of more manic episodes or mixed episodes, often with major depressive episodes, and Bipolar II, characterized by one or more major depressive episodes accompanied by at least one hypomanic episode, are separate disease states. *See* DSM-IV-TR 382-92. Because of its complexity, bipolar disease can be difficult to diagnose; between seven and ten years of mis-diagnoses and incorrect treatment is typical for bipolar patients.

39.   In the past five years there has been an extensive amount of research into diagnosing and recommending treatments for bipolar disorder, funded in part by pharmaceutical manufacturers. There has been a corresponding growth of bipolar diagnoses— correct *and* incorrect—leading to an increase in patients and greater awareness of the disease; many patients labeled "bipolar" are mentally ill but, upon detailed psychiatric exam, not bipolar. An estimated 5.7 million American adults are affected by the disorder, and at least 800,000 children in the United States have been diagnosed as bipolar, no doubt some of them wrongly.

40.   Geodon® is generally known as a "second generation antipsychotic" or "SGA" to differentiate it from older, first-generation antipsychotics ("FGAs"), which were the common drug therapy for schizophrenia until the 1990s. FGAs include chlorpromazine (Thorazine®), fluphenzine (Proxilin®), haloperidol (Haldol®), molindone (Moban®), thioridazine (Mellaril®), loxapine (Loxitane®), mesoridazine (Serentil®), perphenazine (Trilafon®), thiothixene (Navane®), and trifluoperazine (Stelazine®), some of which have been in use since the 1950s. FGAs are sometimes referred to as "typical" antipsychotics and SGAs "atypical." Although many different FGAs exist, they share similar levels of efficacy. They are, generally speaking, post-synaptic dopamine-receptor antagonists -- *i.e.*, they target dopamine receptors in

12

the brain. A troubling side effect of typical antipsychotics is that the blockage of dopaminergic neurotransmission causes extrapyramidal syndromes ("EPS") such as Parkinsonian effects or tremors. Tardive Dyskinesia ("TD"), a long-lasting movement disorder, also frequently occurs with prolonged treatment.

41.     During the 1990s pharmaceutical companies, building on the "atypical" hypothesis, developed newer, second-generation antipsychotic drugs ("SGAs") attempting to capture the enhanced therapeutic effect of clozapine without its toxicity and, they hoped, without the side effects, such as EPS and TD, caused by traditional antipsychotics. The introduction of atypical antipsychotic medications was trumpeted by the manufacturers of these pharmaceutical agents as a major advance in the treatment of schizophrenia with improved symptomatic control of the psychosis and a reduction in both tardive dyskinesia and extra pyramidal side effects.

42.     SGAs now account for about ninety percent of all antipsychotic drugs prescribed for all psychiatric purposes, regardless of whether they were approved for those indications or not. While the two primary uses of SGAs remain the treatment of schizophrenia and bipolar disorder, SGAs are prescribed "off label" to treat symptoms related to agitation, anxiety, psychotic episodes, obsessive behavior, behaviors related to dementia, depression, obsessive compulsive disorder ("OCD"), Post Traumatic Stress Disorder ("PTSD"), personality disorders and Tourette's Syndrome. Although there is only mixed evidence about their efficacy for these purposes (as well as for their indications), SGAs have become a booming business.

### B.     PFIZER MARKETING OF GEODON®.

43.     Marketing and advertising have been critical to the success of the pharmaceutical industry in the last two decades, and particularly at Pfizer. Whether via increasingly common direct-to-consumer ("DTC") advertising or one-on-one physician detailing, drug companies

13

spend billions on drug promotion. Gardiner Harris, *Group Urges Ban on Medical Giveaways*, N.Y. Times, April 28, 2008. In 2000, for example, total national prescription drug promotion expenditures totaled more than $15.7 billion. Of that amount, $4.8 billion is spent on drug detailing alone.

44.    It is undisputable that expenditures for drug marketing increase sales. Intense pharmaceutical marketing saturates the pharmaceutical industry and appears in many forms— some of which some people would call disguised. To accomplish these goals and raise sales, Pfizer utilized all the various channels of information through which pharmaceutical companies can market their products to propel Geodon®'s brand message. Those channels— today highly susceptible to industry influence—are described below.

45.    The most obvious source of information about a medication is its own prescription label. Although a pharmaceutical company must obtain the FDA's approval for its drug's label, the label is the property of the manufacturer, not the FDA. Initially drafted by the manufacturer, labels are then subject to negotiations between the federal agency and the manufacturer. Because the FDA, however, depends solely on drug safety and efficacy information provided by pharmaceutical companies, it cannot object to a label's shortcomings if it never received the data from the manufacturer showing the drug's drawbacks.

        **1.**      **Drug Maker Detailing of Doctors and Health Care Professionals.**

46.    "Detailing" is the one-on-one promotion of drugs to physicians by pharmaceutical sales representatives, usually through regular office visits, free gifts, and friendly advice, when "drug reps go to doctors' offices to describe the benefits of a specific drug." Daniel Carlat, *Dr. Drug Rep.*, N.Y. Times Mag., Nov. 25, 2007, at 67.

14

47.   Medical detailing is a large field, employing over 90,000 sales representatives, or one detailer for every 4.5 doctors. The vast majority of doctors—eighty-five to ninety percent—do speak with drug detailers, and most consider them and the information they provide helpful and accurate. Drug representatives ostensibly provide useful information for physicians as they address "difficult problems in treating patients." Jonna Perala et al., *Lifetime Prevalence of Psychotic and Bipolar I Disorders in a General Population,* 64 Archives of Gen. Psychiatry 19, 1892 (2007).

48.   But drug company-controlled and -produced information has great potential to mislead.  One article published in the Journal of General Internal Medicine shows that nearly half (forty-two percent) of the material given to doctors by drug reps made claims in violation of FDA regulations. And only thirty-nine percent of the material provided by drug reps provided scientific evidence to back up the claims being made.

49.   On May 30, 2007, the Tacoma News Tribune reported an expose of drug manufacturer detailing of atypical antipsychotics at Western State Hospital, the Washington state psychiatric hospital in Lakewood, Washington.  *See* Otto, *Abilify And Other Newer Drugs May Cause Increased Violence*, Tacoma News Tribune (May 30, 2007).  The article studied the use of atypical antidepressants in the hospital since 1999.  According to the News Tribune, SGAs, which were far more expensive compared with older, generic alternatives, had been heavily promoted at the hospital by the pharmaceutical companies that make them. Sales representatives for those companies had logged about 1,200 visits to Western in just four years since late 2003, when administrators began tracking their activity:

> [Atypical antipsychotic drugs] are expensive, some more than $15 per pill, compared with less than a dollar per pill for the older medications. In 2006, the hospital spent more than $5 million on atypical antipsychotics, according to Western's pharmacy.  Promoted by drug companies as safer

15

**Filed Under Seal**
129894.00601/35873664v.4

> and more effective, atypicals are widely used at Western and most psychiatric hospitals. Their growing use, coupled with the continued use of some of the older drugs, has resulted in an increase since 1999 of about 30 percent in the amount of antipsychotic medication being given to patients at Western, The News Tribune found.

*Id.* Pfizer's sales representatives were among the most frequent visitors at Western. "Asked why Pfizer representatives have made almost 200 visits to Western since December 2003, company spokesman Bryant Haskins said, 'That's where our customers are.'" *Id.*

### 2.    Biased Clinical Trials Funded By Drug Makers.

50.    Clinical trials provide the empirical data upon which the FDA determines a drug's safety and efficacy and doctors make professional judgments about the relative risks and benefits of a drug—and whether it is appropriate to prescribe it for their patients.  The pervasive commercial bias found in today's research laboratories, however, means studies are often lacking in essential objectivity, with the potential to lead to misinformation, skewed results, or cover-ups.  According to Harold Sox, M.D., editor of *Annals of Internal Medicine*, and Drummond Rennie, M.D., deputy editor of *the Journal of the American Medical Association*, the following are indicia of marketing masquerading as science:  an open-label design, no control group, a very large projected enrollment relative to the importance of the question, a short-term study of a chronic disease, or a study of an already approved drug.

51.    Such bias is a recent phenomenon. Before 1980, the National Institute of Health ("NIH") funded most clinical trials. During the 1980s, its budget was slashed; in response, drug industry funding went up six-fold from 1977 to 1990. By 1991, drug companies funded 70 percent of all clinical trials, though eighty percent of commercially funded trials were still performed at universities.  By 2004, only twenty-six percent of commercially funded trials took place at universities.

16

52.    Today, eighty percent to ninety percent of all trials are commercially funded; between sixty-six percent and seventy-five percent of the clinical studies published in the most prestigious medical journals are commercially funded. Study design and control are increasingly in the hands of drug companies. Published studies often do not, however, reflect their commercial ties or authorship; they may be "ghostwritten" by company employees, use proprietary data not accessible to the scientific community, or simply not acknowledge their authors' financial ties to drug makers.

53.    Sponsorship is not insignificant. Even those trials performed at academic institutions are often partly to almost wholly controlled by the sponsor.  Sponsorship significantly affects chance whether trial will support drug; the odds are 5.3 times greater that commercially funded studies will conclude that the sponsor's drug is the treatment of choice compared to non-commercially funded studies of exactly the same drug.

54.    Odds of a trial favoring a drug also greatly increase if the trial's researchers had a financial conflict of interest with manufacturer. Not only does commercial bias affect the probable outcome of a study, but it also often controls whether and when a study is published. Because drug manufacturers often delay or suppress negative results from clinical trials they or their affiliated research institutions conduct, doctors, formulary committees, and policy makers had based their decisions on an unrepresentative fraction of the available scientific evidence when deciding if antidepressants in children were safe (only six out of the fifteen studies completed until then had been published).  *See* Benedict Carey, *Researchers Find Bias in Drug Trial Reporting*, N.Y. Times, Jan. 17, 2008, at A20 ("The makers of antidepressants like Prozac and Paxil never published the results of about a third of the drug trials that they conducted to win government approval, misleading doctors and consumers about the drugs'

17

true effectiveness, a new analysis has shown."); Alex Berenson, *Accusations of Delays in Releasing Drug Results*, N.Y. Times, April 1, 2008, at C7 (reporting a lead investigator's accusations against his study's commercial sponsors of deliberately delaying the release of his trial results, which reflected substantially negatively for the sponsor's drug, for two years "to hide something.").

### 3.    Drug Maker Sponsored CME Courses Using Paid "Thought Leaders."

55.    Another key source of drug information for doctors is continuing medical education ("CME") courses, usually medical lectures held locally featuring prominent "thought leaders" as speakers. Required to maintain medical licenses and to stay current with new developments to give patients the best medical care, many CME courses provide expert syntheses of clinical trial information.

56.    CMEs that are commercially funded have increased sharply, from forty-eight percent in 1998 to fifty-eight percent in 2002.  Sixty percent of CMEs have direct commercial sponsorship; indirect sponsorship (e.g., via non-profits funded by company money) accounts for a large portion of the remainder. Total industry contributions towards continuing medical education is estimated to be seventy percent or higher and in the hundreds of millions of dollars.

57.    Studies have shown that commercial sponsorship does result in biased CMEs. Drug company-sponsored lectures are two-and-a-half to three times more likely to mention the sponsor's drug in a positive light and the competitors' drugs in a neutral or negative light than are non-commercially sponsored lectures. Increased formulary requests, the prescribing of new brand-name drugs instead of older generic products, and the prescribing of the specific product

18

promoted have all been demonstrated to increase after exposure to pharmaceutical promotion and company-sponsored CMEs.

58.    Pfizer and other drug makers employ recognized clinical experts, well-known and respected in their field and referred to as "thought leaders" or "key opinion leaders," to join company "speakers bureaus" and conduct CMEs and product promotional programs in exchange for often significant lecture fees.  One recent study indicates that at least twenty-five percent of all doctors in the United States (approximately 200,000 physicians) receive drug money for lecturing to physicians or for helping to market the drugs in other ways.  Daniel Carlat, *Dr. Drug Rep*, N.Y. Times Mag., at 67; *see also* Gina Kolata, *Citing Ethics, Some Doctors Are Rejecting Industry Pay*, N.Y. Times, April 15, 2008 (reporting that a small number of prominent academic scientists have decided to stop accepting payments from food, drug and medical device companies in response to accusations of ethical conflicts inherent in these arrangements). In many of these presentations, the slides used have been "created by drug makers, not the speakers. That's like ghost-talking." Gardiner Harris, *Group Urges Ban on Medical Giveaways*, N.Y. Times, April 28, 2008 ("Speakers' bureaus and drug samples are pillars of the industry's marketing operations").

59.    Paying lucrative speaker fees is a key part of Pfizer's marketing of Geodon® to psychiatrists.  As a group, psychiatrists earn less in base salary than any other medical specialists.  Benedict Carey and Gardiner Harris, *Psychiatric Group Faces Scrutiny Over Drug Industry Ties*, New York Times, July 12, 2008.  In 2007, for example, median compensation for psychiatrists was $198,653, less than half of the $464,420 earned by diagnostic radiologists and barely more than the $190,547 earned by doctors practicing internal medicine.  But many psychiatrists supplement this income with consulting arrangements with drug makers, traveling

19

the country to give dinner talks about drugs to other doctors for fees generally ranging from $750 to $3,500 per event, for instance.   While data on industry consulting arrangements are sparse, state officials in Vermont reported that in the 2007 fiscal year, drug makers gave more money to psychiatrists than to doctors in any other specialty. *Id.* Eleven psychiatrists in the state received an average of $56,944 each.

**4.     Drug Maker Sponsored Journal Articles to Promote Drug Products.**

60.    Clinical trials are published via research and review articles in medical journals. Doctors value keeping up-to-date with medical literature, as journal articles are their primary source of best practices and current developments. Research articles describe individual primary clinical trials; review articles summarize results from multiple trials on the same subject.  Both are subject to systemic industry bias.

61.    Because of the increase in commercially-funded trials, the number of commercially funded journal publications has likewise dramatically increased. Today, two-thirds to three quarters of trials published in the four most respected medical journals are commercially funded.  Several editors of preeminent medical journals have gone so far as to say that their publications have devolved into information-laundering operations for the pharmaceutical industry.

62.    Drug makers also advertise their drug products through articles and "supplements" which are published in medical journals often as an addition to an issue.  These supplements are typically not peer-reviewed, and offer drug makers another venue to market drug products beyond their approved labeling.  These supplements are frequently prepared in conjunction with a CME set up for the drug maker by a Medical Education and

20

Communication Company ("MECC") to present information that appears to be—but in actuality is not—free from drug maker influence.

63.     MECCs are typically for-profit businesses that receive money from pharmaceutical companies to develop educational programs favorable to the product. Typically, these programs are offered live and/or telephonically.  Physician attendees used these educational programs to obtain CME credits, which are a requirement of all medical subspecialties.  Drug makers use MECC programs discussing the disease states relevant to their products, presenting information that appeared less promotional than that offered through FDA-regulated promotional talks.

64.     FDA-regulated promotional talks must comply with the approval data of the product.  Programs offered by MECCs often present new information about a product, typically representative of off-label (non-FDA approved) use of the product.  Key opinion leader ("KOL") experts like Defendant Dr. Kaye presented these programs.  Therefore, the information appeared to be purely educational and from a trusted source, when in fact it is simply a well-disguised marketing message for the drug product.

65.     On April 25, 2007, the Senate Finance Committee released the results of a Committee inquiry into drug company grants to fund continuing education for medical providers.  The Committee found that "drug companies have used educational grants as a way to increase the market for their products in recent years.  This practice is of particular concern when the companies use educational grants to encourage physicians to prescribe products for uses beyond their FDA approval."  *See* <u>Use Of Educational Grants By Pharmaceutical Manufacturers</u>, Committee Staff Report To The Chairman And Ranking Member, 110th Cong., Sen. Prt., 110-121, April 2007.  The report found that drug company corporate policies "allow

21

this industry to walk a fine line between violating rules prohibiting off-label promotion and awarding grant money in a manner likely to increase sales of their products, including sales for off-label uses." According to the Committee, risks exist for kickbacks, veiled advertising of drugs, efforts to bias clinical protocols, and off label promotion.

66.   On July 3, 2008, Pfizer announced that it would no longer directly fund medical education and communication companies (MECCs). Pfizer is making this move, in part, because of the widespread perception among the healthcare community and the public that MECCs blur the line between education and promotion. *See Pfizer Cuts Off Funding for Medical Education Companies*, Medical Meetings, July 2, 2008. Pfizer will, however, continue to *in*directly fund MECCs, as long as the grant money goes first to a medical society or medical center.

### 5.   Dr. Kaye's Off-Label Journal Articles Touting Geodon®.

67.   Pfizer regularly used "key opinion leaders" like Defendant Dr. Kaye to promote off-label uses of Geodon® in journal articles. One such presentation sponsored by a MECC is Dr. Kaye's article "A Primary Care Approach to Bipolar Disorder," in the Johns Hopkins Advanced Studies in Medicine, Vol. 6A, June 2006. This article is not peer-reviewed, and purports to publish "proceedings" presented at a drug manufacturer-sponsored CME round table symposium in Baltimore, Maryland held on November 12, 2005. Dr. Kaye's disclosure for this article states he is a consultant to various drug makers, including Pfizer, and that he receives honoraria from drug makers, including Pfizer. In his paper, among his other off-label statements, Dr. Kaye argues that Geodon® should be dosed off-label as high as 240 mg to 320 mg per day for acute mania, and includes a "sidebar" discussing "thoughts on off-label use of prescription drugs," including the following quote from the CATIE study:  "The dose range

22

approved by the FDA for quetiapine and ziprasidone [Geodon®] may be below their optimal

therapeutic doses . . ." *Id.* at S452.

68.     Yet another paper co-authored by Dr. Kaye, *Challenges in Recognition, Clinical*

*Management, and Treatment of Bipolar Disorder at the Interface of Psychiatric Medicine and*

*Primary Care*, was published as a supplement in Current Psychiatry, 2007, which has a

readership of over 40,000 psychiatrists, residents, and advanced practice nurses.  This

supplement was sponsored by a MECC, Health and Wellness Partners, and is "a supported

educational activity by Pfizer, Inc."  In addition, the supplement discloses in the fine print that

the authors received an honorarium from Pfizer, and that it was ghost-written by someone at

Health and Wellness Partners.

### 6.        Pfizer and Other Drug Maker Funding of NAMI.

69.     Among the strategies intentionally designed to obscure the actual sources and

amounts of funding for promotional activities, drug manufacturers have developed

relationships with front organizations—industry-funded grassroots, consumer advocacy,

research, and educational organizations whose primary goal is to promote marketing, influence

regulations, or advance other industry interests.

70.     NAMI is a national association of mental health organizations in every state and

bills itself as "the nation's largest grassroots mental health organization dedicated to improving

the lives of persons living with serious mental illness and their families."

71.     NAMI's 2000 Form 990 (the last year NAMI listed its contributors) states that it

has a supporting organization, the NAMI Anti-Stigma Foundation ("NASF"), which for the

year ended June 30, 2000, provided it with financial support in the form of "undesignated

grants and funding for specific programs and programs" totaling $2,698,602.  Pfizer is listed as

**Filed Under Seal**
129894.00601/35873664v.4

one of the ten drug makers who contributed to NASF.  NASF has been renamed the Mind of

America Foundation.

72.   According to NAMI, because some of its sponsors "may have a vested interest in

NAMI decision-making," it adopted certain "safeguards to ensure there is no such influence."

In reality, this not-for profit organization readily accepts donations offered by pharmaceutical

manufacturers while "cooperat[ing] with these entities to 'grow the market' by making persons

aware of the issues… by bringing into treatment persons who are not being served, and by

helping persons to adhere to their treatment plans."

73.   NAMI has been a key recipient of drug company generosity.  Drug firms gave

NAMI a total of $11.72 million between 1996 and mid-1999. These include Janssen ($2.08

million), Novartis ($1.87 million), Pfizer ($1.3 million), Abbott Laboratories ($1.24 million),

Wyeth-Ayerst Pharmaceuticals ($658,000), and Bristol-Myers Squibb ($613,505).  *See* Ken

Silverstein, *An Influential Mental Health Nonprofit Finds Its 'Grassroots' Watered By*

*Pharmaceutical Millions,* Mother Jones, November/December 1999.

74.   In 2002 and 2003, NAMI accepted over $4 million each year in corporate

donations from the pharmaceutical industry. Alison Bass, <u>Side Effects: A Prosecutor, A</u>

<u>Whistleblower and A Bestselling Antidepressant on Trial</u> (2008) at 131.

75.   During the time he was president of NAMI, James McNulty received thousands

of dollars for regularly speaking on behalf of Pfizer and other drug makers at various company-

sponsored events.  In an arrangement ethicists say is highly irregular, McNulty would process

the "grants" through NAMI Rhode Island.  In order to reduce paperwork, according to

McNulty, the drug maker would then give NAMI Rhode Island a check and NAMI Rhode

Island would in turn give McNulty a check.  At no time did McNulty disclose to the audiences

24

at his various speaking engagements, or to NAMI's membership, that he was being paid to speak by drug makers.  According to medical ethicist and Tufts University professor, Sheldon Krimsky:  "Here is someone who's acting as a citizen advocate, and he's getting paid by the pharmaceutical companies and not disclosing it.  Most people would question whether he's truly a citizen advocate after that."  *Id.*

76.  McNulty's relationship with Pfizer was particularly cozy.  On October 2, 2002, he attended a Pfizer presentation, and was quoted in a Pfizer press release as talking up the drug industry:  "For people with brain disorders, such as mental illness, patient care has been revolutionized by new generations of pharmaceutical therapies.  The scientific possibilities for breakthroughs are exciting. But it is also clear that medical progress depends upon public policy that encourages high-risk investment."

77.  NAMI's 2007 Annual Report lists Pfizer as one of thirteen pharmaceutical company "corporate partners."  *See* http://www.nami.org/Content/NavigationMenu/ InformYourself/About_NAMI/Annual_Reports/2007NAMIannualReport.pdf (last checked on July 26, 2008).  NAMI continues to receive millions of dollars from drug makers, but its annual reports no longer break out the amount of money given by its corporate partners.

### 7.  NAMI's Off Label Promotion of Geodon®.

78.  For its part, NAMI has been outspoken in its support of SGAs, including Geodon®.  Laurie Flynn, former executive director of the NAMI, even went so far as to claim that with the advent of atypical antipsychotic medicines "the long-term disability of schizophrenia can come to an end."

79.  Pfizer became one of the largest contributors among pharmaceutical manufacturers to NAMI, turning Defendant NAMI into a Trojan Horse for the illegal marketing scheme to promote Geodon®.  As but one example, NAMI's website unabashedly

25

goes so far as to promote the off-label use of Geodon® in children and the elderly, as well as

for long-term use in the treatment of bipolar disease, a potential violation of NAMI's stated

policy against endorsing any drug product:

> While not approved by the FDA for other uses, ziprasidone may be used
> alone or with other medications to treat other symptoms such as agitation
> or other behavior problems in older persons with memory loss or people
> with developmental disabilities, children with mental illnesses like
> schizophrenia or bipolar disorder, or depression. It may also be used for
> long-term management of bipolar disorder.

*See* http://www.nami.org/Content/ContentGroups/Helpline1/Geodon®(ziprasidone).htm (last

checked on July 21, 2008).

80.     Likewise, when the CATIE trial was published in 2005, the results of which

suggested that Geodon® and the other SGAs were no better than the older antipsychotic drugs

(only a lot more expensive), NAMI came to Pfizer's and the other drug makers' defense.  From

the minute CATIE's results were announced, NAMI defended its favorite drugs: the most

profitable ones.  NAMI responded to CATIE in predictable fashion, blaming the study's

unexpected results on patients who participated in the study. NAMI's then Medical Director,

Ken Duckworth, spun the CATIE results:

> General findings cannot be substituted for specific choices made in
> treating individuals with schizophrenia. One size does not fit all. It is
> critical that the study's limitations be recognized..

### 8.     Drug Maker Influence and the Exploding Off-Label Use of SGAs in Children and Adolescents.

81.     Off-label use of SGAs among children and adolescents has exploded despite little

research into the long terms effects on children's brains.  Doctors under the influence of

pharmaceutical company propaganda and financial "incentives" to prescribe these drugs are

putting children's lives at risk by prescribing these highly toxic drugs.  Dr. Ronald Brown, who

26

headed an American Psychological Association committee that evaluated the issue, put it
succinctly: "The bottom line is that the use of psychiatric medications far exceeds the evidence
of safety and effectiveness."

82.   There was a 40-fold increase over nine years in the number of children diagnosed
with bipolar disorder, fueling an explosion in the use of antipsychotic meds made by Pfizer and
other drug makers.  *See* C. Moreno, et al., "National Trends in the Outpatient Diagnosis and
Treatment of Bipolar Disorder in Youth," Archives of General Psychiatry, Vol. 64(9): 1032-
1039, September 2007.  The number of scripts written for children doubled to 4.4 million
between 2003 and 2006. The expanded use of bipolar disorder as a pediatric diagnosis has
made children the fastest-growing part of the $11.5 billion US market for antipsychotic drugs.
The study noted that the number of children diagnosed with bipolar disorder during outpatient
visits to doctors skyrocketed to 800,000 in 2003 from 20,000 in 1994. The numbers have
continued to climb even amid reports that more physicians are influenced to prescribe off-label
by drug company inducements.

83.   In 2005 alone, 251,000 Geodon® scripts were written for children in the United
States, up from 89,000 in 2003, according to data from Wolters Kluwer.  All of these
prescriptions are off-label.

84.   A recent report by the University of South Florida found the most common
diagnosis for antipsychotic treatment for children in Florida's Medicaid program between July
and December 2005 was for ADHD.  Fifty-four percent involved children 5 years of age and
younger, while forty-nine percent involved kids between ages 6 and 12.  *See* Robert Farley,
*The 'atypical' dilemma Skyrocketing numbers of kids are prescribed powerful antipsychotic
drugs. Is it safe? Nobody knows,* St. Petersburg Times, July 29, 2007.  According to the study,

27

the Florida Medicaid bill for these drugs jumped from $9 million in 1999 to nearly $30 million in 2006. Florida Medicaid records show the number of children - some just months old - who were prescribed SGAs went from 9,364 in 1999 to 18,137 in 2006.

85. A New York Times analysis of records from Minnesota, the only state that requires public reports of all drug company marketing payments to doctors, documents how financial relationships between doctors and drug makers correspond to the growing use of atypicals in children. Gardiner Harris, Benedict Carey and Janet Roberts, *Psychiatrists, Children and Drug Industry's Role*, N.Y. Times, May 10, 2007. From 2000 to 2005, drug maker payments to Minnesota psychiatrists rose more than six fold, to $1.6 million while prescriptions of antipsychotics for children in Minnesota's Medicaid program rose more than nine fold.

86. In 2006, Dr. Arnold Mech, a psychiatrist in Plano, Texas, diagnosed 13-year-old Brian Sherry with bipolar, obsessive-compulsive, social anxiety, generalized anxiety and attention-deficit hyperactivity disorders. *See* Rob Walters, *J&J, Pfizer Profit on 'Juvenile Bipolar Juggernaut*', Bloomberg.com, http://www.bloomberg.com/apps/news?pid= 20601109&sid=aBYgkHznuux0&refer=home. Dr. Mech prescribed Geodon® and the Pfizer antidepressant Zoloft®, along with Lilly's Straterra®, a stimulant. To counteract the sedating effect of Geodon®, he added Cephalon's Provigil®, a drug that promotes wakefulness. Over the next seven months, Brian had only fleeting relief from anxious, angry moods and rages. The drugs made him so tired he could barely function.

87. Dr. Mech was a paid participating physician in a pediatric study of Geodon® on behalf of Pfizer and has done research sponsored by eleven (11) other drug companies and has

28

served on the advisory boards or speakers' bureaus of eighteen (18) drug and medical device makers.

88.     According to Dr. Steven E. Hyman, the provost of Harvard University and former director of the National Institute of Mental Health, the influence of drug maker money on the growing use of atypicals in children is most troubling: "There's an irony that psychiatrists ask patients to have insights into themselves, but we don't connect the wires in our own lives about how money is affecting our profession and putting our patients at risk." *Id.*

**9.     Burgeoning Off-Label Use of SGAs to Treat Dementia.**

89.     Nearly 1.7 million elderly and disabled Americans live in 17,000 nursing home facilities across the country. Combined Medicare and Medicaid payments for nursing home services total an estimated $70 billion annually.  In 2005, the most recent year for which total expenditure figures are available, Medicaid spent $5.4 billion on atypical antipsychotic drugs, or 13.7 percent of all Medicaid expenditures on prescription drugs.

90.     The off-label use of SGAs to tamp down the agitation, combative behavior and outbursts of dementia patients has soared, especially in the elderly. Part of this increase can be traced to prescriptions in nursing homes.  Laurie Tarkan, *Doctors Say Medication Is Overused in Dementia,* N.Y. Times, June 24, 2008.  Researchers estimate that as much as 30 percent of all nursing home patients have been given antipsychotic drugs, particularly SGAs.  *Id.*

91.     According to CMS, nearly twenty-one percent of nursing-home patients who do not have a psychosis diagnosis are on antipsychotic drugs.  *See* Lucette Lagnado, *Prescription Abuse Seen In U.S. Nursing Homes:  Powerful Antipsychotics Used to Subdue Elderly; Huge Medicaid Expense*, Wall Street Journal, December 4, 2007; Page A1.

92.     There is little evidence supporting the off-label use of SGAs to treat dementia.  A 2006 study of Alzheimer's patients found that for most patients antipsychotics provided no

29

significant improvement over placebos in treating aggression and delusions. *Id.* In 2005, the Food and Drug Administration ordered that the SGAs (including Geodon®) carry a "black box" label warning of an increased risk of death.

**10.    Funding State Medicaid Adoption of Algorithms
to Make Geodon® First Line Treatment.**

93.    One way drug companies have marketed their products is by funding the implementation of guidelines, or algorithms – decision trees that spell out which drugs should be used for different psychiatric conditions, much as other health care algorithms guide the treatment of diabetes or heart disease.

94.    The Texas Medication Algorithm Project ("TMAP") is a particularly controversial algorithm project. It was rolled out in 1997, and provided a set of psychiatric management guidelines for doctors treating certain mental disorders within Texas' publicly-funded mental health care system, along with manuals relating to each of them.

95.    TMAP was designed to create overwhelming use of SGAs by producing a set of treatment algorithms approved as first and second line treatments for schizophrenia, bipolar disorder, and depression. The guidelines TMAP developed mandated the use of the most expensive antipsychotics on the market, the SGAs, by physicians treating Texas Medicaid patients.

96.    The choice of SGAs as first line treatment by the TMAP was not accidental. The initial creation of the TMAP guidelines was underwritten by state funds, along with grants from foundations and gifts from pharmaceutical companies who marketed (or in the case of Pfizer, were seeking approval to market) SGAs. All totaled, the drug companies contributed $1.3 million to TMAP from 1997 to July 2004, at least $834,000 of which was earmarked for TMAP. Pfizer contributed at least $146,500 for TMAP.

30

97.    The original TMAP recommendations, made for adults, were extended unchanged
to become recommendations for medicating children - with the same drugs - as TCMAP or
Texas Children's Medication Algorithm Project.  No studies and no research were performed.
The original TMAP "experts" simply met and agreed that it would be a good idea to treat
children with the same drugs as adults.

98.    At the time of the original TMAP, Geodon® was not included because it had not
yet received approval from the FDA to be marketed.   However, at the Schizophrenia
Algorithm Update Conference held in January 2002, the expert panel (many of whom were
receiving undisclosed monies as speakers, researchers and consultants for drug makers,
including Pfizer) decided to include Geodon® (ziprasidone) as a first-line medication in the
TMAP antipsychotic algorithm.

99.    Once TMAP produced the result that was intended (SGAs as first line treatment
for both on-label and off-label promotion), Pfizer and other drug makers provided major
funding to export the TMAP results to other states.  Pfizer and the other drug makers sponsored
TMAP staff through unrestricted educational grants as they provided 71 presentations for
groups of clinical providers, professional groups, administrators, payors, Medicaid officials,
and other stakeholders in order to drum up interest in similar algorithms in other states.

100.  In so doing, Pfizer and the other drug makers bypassed governmental safeguards
and scientific review by promoting TMAP and the related child and adolescent algorithms as
treatment models developed by a panel of "experts."  Pfizer and the other drug makers relied
upon paid consultants on their expert consensus panels to approve adoption of TMAP-like
programs in states throughout the country.

31

101. NAMI was one of the key participants in the TMAP process, including the addition of Geodon® to the list of first line SGAs in the treatment algorithm.

102. Pfizer regularly used the TMAP algorithms in its marketing, and experienced a significant increase in prescriptions and sales of Geodon® throughout Texas and nationwide as a result of TMAP and TMAP-like treatment algorithms encouraging SGAs as first line therapy.

103. In November 2007, TMAP issued a revised consensus judgment by leading experts suggesting that there is no advantage for chronic schizophrenics of SGAs over FGAs—reversing its earlier judgment on the basis of CATIE and other studies.

### C. THE LIMITED ROLE OF THE FDA IN REGULATING OFF-LABEL PROMOTION OF DRUGS.

#### 1. New Drug Approvals By the FDA.

104. Under the Food, Drug, and Cosmetics Act ("FDCA"), new pharmaceutical drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the satisfaction of the Food and Drug Administration ("FDA") that the drug is safe and effective for each of its intended uses. 21 U.S.C. §§ 355(a), (d). A drug receives FDA approval only for treatment of specified conditions, referred to as "indications." 21 U.S.C. §§ 352, 355(d). For each indication sought a manufacturer must provide condition-specific safety and efficacy information. *Id.* The FDA also determines the particular dosage (or range of dosages) considered safe and effective for each indication.

105. To determine whether a drug is "safe and effective," the FDA relies on information provided by a drug's manufacturer; it does not conduct any substantial analysis or studies itself. Applications for FDA approval (known as New Drug Applications or "NDAs") must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether or not such drug is effective in use." 21 U.S.C. § 355

32

(b)(1)(A). FDA approval of prescription drugs is wholly dependent upon the accuracy of information provided by drug manufacturers. *See generally* Wayne A. Ray & Michael Stein, *Reform of Drug Regulation—Beyond an Independent Drug-Safety Board*, 354(2) NEJM 194 (Jan. 12, 2006).

106.  FDA approval does not require that a new drug be more effective or safer than other drugs approved to treat the same condition. Neither does it require that the drug be cost-effective.  A drug must only be shown to be more effective than a placebo in treating a particular condition, without any statistically significant safety findings. Comparative data showing performance as compared to existing drugs is not required; the FDA has no basis for determining that one drug is better than another drug.

107.  Because short-term studies are accepted, drug applications often do not contain long term data on the safety or efficacy of the drug. Approval of a new drug generally contains a requirement that the manufacturers pursue further long-term studies, but two thirds of the promised studies never materialize and the FDA lacks any enforcement authority to require the manufacturer to complete these studies.  Many of the effects of newly-approved drugs could not possibly be known at the time of FDA approval, particularly the long-term effects of taking a medication, given the short length of and relatively few participants in the clinical trials conducted for approval. *See AP Analysis: How a Drug's Risks Emerge*, N.Y. Times, May 23, 2007. There is no systematic provision requiring drug companies to conduct—or provide results from—post-marketing studies.

108.  The FDA often finds itself in a quandary: "Safety and speed are the yin and yang of drug regulation. Patients want immediate access to breakthrough medicines but also want to believe the drugs are safe. These goals can be incompatible." Gardiner Harris, *Potentially*

33

*Incompatible Goals at F.D.A.: Critics Say a Push to Approve Drugs Is Compromising Safety*,

N.Y. Times, June 11, 2007, at A14.

109.  The drug's label, included as a printed insert in the drug's packaging, must also be

approved by the FDA as part of the original New Drug Application ("NDA"). The approved

indications and respective dosage information appear on the package insert ("the label"). 21

U.S.C. §§ 352, 355(d).  Labels are the primary means of providing prescribing physicians and

their patients with important information on a drug's risks and benefits.

## 2.      FDA Regulation After Approval.

110.  After a drug is approved, the FDA continues to exercise control over the product

labeling. To protect patients from safety concerns, the FDA may require a label change to

reflect the increased risk of various side effects or interactions, restrict a drug's indications, or,

in extreme cases, force a withdrawal from the market. *See* 21 C.F.R. § 201.57(3).

111.  FDA regulations restrict how drug companies may market and promote approved

drugs.  *See* 21 U.S.C. §§ 331, 352; 21 C.F.R. § 314.81. Drug labels—"labels" includes all

marketing and promotional materials relating to the drug—may not describe intended uses for

the drug that have not been approved by the FDA. 21 U.S.C. §§ 331, 352. Illegal

"misbranding" can result in criminal penalties. *See* § 333.

112.  The same general requirements about the promotion of prescription drugs apply to

both professional and consumer-oriented marketing. In particular, promotional materials may

only make claims that are supported by "substantial" scientific evidence (according to strict

scientific procedures) and they may not be false or misleading. FDA oversight helps ensure a

"fair balance" in all promotional claims and materials.  Federal regulations require that the

risks as well as the benefits must be clearly identified and given appropriate prominence.

Promotional materials must be consistent with the FDA-approved product labeling. This

34

restriction pertains to the clinical indications for which the drug has been approved as well as

the dosing regimen that is supported by the clinical trials that were undertaken to establish

safety and efficacy.

113. A manufacturer like Pfizer, wishing to market or otherwise promote an approved

drug for uses other than those listed on the approved label, must resubmit the drug for a series

of clinical trials similar to those required for the initial FDA approval. *See* Food and Drug

Administration Modernization Act of 1997 ("FDMA"), 21 U.S.C. §§ 360aaa(b), (c); *see also*

21 C.F.R. § 314.54 (outlining the administrative procedure for filing an application for a new

indication); 21 U.S.C. §§ 301 *et seq.* A supplemental NDA must be filed. Unless and until an

additional indication is approved by the FDA, the unapproved use is considered to be "off-

label."

114. Off-label information can only be distributed at the request of a health care

provider. 21 U.S.C. §§ 360aaa-366.

> **3.** **DDMAC's Limited Ability to Regulate Drug Maker Marketing and Promotion.**

115. The FDA's Division of Drug Marketing, Advertising and Communications

("DDMAC") is charged with overseeing the marketing and promotion of approved drugs to

ensure that advertisements are not false or misleading, provide a fair balance between the

benefits and risks of the drug, and do not include off-label uses. *See* Statement by Janet

Woodcock, M.D. (Director Center for Drug Evaluation and Research, FDA) Before the Senate

Special Committee on Aging.

116. DDMAC's effectiveness in regulating off-label promotion is limited. In 2003, the

entire staff consisted of forty members, with twenty-five reviewers responsible for reviewing

all drug advertisements and promotional materials. Moreover, drug materials do not have to be

**Filed Under Seal**
129894.00601/35873664v.4

pre-approved. FDA review of promotional materials occurs, if it does at all, after the materials have already appeared in public. Woodcock Statement, *supra*. Upon finding a violation, DDMAC generally requests, but does not require, the company to stop using the promotional materials. *Id.* Sponsors occasionally are required to publicly correct product misimpressions created by false, misleading, or unbalanced materials. *Id.*

117. Once a drug has been approved, the FDA's statutory authority is limited to requesting label changes, negotiating restrictions on distribution with the manufacturer, and petitioning for the withdrawal of the drug from the marketplace. Title 21 of the Code of Federal Regulations requires that "as soon as there is reasonable evidence of a serious hazard with a drug," the "Warnings" section of the label should be revised to reflect this hazard.

118. FDA's ineffectiveness in policing off-label promotion was confirmed in a July 28, 2008 U.S. General Accountability Office Report, which found that the FDA took an average of seven (7) months to issue letters in response to off-label promotions. *See Drugs: FDA's Oversight of the Promotion of Drugs for Off-Label Uses* (GAO 08-835), http://www.gao.gov/new.items/d08835.pdf.

119. Among the Report's findings: (1) FDA does not have separate oversight activities to specifically capture off-label promotion; (2) FDA is unable to review all promotional submissions because of the volume of materials it receives and prioritizes its reviews in order to examine those with the greatest potential impact on human health; (3) FDA is hampered by the lack of a system that consistently tracks the receipt and review of submitted materials; (4) FDA conducts limited monitoring and surveillance to identify violations that would not be identified through its review of submitted material—for instance, discussions between doctors and sales representatives; (5) during calendar years 2003 through 2007, FDA issued 42

36

regulatory letters in response to off-label promotions requesting drug companies to stop
dissemination of violative promotions.

120. Pfizer is among the companies cited in the GAO Report, cited for the July 20,
2005 Zyvox® Warning Letter, which had been approved only for treatment of nosocomial
pneumonia and specific skin infections. Despite the limited indication, Pfizer was warned that
it was improperly marketing Zyvox® for treatment of all infections caused by staphylococcus
infections.

### 4. Use of an Approved Drug Beyond Its Labeling Is Off-Label.

121. Any use of an approved drug for a purpose other than those indicated in the
labeling is considered to be "off-label." *See* David C. Radley, *Off-Label Prescribing Among
Office-Based Physicians*, 166 Archives of Internal Medicine 1021 (May 8, 2006). Physicians
may prescribe drugs for off-label uses at their discretion. It is generally agreed that off-label
prescribing can benefit both individual patients and patient populations as clinical experience
leads to the formation of hypotheses to be tested in structured clinical trials. The FDA does
regulate, however, off-label promotion by drug manufacturers.

122. Off-label uses of approved medications have not been subjected to the baseline
FDA scrutiny that approved uses have been, and are thus riskier. The lack of an indication in
the label should not be an issue, however, in the physician's managing of patients and
prescribing a medication "off-label." Physicians and the community recognize that many drugs
effective for a condition may not be labeled for that condition and may not have a strong body
of evidence for or against their use.

123. When considering off-label prescribing, physicians depend on the patient-specific
evidence they have available to them. This includes the particular patient, the severity of his

**Filed Under Seal**
129894.00601/35873664v.4

problems, the successfulness of prior treatment, and the risks of not treating.  Whether

contemplating on- or off-label use, physicians also rely on personal experience,

recommendations from colleagues and academics, educational seminars, and clinical trials

evidence.  Much of what physicians rely on is information (or, as the case may be,

misinformation) provided by sales representatives from drug makers, drug company sponsored

CMEs and speaker programs, and drug company sponsored clinical trials.


       **D.**    **GEODON® FDA APPROVAL ONLY FOR LIMITED INDICATION AS AN ATYPICAL ANTIPSYCHOTIC TO TREAT SCHIZOPHRENIA.**

       **1.**    **1998:  FDA Refuses to Approve Geodon®.**

124.  Pfizer first submitted Geodon® for approval to the FDA in March 1997.  At the

time, the FDA refused to approve Geodon® because of concerns it did not offer sufficient new

benefits for patients with schizophrenia to outweigh its potential for serious, potentially fatal

side effects.

125.  According to the FDA's "not approvable" letter, dated June 17, 1998, the agency

was concerned that Geodon® lengthened a particular period of the cardiac cycle during which

the heart is resetting its electrolytes, sodium, potassium, and calcium, making it more

vulnerable to rhythm disturbances ("the QT/QTc interval").  The effect is common to

antipsychotic medications; however, the delay seen in clinical trials was longer for Geodon®

than other then marketed antipsychotic agents.

126.  In 1998, FDA noted that there was no evidence of any superior antipsychotic

efficacy for Geodon® compared with any other antipsychotic drugs, either in typical

schizophrenic patients or in those shown refractory to standard antipsychotic therapy.

**Filed Under Seal**
129894.00601/35873664v.4

127.  Pfizer responded to the FDA's rejection of its application by conducting further clinical trials, pitting Geodon® against other leading "atypical" antipsychotic medications, haloperidol, olanzapine, risperidone, and quetiapine. The cardiac effects of each of the drugs were measured and monitored at optimum doses. Each drug was then compared with thioridazine, the older antipsychotic known to exhibit the strongest cardiac effect, and designated by FDA as a second-line drug due to its strong potential for cardiac arrhythmias.

128.  The Pfizer study revealed that the prolonging cardiac effect interval for Geodon® was longer than the four comparison atypical antipsychotics, but was shorter than that seen with thioridazine.  As a result, the FDA's eventual approval only gave approved labeling of Geodon® and included extensive language warning of the potential for Geodon® to cause cardiac arrhythmias. In fact, the label's "Indications" section included the following wording:

> When deciding among the alternative treatments available for this condition [schizophrenia], the prescriber should consider the finding of ziprasidone's greater capacity to prolong the QT/QTc interval compared with several other antipsychotic drugs.

129.  In addition to prolonging the QTc interval, the Pfizer study demonstrated that Geodon® exhibited other potential side effects common to the other atypical antipsychotic agents.  In clinical trials, for example, the most commonly reported emergent adverse events were somnolence (14 percent), extrapyramidal syndrome (5 percent), and "respiratory disorder"—described as "cold symptoms and upper respiratory infection"—(5 percent). Other reported side effects included nausea, dry mouth, constipation, and dyspepsia.

130.  In its presentation to the FDA Center For Drug Evaluation And Research Psychopharmacologic Drugs Advisory Committee ("FDA Drug Advisory Committee") meeting on July 19, 2000, Pfizer explained why the FDA should approve Geodon®.  Among the representations made by Pfizer was the following statement by Edmund P. Harrigan, M.D.,

39

Pfizer Global Research and Development, Executive Director, CNS Therapeutics, concerning

the appropriate dosing for Geodon® (then being referred to as "Zeldox") should be no more

than 160 mg per day:

> One word about dose.  I'll be stating total daily dose, which the label
> would recommend be divided into two equal doses and taken with meals,
> as was done in nearly all ziprasidone clinical trials.  First, a summary
> graphic of the treatment effects in the short-term studies.  This figure
> illustrates the placebo-corrected change from baseline with 95 percent
> confidence intervals for each fixed-dose treatment group studied in these
> trials.  It is proposed that the 40 milligram daily dose is insufficient to treat
> acute exacerbation.  Efficacy has clearly been demonstrated at daily doses
> of 80 to 160 milligrams.  The 200 milligram per day dose appeared to
> offer no advantage in terms of efficacy.  It was associated with increased
> adverse events.  So the recommended effective dose range is 80 to 160
> milligrams daily.

131.  Also present at the hearing before the FDA Drug Advisory Committee speaking

in favor of the FDA approval of Geodon® were NAMI representatives, including Jacqueline

Shannon, then NAMI President, and Rex Cowdry, M.D., then NAMI Medical Director.  The

NAMI representatives were the only public witnesses to testify at the FDA Advisory

Committee meeting.

132.  On July 19, 2000, the FDA Drug Advisory Committee issued a report stating that

it had reviewed the Pfizer study and concluded:  "We are . . . in general agreement with Pfizer

on the antipsychotic efficacy of ziprasidone based on the short-term, fixed dose, placebo-

controlled phase 2/3 studies. Of note, however, we are not aware of any evidence from these or

any other studies of any superior antipsychotic efficacy for ziprasidone compared to any other

antipsychotic drugs, either in typical schizophrenic patients or in those shown refractory to

standard antipsychotic therapy."

40

2.    **February 5, 2001:  FDA Approves Geodon®.**

133.  In the eventual approval letter for Geodon® dated February 5, 2001 for 20, 40,

60, and 80 mg capsules, 160 mg BID, the FDA required Pfizer to complete post-marketing

clinical studies including a dose response study for the drug's effect on the QTc interval, a

study of sudden unexpected death with Geodon® and other atypical antipsychotics, and further

studies to demonstrate possible advantages for Geodon® over other currently marketed

antipsychotic medications.  In addition, the FDA required Pfizer to submit three copies of the

introductory promotional materials for Geodon® to the DDMAC.

134.  Despite extensive studies in adults by Pfizer in order to garner FDA approval for

Geodon®, no studies were completed by Pfizer in children although FDA regulations required

all applications for new active ingredients, new dosage forms, new indications, or new dosage

regimens to contain an assessment of the safety and effectiveness of the product in pediatric

patients. The FDA, in its approval letter for Geodon®, granted a waiver of the pediatric

requirement pending the collection and review of additional safety data.  Pfizer has never

applied to the FDA for pediatric use.

3.    **September 19, 2005:  CATIE Study Shows SGAs
No More Effective Than FGAs.**

135.  On September 19, 2005, the results of the most comprehensive comparative study

ever conducted – *i.e.,* the National Institute of Mental Health ("NIMH") Clinical Antipsychotic

Trials of Intervention Effectiveness (the so-called "CATIE" study) --  were published in the

New England Journal of Medicine, finding that SGAs like Geodon® were no more effective

and no safer in the treatment of schizophrenia than an older, cheaper drug that has been largely

discontinued.  *See* Vedantam, *New Antipsychotic Drugs Criticized: Federal Study Finds No

Benefit Over Older, Cheaper Drug,* Washington Post, September 20, 2005, A01.

41

136.  Older antipsychotics are known to cause involuntary muscle movements, and the newer drugs were heralded for not causing that problem. Jeffrey Lieberman, lead author of the CATIE study, noted that earlier comparisons with older drugs, largely funded by drug manufacturers, had mostly used a highly potent drug called Haldol®, whereas the CATIE study did not find the same degree of movement problems with perphenazine, a less potent drug.

### E.    PFIZER MISLEADS THE PUBLIC, HEALTHCARE PROVIDERS, AND THE FDA ABOUT GEODON®.

137.  Pfizer has engaged in a deliberate pattern of false and misleading promotion of numerous of its drugs, including Geodon®, to the public and to healthcare providers by making false representations and omitting material facts regarding its approved indications; overstating its drugs' efficacy; concealing critical safety information; and by fraudulently promoting its drugs for off-label uses.

138.  As a result, the Division of Drug Marketing, Advertising, and Communications ("DDMAC"), the FDA division responsible for oversight of drug marketing, initiated numerous warnings to Pfizer in an effort to compel Pfizer to stop these illegal promotional practices.  Not only did Pfizer fail to comply with DDMAC's demands, on information and belief it falsely assured DDMAC that it would cease all misleading promotion when, in truth and fact, Pfizer had been flagrantly engaged in a nationwide campaign to illegally promote the off-label use of its products to generate additional profits.

139.  Despite Federal laws prohibiting this conduct, at all times relevant hereto, Pfizer had a corporate policy to promote off-label uses of its drugs, including Geodon®, and made false and misleading statements to the public, healthcare providers, and hospitals, falsely

42

stating and/or implying that the drug could be used in certain settings for which it was not approved.

### 1. September 3, 2002:  Pfizer Receives Warning Letter From DDMAC.

140.  On September 3, 2002, Pfizer received a DDMAC Warning Letter, concerning misleading promotional materials and misleading oral statements for Geodon®.  According to the Warning Letter, Pfizer's sales representatives had promoted Geodon® "in a manner that is misleading and lacking fair balance because it minimizes the important risk information regarding the capacity of Geodon® to cause QT prolongation, and the potential to cause torsade de pointes-type arrhythmia and sudden death."  With regard to the oral representations, the Warning Letter stated that Pfizer sales representatives had "minimized the important risk information regarding the greater capacity of Geodon® to cause QT prolongation and the potential to cause sudden death, and misrepresented Geodon® as having antidepressant effects similar to serotonin reuptake inhibitors (SSRIs)."

141.  The DDMAC Warning Letter requested that Pfizer immediately cease the dissemination of violative promotions, and respond to the FDA stating that Pfizer has complied with the FDA's request.  On information and belief, Pfizer falsely informed the FDA that all violative promotion had ceased, when in fact Pfizer had no intention of complying with the FDA's request and continued the unlawful promotion of Geodon®.  For example, the following month, in October, 2002, Defendant Dr. Neil Kaye, a paid Pfizer national speaker, promoted Geodon® for non-approved uses in a presentation to psychiatrists with Pfizer's support and knowledge.  Defendant Dr. Neil Kaye's role in Pfizer's unlawful promotion is more fully described below.

43

## 2.  September 13, 2002:  Pfizer's Legal Position On Off-Label Marketing.

142.  Only ten days after receiving the DDMAC Warning Letter, on September 13, 2002, Pfizer sent the FDA an explanation of its corporate position whether it could legally off-label market its drugs.  *See* Request for Comment on First Amendment Issues, Docket No. 02N-0209.  According to Pfizer:

> There may be circumstances where the flow of information from the manufacturer, taken together with other conduct, establishes a covert endorsement notwithstanding the absence of any overt promotional statements. In those selected instances, or in cases where the information circulated is false or misleading, FDA should reserve the right to take improper shipment or misbranding enforcement action. In all other cases, however, Pfizer believes that the First Amendment constrains FDA from taking action against the dissemination of off-label information accompanied by disclosures which make clear that: (a) FDA has not approved the use discussed; (b) the manufacturer is not recommending or prescribing the use discussed; and (c) the information is provided for the information of, and to promote dialogue with, the prescribing community, which must make its own determination with respect to the use discussed.

As such, Pfizer argued it was only impermissible to engage in off-label promotion when there was a "covert endorsement" of the promotional statements or when the information it circulated was "false or misleading."  In all other instances, Pfizer believed it was legal to promote its drugs off-label.

143.  It is thus not surprising that over the next five years Pfizer would receive nine additional DDMAC Warning Letters, including for Covera® (October 24, 2003); Camptosar® (November 17, 2003); Zyrtec® (April 22, 2004); Viagra® (November 10, 2004); Celebrex® and Bextra® (January 10, 2005); Zyrtec® (April 13, 2005); Zoloft® (May 6, 2005); and Zyvox® (July 20, 2005).

**Filed Under Seal**
129894.00601/35873664v.4

### 3. July 16, 2007: Pfizer Receives Second Geodon® Warning Letter From DDMAC.

144. Pfizer's blatant disregard for the law governing off-label promotion was once again made clear in a DDMAC Warning Letter dated July 16, 2007 regarding a misleading Geodon® journal advertisement. According to the DDMAC, the advertisement omitted important risk information and included unsubstantiated superiority claims in a journal advertisement for Geodon® injection. In addition, the Geodon® Injection advertisement falsely claimed that Geodon® was twice as effective as haloperidol IM without any support or proof.

145. The Geodon® off-label campaign has paid off for Pfizer. Geodon® is one of the fastest growing antipsychotic medications in the U.S. with sales in 2005 of some $589 million, up 29 percent over 2004 sales. By 2007, sales for Geodon® had grown to $854 million, and helped offset a slowdown in Pfizer's sales of the cholesterol fighter Lipitor® and the loss of U.S. exclusivity for its hypertension pill Norvasc®. George E. Jordan, *Pfizer Profit Down But Tops Forecasts*, Newark Star-Ledger, January 24, 2008.

146. As much as seventy-five percent of sales for atypical antipsychotic drugs like Geodon® comes from Medicaid. *See* Mark Duggan and Fiona M. Scott Morton, *The Distortionary Effects Of Government Procurement: Evidence From Medicaid Prescription Drug Purchasing*, p. 16 (2005).

### V. PFIZER'S FRAUDULENT MARKETING SCHEME.

147. At all relevant times, Pfizer knew that Geodon® was and is being paid or reimbursed by Federal Programs, including Medicaid and Medicare Part D, as well as by the *Qui Tam* States.

45

148.  Pfizer knew, or it was reasonably foreseeable, that its promotion of Geodon®
would lead to the submission by physicians, pharmacists and government-funded health plans
of Geodon® prescriptions ineligible for payment by Federal Programs.

149.  When Pfizer decided to employ these illegal marketing practices, it knew or
should have known that physicians, pharmacists, and federally-funded health programs would
routinely and necessarily file claims with Federal Programs for reimbursement for Geodon®
prescriptions.  But for Pfizer's illegal promotion, these off-label and misbranded prescriptions
for Geodon® would not have been written.  As a result, Pfizer caused the submission of false
claims to Federal Programs for reimbursement of Geodon®.  Pfizer was the beneficiary of
these false claims for reimbursement of Geodon® prescriptions.

### A.   PFIZER ANNOUNCES ITS POLICY TO GROW THE GEODON® MARKET RAPIDLY THROUGH ILLEGAL MARKETING SCHEME.

150.  At the time it was finally approved in 2001, Geodon® became the fourth atypical
antipsychotic drug on the market.  Already on the market were:  Janssen's Risperdal® (1993),
Ely Lily's Zyprexa® (1996), and Astra Zeneca's Seroquel® (1998).  Bristol-Myers Squibb's
Abilify® (2002) was approved by the FDA shortly after Geodon®'s approval.

151.  The long delay in FDA approval placed Pfizer at an initial disadvantage in the
growing market for schizophrenia drugs such as Eli Lilly's Zyprexa®, which was already on
the market.  Another disadvantage was that at the time Zyprexa® had relatively few reported
side effects.

152.  Pfizer had expected Geodon®'s annual sales to reach $1 billion by 2004.  But,
sales lagged far behind that pace. Geodon®'s revenues were only $150 million during 2001,
and had only reached $128 million at the end of the third quarter of 2002.  With the $1 billion
goal seemingly out of reach, Pfizer needed a way to boost sales.

46

153.  Pfizer sales managers held a crucial meeting in November, 2002, during which Pfizer's national head of Geodon® marketing announced at the National Sales Meeting (located at the Disney Complex in Orlando, Florida), that Pfizer's goal was to grow the Geodon® market by promoting its use beyond the current market of schizophrenia.  This promotion was to include unapproved uses.  On information and belief, the head of Pfizer's Geodon® marketing at that meeting who made the announcement was Efren Olivares.

154.  This National Sales Meeting was attended by Pfizer sales managers, including District Managers, Regional Managers, Regional Medical Research Specialists ("RMRSs") and Vice Presidents from Pfizer corporate sales.  In his presentation, Olivares recited a list of the unapproved uses the Pfizer sales force were directed to promote including:  borderline personality disorder, refractory mood disorders (depression, obsessive compulsive disorder, post traumatic stress disorder), dementia in the elderly, bipolar mania, bipolar maintenance, pediatric/adolescent conduct disorders.  These unapproved uses were subsequently cited by Pfizer-sponsored speakers and in Pfizer-sponsored literature.

155.  Olivares' presentation at this National Sales Meeting did not include any reference to Geodon®'s significant risk profile.  The only emphasis was on increasing sales wherever possible.

156.  Given the widespread use of SGAs off-label, Pfizer knew that it could significantly increase sales of Geodon® by increasing marketing to a larger patient population for which Geodon® could be prescribed.  Pfizer thus set into motion its Fraudulent Marketing Scheme to bolster Geodon® sales.

47

157.  Pfizer's announcement at its November 2002 national meeting that Geodon® was
to be promoted for multiple off-label uses was implemented nationwide.  Off-label promotion
of Geodon® thus became ingrained in the sales force and Pfizer management.

158.  For example, Pfizer's District Manager in Chicago, John Hutt, rolled out the
Pfizer corporate Geodon® directive by training his sales representatives on off-label
promotion.  Hutt directed sales representative Bob Burrell to conduct an off-label presentation
for other sales representatives to demonstrate the promotion of Geodon® for depression, mood
disorders, post traumatic stress disorder, bipolar disorder and adolescent use.

### B.    PFIZER SPONSORED AND FACILITATED PRESENTATIONS PROMOTING THE OFF-LABEL USE OF GEODON®.

159.  One prong of Pfizer's Fraudulent Marketing Scheme involved using promotional
speaker programs, employing medical specialists, or "thought leaders," to promote Geodon®,
even in instances when those speakers made presentations that approved of off-label use of
Geodon®. According to the *Field Guide*, the Pfizer compliance bible: "Pfizer is held
responsible for the conduct and content of its promotional speaker programs." *Field Guide* at
97. In addition, the *Field Guide* states that:

> [a]ll information proactively presented must be consistent with labeling.
> A physician speaking for Pfizer at a promotional program represents
> Pfizer and must follow the same promotional policies as a member of the
> Pfizer sales force, with two exceptions:
>
> - He or she may provide off-label information only in response
>   to a specific, unsolicited questions;
>
> - He or she may not create and use his or her own non-product
>   disease state and case study slides for a promotional program;
>   and
>
> - Since the unapproved clinical reprint contains off-label
>   information, the speaker may not include the study in his or her
>   presentation, but may cite it only if appropriate in response to a
>   specific unsolicited question.

48

160.  Pfizer recruited a nationwide network of paid speakers to promote Geodon®, maintained lists of these speakers, tracked each speaker's effectiveness, including each speaker's off-label presentations, and provided these lists to its sales force.

161.  At all times material hereto, although it was Pfizer's stated policy that investigational or unapproved uses could not be presented by a Pfizer-sponsored speaker, its sales force regularly used contracted speakers to make presentations which included unsolicited materials concerning investigational and/or unapproved uses of Geodon®.

162.  With Pfizer's knowledge and approval, Pfizer speakers touted unapproved uses for Geodon®, both verbally and in written materials, such as power point slides.  Written materials that included unapproved uses were disseminated to Pfizer's sales force with Pfizer's knowledge and approval.

163.  Pfizer's network of speakers included influential individuals who Pfizer knew would tout Geodon® for unapproved uses to audiences across the country as part of Pfizer's nationwide scheme to increase Geodon® sales.  One of these key speakers, and a leading off-label proponent for Geodon®, who spoke nationally and commanded premium fees, was Defendant Dr. Kaye.

### C.  PFIZER'S "BIG GUN" SPEAKER:  DEFENDANT DR. NEIL S. KAYE, M.D.

164.  Pfizer knew that a tried and true strategy to increase revenue was to engage in a nationwide illegal marketing campaign, which involved unlawful off-label promotion.  One of the key champions of this nationwide Fraudulent Marketing Scheme was Defendant and co-conspirator Dr. Kaye who conducted hundreds of speeches throughout the United States in which he promoted the off-label use of Geodon®.

49

165. Pfizer conspired with Defendant Dr. Kaye as early as 2001 to begin a nationwide Geodon® promotional campaign at locations across the United States. In exchange for promoting Geodon® off-label, Defendant Dr. Kaye was paid up to $4,000 per day plus all his expenses. Defendant Dr. Kaye became such a frequent speaker that he used his own private helicopter to fly to various locations throughout the United States, all at Pfizer's expense.

166. Because the amounts of money being paid to Defendant Dr. Kaye were considerably more than Pfizer normally paid for such "thought leader" presentations, these payments had to be approved by a Pfizer Vice President. That Kaye could command such premium fees is a testament to just how important he was to the off-label promotion of Geodon®. In the year 2002 alone, Defendant Dr. Kaye embarked on an extraordinary schedule, speaking about Geodon® on behalf of Pfizer throughout the United States to numerous groups of psychiatrists who were treating, in many instances, Medicaid patients.

167. Defendant Dr. Kaye was known to Pfizer sales representatives as a "big gun" hired by Pfizer to increase off-label sales of Geodon®. Defendant Dr. Kaye gave these presentations at clinics, hotels, restaurants, physician offices and mental health facilities all across the country.

## 1. Dr. Kaye's October 16, 2002 Off-Label Presentation of Geodon®.

168. As but one example of Defendant Dr. Kaye's unlawful promotion, on Wednesday, October 16, 2002, he promoted Geodon® to physicians for non-approved uses, utilizing a PowerPoint presentation. The Kaye presentation slides promoted Geodon® for non-approved uses or populations: borderline personality disorder, major depression augmentation, dosing in refractory patients, bipolar mania, bipolar depression, bipolar maintenance, dementia,

Filed Under Seal
129894.00601/35873664v.4

child/adolescent conduct/impulse explosive disorder/attention deficit disorder.  In addition, Dr.

Kaye recommended dosing Geodon® as much as four times a day at doses over the FDA

approved 160 mg per day in refractory schizophrenic patients and in doses as low as 10 mg

once daily (Geodon®'s lowest non-scorable capsule is 20 mg) in dementia patients.

169.  Despite the fact that the patients that Geodon® is being used to treat are

frequently suffering from acute psychosis, dementia, or being treated for substance abuse, as

well as other "prominent negative symptoms," it was Dr. Kaye's view in his promotional

presentations for Pfizer that off-label prescribing by psychiatrists was acceptable so long as

there was informed consent.

170.  At all times material hereto, Defendant Dr. Kaye knew that Geodon® was not

approved for pediatric use, or with elderly patients with dementia.  Despite this knowledge,

Defendant Dr. Kaye made hundreds of presentations in which he made unsolicited promotions

concerning the off-label use of Geodon®, touting its investigational and unapproved uses.

171.  At all times material hereto, Pfizer knew that Defendant Dr. Kaye's promotion of

Geodon® for use in pediatric and elderly populations would greatly increase Geodon® sales.

Geodon®'s chief competition was Zyprexa®, which was considered safer and had obtained

pediatric approval.  Upon information and belief, Pfizer's strategy was thus to promote

Geodon® for unapproved uses to populations for which similar products were already

approved, and thus hope to garner the "halo" effect for such competitive products, which one

expert has described as a "signal to the marketplace that they might be comfortable in trying

these products in other [off-label] areas as well."

172.  At all times material hereto, Pfizer knew Defendant Dr. Kaye was promoting, or

with reckless disregard allowed Defendant Dr. Kaye to promote, Geodon® for off-label uses,

**Filed Under Seal**
129894.00601/35873664v.4

and paid hundreds of thousands of dollars to support this nationwide off-label campaign. Despite the fact that Pfizer senior management was aware of Defendant Dr. Kaye's off-label promotion of Geodon®, at no time did Defendant Pfizer instruct Dr. Kaye that Pfizer's guidelines required off-label information be provided only in response to specific, unsolicited questions. Nor at any time did Pfizer correct any off-label representations made by Defendant Dr. Kaye, either in person during one of his off-label presentations or through a Dear Doctor letter after the fact.

### 2. Dr. Kaye's Off-Label Materials Were Provided to Pfizer Sales Representatives Nationwide.

173. Dr. Kaye's off-label promotional materials were provided to hundreds of Pfizer sales representatives. On October 16, 2002, Pfizer Regional Manager Jim Reilly emailed Dr. Kaye's slides to Pfizer District Managers reporting directly to him, with the subject line referring to "Neil Kaye, MD." Pfizer District Manager Vincent C. Valentine also emailed copies of the Dr. Kaye presentation slides to all Pfizer District Managers in his region. Relator Westlock received these slides via email on October 21, 2002.

174. Pfizer also used Defendant Dr. Kaye's off-label promotion by providing off-label "selling points" to thousands of sales representatives, summarizing his off-label presentation. In a document entitled "Neil Kaye, MD Geodon® Take Home Selling Points," the Pfizer sales force was provided off-label promotional points they could use to implement the off-label sales strategy. While this three-page document includes the annotation "DO NOT DETAIL FOR YOUR INFORMATION ONLY," Pfizer's inclusion of the annotation "do not detail" was at all times material hereto instead was understood by Pfizer's sales representatives to mean "do detail," particularly so since the document clearly was intended to be "selling points" sales representatives were to use in the off-label promotion of Geodon®.

175.  As such, at all times material hereto Defendant Dr. Kaye's "take home selling points" were sent to Pfizer's sales force with the intent and expectation that Pfizer's sales representatives would use these points in connection with unlawful off-label promotional activities for Geodon®.  These off-label marketing selling points include selling Geodon® for borderline personality disorder, dementia and major depression.  Not only were these selling points off-label, Dr. Kaye's presentation is specifically counter to the black box warning from the FDA due to increased mortality in elderly patients with dementia-related psychosis.  Geodon® Prescribing Information, pg. 15.

176.  At all relevant times material hereto, Defendant Dr. Kaye knew that his off-label promotional materials and speaking engagements were being used by Pfizer to increase sales of Geodon® by unlawful promotion for unapproved uses, and that Geodon® prescriptions he unlawfully promoted were being reimbursed by Federal Programs, including Medicaid.

### D.  PFIZER PAID MULTIPLE SPEAKERS TO UNLAWFULLY PROMOTE GEODON®.

177.   Pfizer paid influential speakers to promote its products, including speakers who Pfizer knew made off-label presentations.  Pfizer selected its speakers by their ability to influence prescribers.  Pfizer's nationwide promotion of Geodon® included such "thought leaders" and influential psychiatrists from across the country.

178.  For one such example, Pfizer invited and paid Dr. M. Michael Ishii, the Site Psychiatrist at the Dean Medical Center's Sun Prairie Clinic in Madison, Wisconsin, to speak to an audience of psychiatrists in April 2002.  Dr. Ishii is considered one of the most influential psychiatrists in the Madison, Wisconsin area.  Sun Prairie Clinic's patients include patients covered by Medicaid and Medicare.  Pfizer paid Dr. Ishii approximately $1,000 for each presentation.

53

179.  For this Pfizer program, Dr. Ishii's topic was the "Practical Issues in Prescribing Geodon®."  Dr. Ishii provided this lecture to multiple audiences at multiple dates in at least the states of Illinois and Wisconsin in 2001 and 2002.  His presentation downplayed the side effects of Geodon®, and promoted Geodon® for non-indicated uses, including bipolar, aggression, ADHD, autism, dementia, depression, Tourette's Syndrome, ODD, conduct disorder, adjunctive OCD, trichotillomania and Prader-Willi syndrome.  Dr. Ishii's slides included one titled "Geodon®'s Applications:  Indication and Off Label," discussing blatant off-label use to treat psychosis, bipolar (no indication at this time), aggression, and depression.  Dr. Ishii's also promoted Geodon®'s use in children, adolescents and the elderly, all off label.

180.  Dr. Ishii's audience at these Pfizer-sponsored speeches typically consisted of psychiatrists who primarily worked at large state-funded clinics and county mental health facilities in Wisconsin and Illinois.  The vast majority of the patients seen by the psychiatrists in his audience are covered by Medicaid.  One such psychiatrist who attended Dr. Ishii's Geodon® presentation was Dr. David Holloway.  Dr. Holloway practices psychiatry in Brookfield, Milwaukee, Glendale, Waukesha and Elm Grove, Wisconsin.  He treats numerous patients enrolled in Medicaid, and prescribes medications to these patients, including Geodon® prescriptions.  These prescriptions are reimbursed by Medicaid.

181.  Pfizer sales managers approved of Dr. Ishii's presentations and following Pfizer policy built sales presentations around them.  For example, Pfizer District Manager for the Wisconsin-Chicago CNS area John Hutt encouraged Pfizer sales representatives to take advantage of Dr. Ishii's presentation and off-label pitches.

182.  Pfizer's intent in paying speaker honoraria to Dr. Ishii and other speakers was to unlawfully promote Geodon® for unapproved uses.

Filed Under Seal
129894.00601/35873664v.4

### E. USE OF PFIZER REGIONAL MEDICAL RESEARCH SPECIALISTS ("RMRSs") TO PROMOTE GEODON® OFF LABEL.

183.   Another Pfizer strategy to promote Geodon® for non-approved uses is the use of Pfizer Regional Medical & Research Specialists ("RMRSs") as an end-around to sales representatives' duty to lawfully promote Geodon®.  Pfizer's use of RMRSs in this manner was a way for Pfizer to make the unlawful promotional activities for Geodon® appear lawful.

184.   Pfizer employs RMRSs to engage in non-promotional medical activities, such as answering questions from doctors about Pfizer products and recruit/pre-screen medical clinics that have the capacity to support approved clinical studies.  Although RMRSs are not to be engaged in product promotion, nonetheless RMRSs regularly accompany Pfizer sales representatives on sales calls, including on Geodon® sales calls.

### 1.     Dr. Barry Herman.

185.   One of Pfizer's most prominent RMRSs is Barry K. Herman, MD, MMM, CPE, FACPE, Senior Director of Regional Medical & Research Specialists for Pfizer Worldwide Pharmaceutical Operations.  Dr. Herman has been employed by Pfizer since July, 2001.  Dr. Herman's Pfizer-related work as an RMRS includes "access and advocacy that can accelerate CNS therapeutic area product uptake."  His work was recognized by Pfizer in 2007 with the RMRS Recognition Award for Innovation, honoring a specific project that Herman developed in the previous year that "contributed to improving health and sustaining Pfizer's growth."

186.   Herman was recognized at the Pfizer RMRS National Meeting held in Seattle in May 2004 for his leadership in developing an innovative national program that "produced significant and sustained business impact" for Pfizer.  On information and belief, Dr. Herman received this 2004 award based on his advocacy that increased Geodon® product market share, including off-label sales.

55

187.  Dr. Herman's creation of "opportunities for access and advocacy" to increase Geodon® sales is evidenced by his close interaction with sales representatives and sales managers.  For example, in May, 2003, Dr. Herman sent an email trumpeting a poster that was approved for a presentation to be given at a May, 2003 New Clinical Drug Evaluation Unit of the National Institute of Mental Health ("NCDEU") meeting in Boca Raton, Florida by sending notice of the poster's acceptance to the Philadelphia District Manager and the Regional Manager in Virginia.  This poster promoted Geodon® for unapproved pediatric uses.  The poster was entitled:  "Ziprasidone Treatment in Adolescents:  A Pilot Study."   The presentation and poster were sent to Dr. Herman by Richard Malone, M.D., who was with the Eastern Pennsylvania Psychiatric Institute, whose patients were primarily on Medicaid.  The Malone paper was supported by an educational grant from Pfizer.

188.  Coincidentally, Dr. Malone had been a member of the FDA's Psychopharmacological Drugs Advisory Committee on July 19, 2000 when Pfizer's NDA 20-825 for ziprasidone was given Pfizer's post-marketing approval.

189.  Dr. Herman notes in his email to the Pfizer District Manager that Dr. Malone is also submitting the off-label poster to the October Annual Meeting of the American Academy of Child and Adolescent Psychiatry.

190.  In response to Dr. Herman's news of the approval of the poster, Pfizer Regional Sales Director Dwayne Wright sent an email asking Herman how the sales force could "leverage" the Malone pilot study.  Dr. Herman responded via email that, although the poster promoted Geodon® off-label, sales managers should refer their "influentials" to Dr. Herman.

191.  The Pfizer Regional Sales Director advised via email all subordinate Pfizer District Managers (roughly 1/3 of the national CNS District Managers), regarding the

56

promotion of Geodon® for adolescent use by utilizing Dr. Herman to handle the promotion of any unlawful promotion of Geodon®.

192. RMRSs' primary role was to respond to specific requests for detailed information about Pfizer products, and not product promotion. RMRSs are only permitted to provide information outside Geodon® product labeling if the inquiry is unsolicited. "Unsolicited" means that Pfizer has not encouraged a customer to ask the question. Any other attempt to provide this information would be considered off-label promotion, and is prohibited no matter if a Pfizer RMRS provides the information. Using RMRSs to promote Geodon® was ostensibly prohibited by Pfizer's *Field Guide* unless such communications used Pfizer-approved materials, were on-label, discussed only approved indications, and did not engage in any actual or perceived quid pro quo. It is clear that the deliberate plan was to use Dr. Herman to promote off-label using the Malone poster presentation discussing Geodon®'s off-label use in adolescents.

## 2. Dr. Douglas Geenens.

193. Dr. Douglas Geenens is currently employed as a Pfizer RMRS who Pfizer utilizes to educate Pfizer's sales force on Geodon®'s unapproved uses, and to promote Geodon® for unapproved uses. His responsibilities also include meeting with Psychiatrists in Missouri, Kansas and Oklahoma in which he discusses potential involvement in Pfizer clinical studies and also discusses Geodon clinical information. Prior to his employment with Pfizer, Dr. Geenens was a well-paid, frequent speaker for Pfizer on Zoloft® and Geodon®.

194. In November, 2006 Pfizer Regional Manager Curt McCallister asked Dr. Geenens, then an Overland Park, Kansas child psychiatrist, to speak about Geodon® at a Pfizer sales meeting. This sales meeting (and other similar sales meetings at which all regional sales

57

representatives as well as Pfizer managers attend) are referred to by Pfizer as Plan of Attack meetings ("POA Meetings" or "POA's").

195.   Before he was hired as an RMRS, Dr. Geenens was a popular national speaker for Pfizer, having lectured on Zoloft® and Geodon®.  On November 9, 2006, Pfizer hosted a lecture by Dr. Geenens at the POA Meeting at the Westin Hotel in St. Louis, Missouri.  Pfizer sales managers and sales representatives were present from Missouri, Oklahoma, and Kansas. At this POA Meeting, Dr. Geenens showed slides and discussed unapproved uses for Geodon®, including "conjectural indications" of Tourette's Syndrome, Autism, Post-Traumatic Stress Disorder ("PTSD"), obsessive compulsive disorder ("OCD"), depression and bipolar disorder.  Dr. Geenens also discussed unapproved use of Geodon® in children and adolescents.

196.  For this presentation, Dr. Geenens received no compensation from Pfizer, since his Pfizer-funded talks had reached the Pfizer annual maximum for speaker fees in 2006 (circa $150,000).  Up until this date, Dr. Geenens had given approximately 75 to 125 talks for Pfizer, primarily on Geodon®.

197.  Dr. Geenens was used by Pfizer sales representatives to give Geodon® presentations primarily because he readily spoke about off-label uses (although he did treat several patients with schizophrenia -- the majority of Dr. Geenens' practice was focused on child/adolescent Mood Disorders).

198.  Pfizer knew Dr. Geenens would discuss off-label uses of Geodon®, and intended for Dr. Geenens' off-label presentation to its sales representative as a not-so-subtle message on how to promote Geodon® for unapproved uses.

58

### F. PFIZER CONSPIRED WITH DEFENDANT NAMI TO ACT AS A FRONT ORGANIZATION IN THE OFF-LABEL PROMOTION OF GEODON®.

199.  Pfizer also utilized non-profit organizations such as Defendant NAMI as front organizations to further its own purposes of increasing market share for Geodon®.  Pfizer's funding and partnering with the Defendant NAMI and/or its affiliates has been designed to accomplish through a non-profit organization what Pfizer could not on its own: giving the appearance of independent analysis and a grassroots movement encouraging FDA approval and expanding the use, including unapproved uses, for Geodon®.

200.  In yet another example of using Defendant NAMI influence in the off-label promotion of Geodon® is the quid pro quo speaking engagement between Pfizer and St. Louis, Missouri psychiatrist Dr. Darrin Friesen.  NAMI wanted Dr. Friesen to speak at the NAMI Family Skills Workshop, and asked Pfizer to pay for the speech.  Dr. Friesen is a child and adolescent psychiatrist and the Director at Epworth Children's Home and has been psychiatric consultant for the St. Louis Country Special School District, and practiced at Crider Center, Metropolitan St. Louis Psychiatric Center.  While the stated purpose of the engagement was to retain Dr. Friesen to make a presentation at the NAMI meeting where he would speak on advances in the treatment of schizophrenia and the results of the CATIE trial, the unstated agreement was far more sinister.  Not only was Dr. Friesen not qualified to speak on the CATIE trial (since he was a child psychiatrist and the CATIE trial only dealt with adult schizophrenic patients), the real aim of the speech was to secure continued Geodon® use by Dr. Friesen (who was a heavy Geodon® off-label prescriber with his child and adolescent patients), and to provide "back door" monies for NAMI's continued support.

201.  Under FDA regulations and Pfizer's own compliance policies, a speaker program is a promotional activity and must be controlled by Pfizer to ensure that the speaker's

59

presentation is truthful and accurate, consistent with product labeling, supported by substantiated and scientifically-sound data, and appropriately balanced on both benefits and risks. The Friesen speech met none of these criteria. It had been set up at the insistence of Pfizer District Manager, Cheryl Shaughnessy, who instructed one of the Pfizer sales representatives in her district, Regan Hobbs, to put this NAMI presentation together. The audience for the presentation was NAMI members, including social workers and case workers, many of whom are treating Medicaid patients with chronic mental illness.

202. Even though the paperwork between Dr. Friesen and CardinalHealth (the independent vendor Pfizer used to set up its speaker programs) appeared to fund a discussion of schizophrenia, the actual speech presented by Dr. Friesen on April 22, 2006, "Understanding and Coping With Child-Onset Brain Disorders," had nothing to do with schizophrenia and was little more than a Geodon® promotional program to market Geodon® off-label. No one from Pfizer was in attendance, nor was there any attempt on Pfizer's part to control Dr. Friesen's content.

203. This is but one example of the price tag for NAMI's support of Geodon®. NAMI had insisted on receiving the backdoor monies from Pfizer to support programming on how to manage psychiatric disorders in children. At all times material hereto, Pfizer knew that Geodon® was not indicated for children's psychotic needs, yet allowed Dr. Friesen to make this presentation nonetheless.

204. Relator Westlock received a flyer for this Pfizer-funded Geodon® promotional presentation at NAMI from a co-worker on January 26, 2007. Westlock called and emailed Tania Padilla, in Pfizer Corporate Compliance, to report this off-label marketing of Geodon® to an audience of people intent on addressing psychotic episodes in children.

60

205.  NAMI thus conspired with Pfizer to implement Pfizer's illegal marketing scheme, causing the *Qui Tam* States and Federal Programs to suffer financial injury.

### G. PFIZER PROMOTED GEODON® FOR UNAPPROVED USES AND MADE UNSUBSTANTIATED SUPERIORITY CLAIMS.

#### 1. Promotion in Nursing Homes for Unapproved Dementia and Agitation-Type Behavior.

206.  Geodon® has a black box warning against using it for treating elderly patients with dementia.  Notwithstanding, Pfizer on a regular basis promoted Geodon® to doctors treating this population as a means of increasing Geodon® sales.

207.  One example involves comments made by a Pfizer District Manager to approximately forty to sixty sales representatives at a POA Meeting.  On November 3, 2005, Linda Greeson ("Greeson"), Pfizer's District Manager for Oklahoma advised this group of sales representatives at a POA Meeting at the Sheraton Hotel in Clayton, Missouri that they could grow Geodon® business by marketing Geodon® in nursing homes. Greeson recommended that the sales representatives should do "in-service" calls at nursing homes to market the drug to that population. In so doing, Greeson ignored the FDA black box warning against Geodon®'s use in elderly patients suffering from agitation resulting from dementia, as well as the related off-label use.  Also present at this POA were Pfizer District Manager Randy Hill and now former District Manager Geoff Holt.  Greeson also suggested to the attendees that they speak with a Pfizer sales representative who had promoted Geodon® in nursing homes.

208.  An "in-service" call involved promoting Geodon® at the nursing home to the staff – typically nurses, although physicians or pharmacists may also be present. Pfizer sales representatives also leave Geodon® written materials, as well as small gifts such as pens and magnets.

61

209.  Unless a nursing home resident has a diagnosis of schizophrenia, Geodon® is not eligible for reimbursement by the government.  Pfizer knew this, and intended that Geodon® be prescribed for dementia-related conditions, or agitation as a result of Alzheimer's disease and Parkinson's disease.

210.  Pfizer's nursing home off-label strategy was effective in increasing Geodon® sales.  Geodon®'s average national share of the SGA market was in the range of six to seven percent.  In Oklahoma nursing homes, because of Pfizer's off-label marketing scheme, Geodon®'s market share was much higher, fourteen to fifteen percent.

211.  Further evidence of the impact of Pfizer's off-label promotion was the experience of Gil Shaw, a Pfizer sales representative in Oklahoma who, upon being assigned Geodon in April 2007, followed Greeson's lead and called on Oklahoma nursing homes.  Shaw was surprised to find that, when he called on primary care physicians who were treating patients in nursing homes to promote Geodon® for on-label bipolar acute mania, many physicians responded by stating they already used Geodon® primarily off-label in nursing homes to manage agitated dementia patients.  Shaw reported his findings to both his District Manager, Albert Appiah, and Regional Manager, Curt McAllister.

## 2.     __Promotion of Geodon® for Unapproved Dosages.__

212.  Pfizer regularly engaged in off-label promotion for using Geodon® beyond the FDA-approved product label's 80 mg, twice a day. Although Pfizer had originally informed the FDA Drug Advisory Committee in 2000 that there could be adverse events if Geodon® were used beyond 160 mg each day, beginning as early as Dr. Kaye's off-label presentations in 2002, Pfizer began regularly promoting the dosing of Geodon® well beyond the product labeling.

62

213.  For example, on November 10, 2006, at the Pfizer POA at the Westin Hotel in St. Louis, Missouri, Regional Manager Curt McAllister urged representatives to recommend Geodon® to be used at doses above the FDA approved dose.  Although the recommended dose of Geodon® is 20 to 80 mg twice daily, Pfizer instructed its sales representatives to advise physicians to prescribe much higher than the approved dosages.

### H.  PFIZER SALES REPRESENTATIVES MARKETED GEODON® TO DOCTORS TREATING PATIENTS WHO WOULD NOT USE GEODON® FOR ANY APPROVED INDICATION.

214.  Yet another off-label marketing method employed by Pfizer is to market Geodon® to doctors (primary care physicians, for example) who do not treat schizophrenia or bipolar patients or to psychiatrists who do not treat patients who can be treated using Geodon® on-label (child and adolescent psychiatrists), but may be able to be influenced by Pfizer to prescribe Geodon® off-label.

215.  The solicitation of doctors who did not treat patients with conditions related to Geodon®'s FDA-approved uses was common. For example, Relator Westlock (as did all Geodon® sales representatives) had numerous child and adolescent psychiatrists included in his call-cycle to whom he was expected to sell Geodon®. This was common for other sales representatives as well.  Moreover, Relator Westlock knew other colleagues were asked to market, and that those colleagues did in fact market, Geodon® to doctors who would not in the normal course prescribe Geodon® for its indicated uses.

216.  As one example, on June 21, 2007, Pfizer District Manager Cheryl Shaughnessy edited Relator Westlock's call-list of doctors to detail to include Dr. Sandra Hoffman and Dr. Brid Vaid, Internal Medicine Specialists'.  Per his previous discussions with these doctors, Relator Westlock knew that both of these doctors prescribed SGAs to treat patients for conditions that were not consistent with for any of Geodon®'s indicated uses.  As such,

63

Relator Westlock told Shaughnessy that he refused to market Geodon® to Drs. Hoffman and Vaid because neither one of these doctors used Geodon® for its intended use, and he requested that these doctors be removed from his list of doctors to detail.  In response to Relator Westlock's criticism, Shaughnessy denied that she was asking Westlock to market Geodon® for off-label uses, and told Westlock that Pfizer hoped that, by marketing Geodon® to more physicians, these physicians would see the "utility" of Geodon® in other unapproved uses. Shaughnessy also told Westlock that other sales representatives had no problem marketing Geodon® for off-label uses.  Moreover, she reported Westlock's refusal to market the drug to Regional Manager Curt McAllister.

> **I.** **USING QUOTA AND CREDIT PROGRAMS TO INDUCE SALES TO DOCTORS AND FACILITIES WHO DO NOT USE GEODON® ON-LABEL.**

217.  Moreover, Pfizer's national Geodon® sales strategy included quota and credit programs that both penalized and incentivized the sales force to sell to doctors who could not treat their patients using Geodon® on-label.  Pfizer knew that these programs created a working environment that was conducive to promoting Geodon® for as many uses and as wide a patient base as possible.  The quota and credit programs were instituted immediately upon Geodon®'s approval in 2001, and applied to sales representatives, District Managers, Regional Managers and Vice Presidents.

218.   Pfizer's quota system required Geodon® sales representatives to detail any physician on their call list (regardless of specialty) and awarded them with bonuses based on sales of Geodon®.  For example, Geodon® sales representatives that exceeded quota of, for example, 105%, would be paid additional bonus dollars and additional chances of winning award trips.

64

219.  The prescribers Pfizer included in its quota and credit programs were doctors that would not normally treat patients with Geodon®'s approved indications.  These doctors included child psychiatrists, primary care physicians, and geriatric physicians (including calling directly on nursing homes).

220.  Included in the Geodon® sales quotas were the following providers: 1- CNS Representatives in an assigned territory would have a quota for all psychiatrists (adolescent, adult and geriatric), select hospitals (general, academic, and psychiatric (both state and private)); 2 – Primary Care Representatives would have a quota for all/most (10-40) psychiatrists (adolescent, adult and geriatric), primary care physicians, internal medicine specialists, and select hospitals (general, academic (institutional sales representative only), and select psychiatric (both state and private)) hospitals.

221.  Geodon® sales quotas were based on several components: 1- the previous territory sales year revenue of Geodon® for all assigned licensed medical professionals; 2 - the previous territory sales year revenue of all SGAs for all assigned licensed medical professionals (without regard to what the SGAs were used to treat); and 3 – a corporate growth component applied to the based quota. Once the quota was set for the semester, Pfizer rarely made any adjustments to the representative's quota.

222.  The accumulative quotas of the district sales representatives (8 to 14 per district) generate the District Manager's quota.  The quotas of the district sales managers (8 to 12 per region) generate the Regional Manager's quota. The quotas of the regional sales managers (6 to 8 nationally) feed into the Vice-President of Sales quota and eventually up to the CEO/corporate quota.

65

223.  Pfizer's quota and credit programs also influenced the selection of speakers. Speakers such as Dr. Neil Kaye who spoke about unapproved uses and for unapproved populations were selected by sales representatives, District Managers, Regional Managers and Vice Presidents for their ability to enhance quota and credit scores.

224.  Finally, under pressure from Relator Westlock, Pfizer eventually announced in April 2007 that child and adolescent psychiatrists designated as such by the AMA were to be deleted from the quota and credit programs.  However, Pfizer later in 2008 reversed this position because in some instances the AMA designations were not completely accurate due to multiple specialties (such as doctors with an AMA child psychiatrist designation who also treat adults).

### J.   PFIZER PROMOTED GEODON® FOR UNAPPROVED USES AS A MAINTENANCE MEDICATION IN THE LONG TERM TREATMENT OF BIPOLAR DISEASE.

225.  Despite the fact that the FDA had only approved Geodon® for short-term use for 21-day increments in bipolar patients prevalent in emergency settings not primary care settings, Pfizer directed its sales representatives to use materials that marketed Geodon® as a maintenance drug for the long-term treatment of bipolar patients. The PowerPoint presentation from the "Managing Bipolar in Primary Care" teleconference promotes Geodon® in primary care settings where the focus is on maintenance treatment, for which Geodon® is not indicated. Thus, marketing Geodon® in primary care settings is promoting Geodon® for the off-label use of long term maintenance treatment of bipolar patients.

226.  In June 2007, the Pfizer Geodon® Disease Management Team (in charge of preparation of marketing materials for Geodon®),  sent a DVD to all Powers District Managers to share "best practices" from the top three performing sales districts.   In the video was Kevin Kirk, a Pfizer sales representative from Charleston, West Virginia.  In his presentation to a

66

physician, Kirk stated, "that Geodon® works for 55 weeks in bipolar disorder patients."
However, there was no clinical data to support this, nor had Geodon® ever been approved as a
maintenance drug treatment of bipolar disorder.

227.  Thereafter, Pfizer directed all sales representatives nationwide to make a false
claim in that Geodon® treats bipolar disorder in a maintenance capacity.  Pfizer has not
conducted, nor is there published, two double-blind, placebo controlled studies to demonstrate
that Geodon® is effective as a therapy for bipolar maintenance.  By instructing representatives
to inform physicians that Geodon® is efficacious in treating bipolar Disorder for 55 weeks:

- 1 – patients may not be adequately treated for bipolar disorder and as such may
  relapse, causing physical harm to themselves and/or others;

- 2 – because long term side effects of using Geodon® in patients with bipolar
  Disorder are unknown, patients may be exposed to unknown cardiovascular risk,
  cognitive or mood impairments, as well as increased risks to movement disorders
  and other medical conditions;

- 3 –physicians are encouraged to prescribe Geodon® for such use in patients being
  reimbursed through Medicaid, Medicare/Medicaid, Medicare-D, and various private
  insurance plans, constituting fraud.

228.  Relator Westlock thereafter contacted Lisa Shrayer and Jeff Williams in Pfizer's
Compliance Department to report this blatant off-label marketing of Geodon® for extended use
in bipolar patients.

229.  Following Westlock's complaint, on September of 2007, John T. Zgomatic, Vice
President of Sales of Pfizer Worldwide Pharmaceuticals Operations, wrote a letter to the
Geodon® sales team, telling them that Geodon® was not indicated for the treatment of bipolar

**Filed Under Seal**
129894.00601/35873664v.4

as a long-term maintenance drug and directing them to discontinue the use of Pfizer promotional materials which promoted this off-label use.

### K.   PFIZER MADE UNSUBSTANTIATED COMPARISON CLAIMS OF THE SUPERIORITY OF GEODON®.

230.    In violation of federal law, Pfizer knowingly and deliberately falsely promoted Geodon® by the use of unsubstantiated comparative claims, comparing Geodon® with competing products Seroquel®, Abilify®, Zyprexa®, and Risperdal®. These unsubstantiated, comparative claims are prohibited by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 352, and 21 CFR § 202.1(e)(6), as well as Pfizer's own internal sales policies. The use of unsubstantiated comparative claims renders a drug "misbranded" by the FDA. Pfizer promoted these Geodon® falsehoods to physicians to induce physicians to prescribe Geodon®.  Once Geodon® became "misbranded" it was no longer eligible for reimbursement by Federal Programs, including Medicaid.

231.    Additionally, Pfizer was required to provide fair and balanced information whenever it engaged in promotional activities. Fair and balanced promotional activities include written materials, as well as, oral presentations. According to federal regulations and industry standards and practices, "fair and balanced" means that whenever Pfizer made representations about Geodon®'s efficacy, it was required to also make statements about the drug's side effects.

232.    In addition, according to Pfizer's sales and marketing practices guide titled *The Field Guide,* in order to make claims concerning the superiority of Geodon®, "the claims must have been supported by at least two adequate, well-controlled studies in which were compared head-to-head using comparable dosage regimens or a single, large, well-controlled study. . . . [I]t is not appropriate to make comparative claims based on the data in the products' package inserts,

68

Similarly, because of the differences in trial designs, inclusion criteria and other factors, it is not permissible to compare results from two non-comparable trials."

233. In violation of federal law, Pfizer, on innumerable occasions, knowingly and deliberately failed to give fair and balanced presentations on Geodon®. These false superiority claims about Geodon®'s efficacy were made without "substantial evidence" to support such claims. As such, any statements about Geodon®'s efficacy were false, misleading, distorted, inaccurate, unfair, imbalanced and omitted material facts Pfizer was required to disclose.

### 1.    August 17, 2006 Abilify® "Compare and Win Strategy".

234. As an example of false comparative promotions of Geodon®, on August 17, 2006, Pfizer Regional Manager Curt McAllister sent almost 90 sales representatives a voice message telling them to use the "compare and win strategy" comparing Geodon® and Abilify®, a Bristol-Meyers Squibb product. McAllister encouraged these representatives to use this compare and win strategy that he had observed Pfizer representative Mark Mannix using during a field day outing with McAllister. On the voicemail, McAllister urged these sales representatives to compare Geodon® to Abilify®, a Bristol Myers Squibb product, although there was no clinical data to support the comparison.

235. When Relator Westlock learned of this unsupported drug to drug comparison, he called McAllister and District Manger Cheryl Shaughnessy on August 17, 2006, and reminded them that this was in direct violation of Pfizer's compliance policy and FDA regulations. McAllister replied to Westlock, copying Shaughnessy with a voicemail, acknowledging the problem and assuring Westlock that his initial message to the sales representatives urging the Geodon® to Abilify® comparisons would be corrected or retracted. Westlock later checked several times to see if a retraction had ever been made, but it was not.  As a result, Westlock reminded Shaughnessy in September of 2006 that no retraction had been made. Westlock again

69

asked McAllister and Shaughnessy about the retraction on January 23, 2007. McAllister showed Westlock a retraction email that McAllister had supposedly sent out to the sales representatives. However, the Professional Healthcare Representatives, who comprise the majority of the sales representatives selling Geodon®, did not receive this retraction email.  When confronted by Westlock, Shaughnessy contended that this email and a voice mail had in fact been forwarded to the sales representatives in Westlock's district; however, because Westlock never received either this email or the voicemail, he disputed that this email and/or email was ever sent.

## 2.  November 10, 2006 "Competing to Win" POA.

236.    In another example of unsupported comparison claims, at the November 10, 2006 POA, Competing to Win, held at  the Westin Hotel in St. Louis, Missouri, Pfizer disseminated false and misleading promotional literature and marketing materials to its sales force (which would have disseminated as well nationwide to all Pfizer representatives selling Geodon® around the country), intending that the "essence of this message must be conveyed to physicians on every sales call." The goal of the POA was clear:  "to compete and win against other leading atypicals."

237.    The materials provided  include marketing materials, comparing  Geodon® to Seroquel®, Geodon® to Abilify®, Geodon® to Zyprexa® and Geodon® to Risperdal®, and thereby misbranded Geodon® in violation of the FD&C Act.  The Pfizer marketing team provided sales representatives with instructional material on how to compare Geodon® to competitive products:

> a.    When comparing Geodon® to Risperdal® and Zyprexa® in
>        patients with bipolar disorder, Pfizer marketing instructed
>        representatives to tell physicians that Geodon® is efficacious in
>        bipolar patients for one year, yet Geodon® has neither an
>        indication for bipolar maintenance, nor "substantial evidence" (two
>        peer-reviewed, double-blind placebo controlled studies) to support
>        such claims.

70

  b.  When comparing Geodon® to Zyprexa® in schizophrenic patients, Pfizer instructed representatives to stress that Geodon® has less somnolence than Zyprexa®. However, in a Pfizer sponsored head-to-head study (Simpson) somnolence rates were comparable between Zyprexa® and Geodon®.

  c.  When comparing Geodon® to Abilify®, Pfizer instructed representatives to stress that: 1-- More patients using Geodon® get to remission, 2 – Geodon® is efficacious in bipolar patients for one, year yet Geodon® has neither an indication for bipolar maintenance, nor "substantial evidence" to support such claims, 3- Geodon® has switch data (open label studies) from Zyprexa® and Risperdal® to Geodon® in schizophrenia only, showing positive outcomes. Pfizer has no approved head-to-head studies comparing Geodon® and Abilify® yet Pfizer management has instructed representatives to use other comparative drug studies to demonstrate Geodon®'s benefits vs. Abilify®.

  d.  When comparing Geodon® to Seroquel®, Pfizer management instructed sales representatives to utilize sales materials comparing Geodon® and Zyprexa® or Risperdal® to infer Geodon® benefits (less weight gain, less sedation, stronger efficacy, etc.) against Seroquel®. In fact, Pfizer had no head-to-head studies comparing Geodon® and Seroquel®, and as such should have instructed representatives not to engage in compare-to-win strategies between these two products.

  238. Pfizer thus deliberately violated the FDA comparative claims regulations and ignored its own compliance mandates in making unsupported comparative claims for Geodon®. In making claims about the advantages of Geodon® in relation to other competing products' weaknesses, Pfizer made a calculated decision to grow Geodon® sales even if it meant deliberately flouting FDA fair and balanced regulations and its own compliance policies.

## VI. PFIZER KNEW THE LEGAL RISKS RELATED TO OFF-LABEL PROMOTION OF GEODON®.

  239. Pfizer was well aware of the legal risks inherent in the unlawful marketing and promotion of its prescription drug products. In May, 2004, Pfizer entered into a Corporate Integrity Agreement ("CIA") with the United States Office of Inspector General of the Department of Health and Human Services. Pfizer signed the CIA in connection with the

71

settlement of allegations that it engaged in illegal off-label marketing of its drug product

Neurontin® (the "Neurontin CIA"). The Neurontin CIA expressly incorporated measures

aimed at prohibiting Pfizer from future promotion of its products for off-label uses. Pfizer's

conduct as described herein constitutes flagrant, intentional and material breaches of the

Neurontin CIA.

240. The Neurontin CIA also required Pfizer to certify compliance, and to report to the

government "reportable events" which are defined in the Neurontin CIA as:

> anything that involves a matter, brought to the attention of senior
> management at Pfizer's New York headquarters, that a reasonable person
> would consider a probable violation of criminal, civil, or administrative
> laws applicable to any Federal health care program, and/or applicable to
> any FDA requirements relating to the off-label promotion of drugs....

241. There is no doubt that, following the Neurontin® criminal plea and Neurontin

CIA, Pfizer and its sales representatives have been clearly aware of the legal risks the

Company takes if it chooses to illegally market drug products. For example, Pfizer has issued

to all its sales representatives *The Field Guide*, the Pfizer drug representative's bible on all

compliance issues (also called the "Orange Manual" by company employees). *The Field Guide*

describes how the sales force is expected to conduct itself when marketing a product, including

what constitutes a clear violation of Pfizer policy and federal law.

242. *The Field Guide* makes clear that sales representatives must stay on-label:

> As discussed in the Overview of this Guide, our May 2004 Corporate
> Integrity Agreement (CIA), arose from allegations concerning the off-
> label promotion of Neurontin®. Off-label promotion is taken very
> seriously by Pfizer and the government. In fact, Pfizer is obligated under
> our CIA to proactively report any instance of off-label promotion to the
> Office of the Inspector General (OIG).

243. Relator Westlock alleges, upon information and belief, that Pfizer knowingly

failed to completely and truthfully certify compliance with the Neurontin CIA, and failed to

**Filed Under Seal**
129894.00601/35873664v.4

completely and truthfully report "reportable events," all as required by the Neurontin CIA.  As a result, Pfizer has presented or caused to be presented to the United States a false certification or claim under U.S.C. § 3729 *et seq.*

244.  Relator Westlock alleges, on information and belief, that Pfizer failed to accurately and truthfully report its improper Geodon® marketing as described above, as required by the terms of the Neurontin CIA.

245.  The failure by Pfizer to truthfully and accurately report, or the submission of a false report, to the United States, pursuant to the Neurontin CIA, was done knowingly and deliberately, without just cause.

246.  While Pfizer was clearly aware of its compliance obligations regarding sales and marketing of its products, Pfizer senior sales, marketing, and corporate executives did everything they could to get around any such limitations in order to sell Geodon®.

247.  Pfizer's pattern of off-label promotion, misbranding and purposeful targeting of vulnerable populations such as children and the elderly is all the more alarming and reprehensible given Geodon®'s serious side effects, some of which could be fatal.

248.  As a result of Pfizer's unlawful conduct, the United States has been damaged, and continues to be damaged, by Federal Program payments for off-label and falsely promoted Geodon® prescriptions.  Upon information and belief, Geodon® off-label prescription payments made by Federal Programs total in the hundreds of millions of dollars.

## VII.  PFIZER'S FRAUDULENT MARKETING SCHEME VIOLATED FEDERAL PROGRAM LIMITATIONS.

249.  Pfizer could lawfully market Geodon® in a number of ways, including the dissemination of truthful information that complies with federal law.  Once a drug is approved by the FDA for a certain use (or "indication"), it must be promoted by the manufacturer for

Filed Under Seal
129894.00601/35873664v.4

that use, and that use only. Geodon® was initially FDA approved to treat schizophrenia and later for acute manic or mixed episodes of bipolar disorder.  After its approval, Pfizer could only promote Geodon® to treat the then FDA-approved conditions.  However, at no time could Pfizer lawfully promote Geodon® for any other non-FDA approved purpose.

250.  In violation of federal law, Pfizer knowingly and deliberately promoted Geodon® for non-FDA approved uses ("off-label" uses) that Pfizer knowingly and deliberately knew, or could reasonably foresee, would lead to violations of federal Medicaid statutes and regulations designed to restrict reimbursement to Federal Programs such as Medicaid.

251.  Federal Programs, including the Medicaid program, also rely on the FDA's findings regarding what uses for approved drugs are safe and effective.  Whether a drug that is FDA-approved for a particular use will largely determine whether a prescription for that drug will be reimbursable under Federal Programs, including the Medicaid program.

252.  In 1990, Congress passed the Budget Reconciliation Act which limited reimbursement for prescription drugs to "covered outpatient drugs."  Covered outpatient drugs only include drugs used for "medically accepted indications."  A medically-accepted indication is a use which has been approved by the FDA or one which is supported by specific drug reporting compendia set forth in the Medicaid statute, 42 U.S.C. § 1396r-8(k)(6).  Reimbursement by Medicaid is, with only one rare exception, prohibited if the drug is not being used for a medically accepted indication.  42 U.S.C. § 1396r-8(k)(3).

253.  Congress has adopted a compendia-based system for determining appropriate Medicaid reimbursements for off-label uses of a "covered outpatient drug."  Soc. Sec. Act § 1927(g)(1)(B)(i) and (k)(6) (permitting reimbursements for drug uses that "(i) are appropriate, (ii) are medically necessary, and (iii) are not likely to result in adverse medical results").  Thus,

74

the only way a prescription could be allowed under the Medicaid statute was if the particular

off-label Geodon® indication had been approved in one of the compendia identified in

§ 1927(g)(1)(B)(i) to be eligible for reimbursement under Medicaid, and other federal

reimbursement programs.

254.  The most commonly-available of these compendia, DRUGDEX, does not support

the off-label uses for Geodon® promoted by Pfizer.  The 2008 DRUGDEX does not support

the use of Geodon® in children, nor elderly patients with dementia.  As such, all Medicaid

reimbursements for Geodon® prescriptions related to pediatric or geriatric patients with

dementia were not eligible for reimbursement and should not have been made.

255.  Similarly, off-label indications qualify as "medically accepted indications" for

Medicare reimbursement if they appear on the identified drug reporting compendia.

Reimbursement under Medicare is only available to a physician if the services he or she

provided were "medically required," and he or she certifies that the services performed were

medically necessary.  42 U.S.C. § 1395n(a)(2).

## VIII.  PFIZER'S PROMOTION OF GEODON® CAUSED SUBMISSION OF OFF-LABEL CLAIMS TO FEDERAL PROGRAMS AND THE *QUI TAM* STATES.

256.  Defendant Pfizer promoted off-label indications and dosages of Geodon®,

knowing they were not eligible for reimbursement because the indication or dosage was neither

listed on the drug reporting compendia or the relevant fiscal intermediary's Local Coverage

Determination ("LCD"), nor was it included on Geodon®'s FDA-approved product labeling.

Furthermore, Defendant Pfizer illegally promoted all off-label uses without meeting the FDA

requirements, and without resubmitting Geodon® to the FDA testing and approval process as

required by 21 U.S.C. § 360aaa *et seq.*  Thus, claims for reimbursement of off-label Geodon®

75

prescriptions fail to meet the eligibility requirements of Federal Programs and the *Qui Tam* States.

257. Pfizer's off-label promotion of Geodon® resulted in reimbursement by Federal Programs and the *Qui Tam* States for numerous false claims. For example, as the table below sets forth in detail, numerous such false claims were submitted for reimbursement to the Florida Medicaid program. Under the Florida Medicaid Prescribed Drug Services Coverage, Limitations, and Reimbursement Handbook, in order to be reimbursed by Medicaid, a drug must be medically necessary and prescribed for medically accepted indications and dosages found in (1) the FDA-approved drug labeling ("labeling" means all labels and other written, printed, or graphic matter upon any article or any of its containers or wrappers, or accompanying such article); (2) the American Hospital Formulary Service Drug Information; (3) the United States Pharmacopeia-Drug Information; or (4) the DRUGDEX Information System.

258. Geodon® is not FDA-approved for pediatric use, and there are no supporting citations in the specified drug compendia. Thus, Florida Medicaid should not have paid or otherwise reimbursed for Geodon prescriptions written for pediatric uses.

259. As a result of Pfizer's unlawful promotion of Geodon®, the Florida Agency for Health Care Administration's records show that Geodon® was prescribed for pediatric uses and paid for by Florida Medicaid. For example, in 2005 alone, Geodon® was prescribed 4,979 times for unapproved pediatric purposes. Florida Medicaid spent $935,584 on these off-label prescriptions.

76

260.  The Florida Agency for Health Care Administration's records for all atypical antipsychotics, including Geodon®, show that the primary diagnosis associated with these prescriptions was for ADHD – 39.6% - not an approved indication for any antipsychotic.

261.  The following table shows the breakdown of Florida Medicaid prescriptions by diagnosis.:

| Diagnosis | Number of Children | % of Children |
|---|---|---|
| Schizophrenia | 1409 | 7.2% |
| Major Depression | 1394 | 7.1% |
| Affective Disorders (other) | 3134 | 16.0% |
| Autism | 797 | 4.1% |
| Tourette's Syndrome | 90 | 0.5% |
| ADHD | 7782 | 39.6% |
| Conduct Disorder | 2127 | 10.8% |
| Depressive Disorder | 491 | 2.5% |
| Anxiety Disorder | 459 | 2.3% |
| Adjustment Disorder | 783 | 4.0% |
| Other not specified | 1163 | 5.9% |
| **TOTAL** | 19,629 | 100.0% |

262.  From 2002-2007, Florida Medicaid spent approximately $6.5 million on Geodon®  prescriptions for pediatric use, despite lacking FDA approval.

263.  The Geodon® prescription claims for unapproved pediatric uses listed in the above table are the direct result of Pfizer's unlawful promotional tactics, causing the United States and the Qui Tam States to expend hundreds of millions of dollars on Geodon® prescriptions, which were ineligible for reimbursement.

**VIII.   PFIZER'S RETALIATION AGAINST RELATOR WESTLOCK.**

264.  Relator Westlock was forced to resign from Pfizer on September 14, 2007. Preceding his discharge, Relator Westlock had informed Pfizer of illegal activity, including misleading efficacy promotion of Geodon®, illegal off-label promotion and numerous compliance violations. The illegal activity includes:

77

(1) directives from his District Manager, Cheryl Shaughnessy, to market Geodon® to physicians that were known for using it for the off-label use of agitated dementia in the elderly;

(2) directives from his District Manager to minimize the side effects of Geodon®;

(3) directives from his Regional Manager and Pfizer marketing personnel to use side-by-side promotional materials to demonstrate the comparative advantages of Geodon® as opposed to Abilify®, Seroquel®, Zyprexa® and Risperdal®, absent substantial evidence supporting such claims;

(4) Pfizer's false claims regarding Pfizer's products, including Geodon®; and

(5) Pfizer requesting sales representatives to set up programs that are not within promotional guidelines, and to engage in illegal promotional activity.

265. Relator Westlock made his reports of illegal promotion and compliance violations to multiple Pfizer managers, as well as human resources and compliance personnel.

266. Pfizer compliance rules and the Pfizer Open Door Policy encourage representatives to express any concerns they may have to Pfizer management regarding policy without fear of retaliation. Pursuant to this Policy, and in order to support corporate interests, Relator Westlock made numerous reports of off-label marketing to Cheryl Shaughnessy (his District Manager), Curt McAllister (his Regional Manager), Amy Pitts (his Vice-President), Ian Read (President U.S. Pharmaceutical Operations) and other Pfizer Human Resources, Employment Law and Compliance personnel when presented with inappropriate or improper behavior on Pfizer's part.

267. Specifically, in January, February, March, June, July and August, 2007, Relator Westlock used the Open Door Policy to provide the aforementioned Pfizer personnel

**Filed Under Seal**
129894.00601/35873664v.4

information regarding management activities that may have been in violation of Pfizer policies.
Some of these policies include: 1) making false claims regarding Pfizer products; 2)
inappropriate comparison of Pfizer products with another company's competitive products; 3)
demanding that he sell Pfizer products to physicians that would not be using them for their
indicated use; 4) discouraging Relator Westlock from reporting these questionable marketing
practices; and 5) asking sales representatives to set up programs that were not within Pfizer's
guidelines, and would be in violation of FDA regulations.

268.  In the first draft of his performance review initially given on January 17, 2007,
there were statements included regarding his support of corporate compliance objectives and a
recommendation that Relator Westlock be a Visiting National Guest Trainer at the Pfizer
Training Center.  On February 7, 2007, Relator Westlock received a modified performance
review which eliminated all statements regarding support of corporate compliance objectives,
and contained disparaging and unsubstantiated comments regarding Relator Westlock's
character.  Relator Westlock's invitation to act as a visiting National Guest Trainer for
Geodon® was then retracted by his Curt McAllister, his Regional Manager.  Instead, Relator
Westlock received a negative performance review as well as negative written feedback from
Cheryl Shaughnessy and Curt McAllister, some of which was shared with other Pfizer
employees.

269.  In retaliation for Relator Westlock's reporting Pfizer's inappropriate activities, in
March 2007 (after reporting both further marketing and retaliation concerns to Senior Pfizer
management, Human Resources, Compliance and Employment Law), Relator Westlock was
placed on an unexplained three month administrative leave by Amy Pitts, his Vice-President.

79

270.  When Relator Westlock returned from the Pfizer mandated three-month leave, he was informed that he had not violated any Pfizer policies, and that he was in good-standing within Pfizer.

271.  Within three weeks of his return, however, Relator Westlock was further harassed by Cheryl Shaughnessy, his District Manager, who directed him to promote Geodon® off-label to primary care physicians, and accused him of making an unsubstantiated statement to an unspecified person.

272.  As a result of reporting these inappropriate and illegal activities, Relator Westlock was repeatedly intimidated, and was subjected to a hostile work environment.

273.  Unable to withstand any further such intimidation, harassment and intolerable work environment, on September 14, 2007, Relator Westlock notified Pfizer's CEO Jeffrey Kindler of his forced, involuntary resignation via email.

274.  As a direct and proximate result of this unlawful and repeated harassment and retaliation, Relator Westlock has suffered emotional pain and mental anguish, together with serious economic hardship and was compelled to resign from Pfizer.

## COUNT I
## VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729, ET SEQ.

275.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

276.  This is a civil action brought by Relator Westlock, on behalf of the United States of America against Defendant under the False Claims Act, 31 U.S.C. §§ 3729(a)(1) and (2).

277.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, and may still be presenting or

**Filed Under Seal**
129894.00601/35873664v.4

causing to be presented, to CMS, or other Federal Programs, false or fraudulent claims for payment, in violation of, inter alia, 31 U.S.C. § 3729(a)(1).

278.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, made, caused, or caused to be used, and may still be using or causing to be used, false or fraudulent records and/or statements to get false or fraudulent claims paid in violation of, inter alia, 31 U.S.C. § 3729(a)(2).

279.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information which supported claims to CMS, and Federal Programs, with actual knowledge of the falsity of the information that supported these claims, caused, and may still be causing, the use of false or fraudulent materials or information to support claims paid by the government.

280.  The United States of America, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and may still be paying or reimbursing for Geodon® prescribed to patients enrolled in Federal Programs.

281.  As a result of Defendants' actions as set forth above in this complaint, the United States of America has been, and may continue to be, severely damaged.

## COUNT II
## VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729, *et seq.*

282.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

283.  Pfizer's failure to report, or false reporting to the United States in accordance with the Neurontin CIA, was done deliberately, or in reckless disregard of the truth, and as a result, caused, and may still be causing, false or fraudulent records and/or statements resulting in false

81

or fraudulent claims paid by the United States in violation of, inter alia, 31 U.S.C. § 3729 *et seq.*

284.  As a result of Defendants' actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

**COUNT III**
**VIOLATION OF FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(3)**
**AS AGAINST ALL DEFENDANTS**

285.  Relator Westlock hereby incorporates by reference all allegations set forth in this Complaint, as though fully set forth herein.

286.  By submitting false claims, as set forth above, Defendants Pfizer, Dr. Kaye, M.D., NAMI,  and DOES 1 through 100, have conspired to knowingly submit, or caused or be submitted, a false or fraudulent claim to the United States for payment or approval by the government for payment.

287.  All Defendants have formed an agreement to submit each false claim.

288.  All Defendants have committed an act in furtherance of the object of this Agreement.

289.  Each Defendant has acted with the intent to defraud.

290.  As a proximate result of the aforesaid fraudulent conduct, the United States of America sustained damages in an amount to be proven at trial.

**COUNT IV**
**VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3730(h)**
**(AS AGAINST PFIZER)**

291.  Relator Westlock hereby incorporates by reference all allegations set forth in this Complaint, as though fully set forth herein.

292.  As a result of Relator Westlock's lawful acts in furtherance of protected activities investigating and reporting fraud, Pfizer retaliated against Relator Westlock.

82

293.  Relator Westlock's termination of employment was a direct result of Pfizer's retaliatory acts, causing Relator Westlock to suffer and continue to suffer substantial damage, in an amount to be proven at trial.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (AS AGAINST PFIZER)

294.  Relator Westlock hereby incorporates by reference allegations set forth in this Complaint, as though fully set forth herein.

295.  Pfizer's conduct toward Relator Westlock was a calculated plan to cause Relator Westlock emotional harm.  Pfizer's motive was retaliation for exposing Pfizer's violations of law and Pfizer's obligations under its Corporate Integrity Agreement.

296.  All of the acts attributed to Pfizer, taken together, were so outrageous as to be utterly intolerable in a civilized community.

297.  The emotional distress inflicted by Pfizer was severe, requiring Relator Westlock to seek medical treatment.

298.  Pfizer's extreme and outrageous conduct as alleged herein either intentionally or recklessly caused Relator Westlock to suffer severe emotional distress.

299.  Relator Westlock was damaged as a result of suffering severe emotional distress, in an amount to be proven at trial.

300.  Relator Westlock is entitled to compensatory and punitive damages.

## COUNT VI
## ARKANSAS MEDICAID FRAUD FALSE
## CLAIMS ACT, ARK. CODE ANN. § 20-77-901, *et seq.*

301.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

83

302.  This is a civil action brought by Relator Westlock, in the name of the State of Arkansas, against Defendants pursuant to the State of Arkansas Medicaid Fraud False Claims Act, ARK. CODE ANN. § 20-77-901, *et seq.*

303.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact on an application for any benefit or payment under the Arkansas Medicaid program, in violation of ARK. CODE ANN. § 20-77-902(1).

304.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or representation of material fact for use in determining rights to a benefit or payment, in violation of ARK. CODE ANN. § 20-77-902(2).

305.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally concealed or failed to disclose, and may still be concealing or failing to disclose, an event with an intent fraudulently to secure the benefit or payment either in a greater amount or quantity than is due or when no benefit or payment is authorized, in violation of ARK. CODE ANN. § 20-77-902(3).

306.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly offered or paid, and may still be offering or paying, remuneration, directly or indirectly, overtly

84

or covertly, in cash or in kind, in return for purchasing, ordering or arranging for, or recommending purchasing or ordering of, a good, supply or service for which payment was made, in whole or in part, under the Medicaid program, in violation of ARK. CODE ANN. § 20-77-902(7)(A)(ii).

307.  The State of Arkansas or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

308.  As a result of Defendants' actions, as set forth above, the State of Arkansas or its political subdivisions has been, and may continue to be, severely damaged.

## COUNT VII
## VIOLATION OF THE STATE OF CALIFORNIA
## FALSE CLAIMS ACT, CAL GOV'T CODE § 12650, *et seq.*

309.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

310.  This is a civil action brought by Relator Westlock on behalf of the State of California against Defendants under the California False Claims Act, CAL. CODE § 12652(c).

311.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented to, and may still be presenting or causing to be presented to, an officer or employee of the State of California or its political subdivisions false or fraudulent claims for payment, in violation of CAL. CODE § 12651(a)(1).

312.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made

85

or used, false records or statements to get false or fraudulent claims paid in violation of CAL. CODE § 12651(a)(2).

313.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of California or its political subdivisions in violation of CAL. CODE § 1265 1 (a)(7).

314.  The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state and state subdivision funded health insurance programs.

315.  As a result of Defendants' actions as set forth above, the State of California, including its political subdivisions, has been, and may continue to be, severely damaged.

### COUNT VIII
### VIOLATION OF THE STATE OF DELAWARE FALSE CLAIMS AND REPORTING ACT, DEL. CODE ANN. TIT. 6 § 1201, *et seq.*

316.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

317.  This is a civil action brought on behalf of Relator Westlock on behalf of the Government of the State of Delaware against Defendants under the State of Delaware's False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1203(b).

318.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

86

presented or caused to be presented, and may still be presenting or causing to be presented, directly or indirectly, to an officer or employee of the Government of the State of Delaware false or fraudulent claims for payment or approval, in violation of DEL. CODE ANN. tit. 6, §1201 (a)( 1 ).

319.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, directly or indirectly, false records or statements to get false or fraudulent claims paid or approved, in violation of DEL. CODE ANN. tit. 6, §1201(a)(2).

320.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, increase or decrease an obligation to pay or transmit money to the Government of Delaware, in violation of DEL. CODE ANN. tit. 6, § 120l(a)(7).

321.  The Government of the State of Delaware, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health care programs funded by the Government of the State of Delaware.

322.  As a result of Defendants' actions, the Government of the State of Delaware has been, and may continue to be, severely damaged.

87

## COUNT IX
## VIOLATION OF THE DISTRICT OF COLUMBIA
## FALSE CLAIMS ACT, D.C. CODE A § 2-308.13, *et seq.*

323.   Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

324.   This is a civil action brought by Relator Westlock, in the name of the District of Columbia against Defendants under the District of Columbia False Claims Act, D.C. CODE ANN. § 2-308.15(a).

325.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, a false or fraudulent claim for payment or approval, in violation of D.C. CODE ANN. § 2-308.14(a)(l).

326.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly used or caused to be used, and may continue to use or cause to be used, false records and/or statements to get false claims paid or approved by the District, in violation of D.C. CODE ANN. § 2-308.14(a)(2).

327.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or used, or caused to be made or used, and may still be making or using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, in violation of D.C. CODE ANN. § 2-308.14(a)(7).

328.   The District of Columbia, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid,

88

and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the District.

329.  As a result of Defendants' actions, as set forth above, the District of Columbia has been, and continues to be, severely damaged.

### COUNT X
### VIOLATION OF THE STATE OF FLORIDA
### FALSE CLAIMS ACT, FLA. STAT. 68-081, *et seq.*

330.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

331.  This is a civil action brought by Relator Westlock on behalf of the State of Florida against Defendants under the State of Florida's False Claims Act, FLA. STAT. ANN. § 68.083(2).

332.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Florida or one of its agencies false or fraudulent claims for payment or approval, in violation of FLA. STAT. ANN**.** § 68.082(2)(a).

333.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida or one of its agencies, in violation of FLA. STAT. ANN. § 68.082(2)(b).

334.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made

89

or used, false records or statements to conceal, avoid, or decrease an obligation to pay or

transmit money to the State of Florida or one of its agencies, in violation of FLA. STAT. ANN.

§ 68.082 (2)( g).

335.  The State of Florida and its agencies, unaware of the falsity of the claims and/or

statements made by Defendants, and in reliance on the accuracy of these claims and/or

statements, paid, and may continue to pay, for prescription drugs and prescription drug-related

management services for recipients of health insurance plans funded by the State of Florida or

its agencies.

336.  As a result of Defendants' actions, as set forth above, the State of Florida and/or

its agencies have been, and may continue to be, severely damaged.

**COUNT XI**
**VIOLATION OF STATE OF GEORGIA MEDICAID**
**FALSE CLAIMS ACT, GA. CODE ANN. § 49-4-168 (2007),** *et seq.*

337.  Relator Westlock incorporates herein by reference the preceding paragraphs of the

Complaint as though fully set forth herein.

338.  This is a civil action brought by Relator Westlock, in the name of the State of

Georgia, against Defendants pursuant to the State of Georgia Medicaid Fraud False Claims

Act, GA. CODE ANN. § 49-4-168 (2007), *et seq.*

339.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

the information involved, or with actual knowledge of the falsity of the information, knowingly

or intentionally made or caused to be made, and may still be making or causing to be made, a

false statement or misrepresentation of material fact on an application for any benefit or

payment under the Georgia Medicaid program, in violation of  GA. CODE ANN. § 49-4-168

(2007).

**Filed Under Seal**
129894.00601/35873664v.4

340.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or representation of material fact for use in determining rights to a benefit or payment, in violation of GA. CODE ANN. § 49-4-168 (2007).

341.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally concealed or failed to disclose, and may still be concealing or failing to disclose, an event with an intent fraudulently to secure the benefit or payment cither in a greater amount or quantity than is due or when no benefit or payment is authorized, in violation of GA. CODE ANN. § 49-4-168 (2007).

342.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly offered or paid, and may still be offering or paying, remuneration, directly or indirectly, overtly or covertly, in cash or in kind, in return for purchasing, ordering or arranging for, or recommending purchasing or ordering of, a good, supply or service for which payment was made, in whole or in part, under the Medicaid program, in violation of GA. CODE ANN. § 49-4-168 (2007).

343.  The State of Georgia or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

91

344.  As a result of Defendants' actions, as set forth above, the State of Georgia or its political subdivisions has been, and may continue to be, severely damaged.

## COUNT XII
## VIOLATION OF THE STATE OF HAWAII FALSE CLAIMS ACT
## FALSE CLAIMS TO THE STATE,
## HAWS REV. STAT. § 661-21, *et seq.*

345.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

346.  This is a civil action brought by Relator Westlock on behalf of the State of Hawaii and its political subdivisions against Defendants under the State of Hawaii's False Claims Act - False Claims to the State, HAW. REV. STAT. § 661-25.

347.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of HAW. REV. STAT. § 61-21(a)(l).

348.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of HAW. REV. STAT. § 661-21(a)(2).

349.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made

92

or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of HAW. REV. STAT. § 661-21(a)(7).

350.  The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of state funded health insurance programs.

351.  As a result of Defendants' actions, as set forth above, the State of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIII**
**VIOLATION OF THE STATE OF INDIANA FALSE CLAIMS**
**AND WHISTLEBLOWER PROTECTION ACT,**
**IND. CODE § 5-11-5.5,** *et seq.*

352.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

353.  This is a civil action brought by Relator Westlock on behalf of the State of Indiana against Defendants under the State of Indiana False Claims and Whistleblower Protection Act, IND. CODE ANN. § 5-11-5.5-4(a).

354.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of IND. CODE ANN. § 5-11-5.5-2(b)(l 1.

93

355.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Indiana, in violation of IND. CODE ANN. § 5-11-5.5-2(b)(2).

356.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, in violation of IND. CODE ANN. § 5-11-5.5-2(a)(6).

357.  The State of Indiana, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

358.  As a result of Defendants' actions, as set forth above, the State of Indiana has been, and may continue to be, severely damaged.

**COUNT XIV
VIOLATION OF THE STATE OF ILLINOIS
WHISTLEBLOWER REWARD AND PROTECTION ACT,
740 ILL. COMP. STAT. ANN. 175/1, _et seq._**

359.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

94

360.  This is a civil action brought by Relator Westlock on behalf of the State of Illinois against Defendants under the State of Illinois Whistleblower Reward and Protection Act, 740 ILL, COMP. STAT. ANN. 175/4(b).

361.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Illinois or a member of the Illinois National Guard a false or fraudulent claim for payment or approval, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(I).

362.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Illinois, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(2).

363.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(7).

364.  The State of Illinois, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and

95

may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

365.  As a result of Defendants' actions, as set forth above, the State of Illinois has been, and may continue to be, severely damaged.

**COUNT XV**
**VIOLATION OF THE STATE OF LOUISIANA**
**MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW,**
**LA. REV. STAT. § 46:437.1, *et seq.***

366.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

367.  This is a civil action brought by Plaintiff, Relator, on behalf of the State of Louisiana's medical assistance programs against Defendants under the State of Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. § 46:439.1.

368.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of LA. REV. STAT. § 46:438.3(A).

369.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of LA. REV. STAT. § 46:438.3(B).

370.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly submitted, and may continue to submit, claims for goods, services or supplies which were

96

medically unnecessary or which were of substandard quality or quantity, in violation of LA. REV. STAT, § 46:438.3 (D).

371.  The State of Louisiana, its medical assistance programs, political subdivisions and/or the Department, unaware of the falsity of the claims and/or statements made by Defendants, or their actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of Defendants' claims and/or statements in paying for prescription drugs and prescription drug-related management services for medical assistance program recipients.

372.  As a result of Defendants' actions, the State of Louisiana, its medical assistance programs, political subdivisions and/or the Department have been, and may continue to be, severely damaged.

### COUNT XVI
### VIOLATION OF THE COMMONWEALTH OF MASSACHUSETTS FALSE CLAIMS ACT, MASS LAWS ANN. Ch. 12, § 5A, *et seq.*

373.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

374.  This is a civil action brought by Relator Westlock on behalf of the Commonwealth of Massachusetts against Defendants under the Massachusetts False Claims Act, MASS. LAWS ANN. ch. 12, § 5C(2).

375.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of MASS. LAWS ANN, ch. 12, § 5B(1).

376.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

97

made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts or its political subdivisions in violation of MASS. LAWS ANN. ch. 12, § 5B(2).

377.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts or one of its political subdivisions, in violation of MASS. LAWS ANN. ch. 12, § 5B(8).

378.  The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

379.  As a result of Defendants' actions, as set forth above, the Commonwealth of Massachusetts or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XVII
### VIOLATION OF THE STATE OF MICHIGAN MEDICAID
### FALSE CLAIMS ACT,
### MICH. COMP. LAWS SERV. § 400.601, *et seq.*

380.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

98

381.  This is a civil action brought by Relator Westlock in the name of the State of Michigan against Defendants under the State of Michigan Medicaid False Claims Act, MICH. COMP. LAWS SERV. § 400.610a(l).

382.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, a false statement or false representation of a material fact in an application for Medicaid benefits, in violation of MICH. COMP. LAWS. SERV. § 400.603(1).

383.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit, in violation of MICH. COMP. LAWS. SERV. § 400.603(2).

384.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, an event affecting its initial or continued right to receive a Medicaid benefit or the initial or continued right of any other person on whose behalf Defendants has applied for or is receiving a benefit with intent to obtain a benefit to which Defendants are not entitled or in an amount greater than that to which Defendants are entitled, in violation of MICH. COMP. LAWS. SERV. § 400.603(3).

385.  Defendants, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the

99

payment of a Medicaid benefit, knowingly presented or made or caused to be presented or made, and may still be presenting or causing to be presented a false claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, in violation of MICH. COMP. LAWS. SERV. § 400.607(1).

386.  The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

387.  As a result of Defendants' actions, as set forth above, the State of Michigan or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XVIII**
**VIOLATION OF STATE OF MONTANA FALSE**
**CLAIMS ACT, MONT. CODE ANN. § 17-8-401,** *et seq.*

388.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

389.  This is a civil action brought by Relator Westlock on behalf of the State of Montana against Defendants under the State of Montana False Claims Act, MONT. CODE ANN. § 17-8-406( 1).

390.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of MONT. CODE ANN**.** § 17-8-403( l)(a).

391.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made

100

or used, false records or statements to get a false claim paid or approved, in violation of MONT. CODE ANN. § 17-8-403(1)(b).

392. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Montana or one of its political subdivisions, in violation of MONT. CODE ANN. § 17-8-403( l)(g).

393. The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

394. As a result of Defendants' actions, as set forth above, the State of Montana or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIX
### VIOLATION OF STATE OF NEW HAMPSHIRE MEDICAID FALSE CLAIMS ACT, N.H. REV. STAT. ANN. § 167:61-b, *et. seq.*

395. Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

396. This is a civil action brought by Relator Westlock on behalf of the State of New Hampshire against Defendants under the State of New Hampshire Medicaid False Claims Act, N.H. REV. STAT. ANN. § 167:61-cII.(a).

397. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

101

presented or caused to be presented, and may still be presenting or causing to be presented, a

false claim for payment or approval, in violation of N.H. REV. STAT. ANN. § 167:61-bI.(a).

398.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements to get a fake claim paid or approved, in violation of N.H.

REV. STAT. ANN. § 167:61-bI.(b).

399.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using or causing to be

made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or

transmit money to the State of New Hampshire or one of its political subdivisions, in violation

of N.H. REV. STAT. ANN. § 167:61-bI.(e).

400.  The State of New Hampshire, or its political subdivisions, unaware of the falsity

of the claims and/or statements made by Defendants, and in reliance on the accuracy of these

claims and/or statements, paid, and may continue to pay, for prescription drugs and

prescription drug-related management services for recipients of health insurance programs

funded by the state or its political subdivisions.

401.  As a result of Defendants' actions, the State of New Hampshire or its political

subdivisions have been, and may continue to be, severely damaged.

### COUNT XX
### VIOLATION OF STATE OF NEW JERSEY
### FALSE CLAIMS ACT, N.J. STAT. ANN. § 265 (2007), *et seq.*

402.  Relator Westlock incorporates herein by reference the preceding paragraphs of the

Complaint as though fully set forth herein.

102

403. This is a civil action brought by Relator Westlock, in the name of the State of New Jersey, against Defendants pursuant to the State of New Jersey Fraud False Claims Act, N.J. STAT. ANN. § 265 (2007), *et seq.*

404. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact on an application for any benefit or payment under the New Jersey Medicaid program, in violation of N.J. STAT. ANN. § 265 (2007).

405. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or representation of material fact for use in determining rights to a benefit or payment, in violation of N.J. STAT. ANN. § 265 (2007).

406. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally concealed or failed to disclose, and may still be concealing or failing to disclose, an event with an intent fraudulently to secure the benefit or payment cither in a greater amount or quantity than is due or when no benefit or payment is authorized, in violation of N.J. STAT. ANN. § 265 (2007).

407. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly offered or paid, and may still be offering or paying, remuneration, directly or indirectly, overtly

103

or covertly, in cash or in kind, in return for purchasing, ordering or arranging for, or recommending purchasing or ordering of, a good, supply or service for which payment was made, in whole or in part, under the Medicaid program, in violation of N.J. STAT. ANN. § 265 (2007).

408. The State of New Jersey or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

409. As a result of Defendants' actions, as set forth above, the State of New Jersey or its political subdivisions has been, and may continue to be, severely damaged.

## COUNT XXI
## VIOLATION OF STATE OF NEW MEXICO MEDICAID FALSE CLAIMS ACT, N.M STAT. ANN. § 27-14-1, *et seq.*

410. Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

411. This is a civil action brought by Relator Westlock on behalf of the State of New Mexico against Defendants under the State of New Mexico Medicaid False Claims Act, N.M. STAT. ANN. § 27-14-7(B).

412. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false or fraudulent claim for payment under the Medicaid program, in violation of N.M. STAT. ANN. § 27-14-4A.

413. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

104

presented, or caused to be presented, and may be continuing to present or causing to be presented a claim for payment under the Medicaid program that is not authorized or is not eligible for benefit under the Medicaid program, in violation of N.M. STAT. ANN. § 27-14-4B.

414.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false or fraudulent claim paid or approved, in violation of N.M. STAT. ANN. § 27-14-4C.

415.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Mexico or one of its political subdivisions, in violation of N.M. STAT. ANN. § 27-14-4E.

416.  The State of New Mexico, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of health insurance programs funded by the state or its political subdivisions.

417.  As a result of Defendants' actions, as set forth above, the State of New Mexico or its political subdivisions have been, and may continue to be, severely damaged.

**Filed Under Seal**
129894.00601/35873664v.4

## COUNT XXII
## VIOLATION OF THE STATE OF NEW YORK
## FALSE CLAIMS ACT, N.Y. CLS. ST. FIN. § 187 *et seq.*

418.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

419.  This is a civil action brought by Relator Westlock on behalf of the State of New York against Defendants under the State of New York False Claims Act, N.Y. CLS St. Fin. § 190.2.

420.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of N.Y. CLS St. Fin. § 189(a).

421.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false claim paid or approved, in violation of N.Y. CLS St. Fin. § 189(b).

422.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New York or one of its political subdivisions, in violation of N.Y.CLS St. Fin. § 189(g).

423.  The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims

106

and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

424.  As a result of Defendants' actions, as set forth above, the State of New York or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXIII**
**VIOLATION OF THE STATE OF NEVADA**
**SUBMISSION OF FALSE CLAIMS TO STATE OR LOCAL**
**GOVERNMENT ACT, NEV. REV. STAT. ANN. § 357.010,** *et seq.*

425.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

426.  This is a civil action brought by Relator Westlock on behalf of the State of Nevada against Defendants under the State of Nevada Submission of False Claims to State or Local Government Act, NEV. REV. STAT. ANN. § 357.080(1)

427.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of NEV. REV. STAT. ANN. § 357.040( l)(a).

428.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval for false claims in violation of NEV. REV. STAT. ANN. § 357.040(1)(b).

429.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

107

made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada or one of its political subdivisions, in violation of NEV. REV. STAT. ANN. § 357.040(1)(g).

430. The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

431. As a result of Defendants' actions, as set forth above, the State of Nevada or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XXIV
### VIOLATION OF STATE OF OKLAHOMA MEDICAID
### FALSE CLAIMS ACT, OKLA. STAT. tit. 63, § 5053 (2007), *et seq.*

432. Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

433. This is a civil action brought by Relator Westlock, in the name of the State of Oklahoma, against Defendants pursuant to the State of Oklahoma Medicaid Fraud False Claims Act, OKLA. STAT. tit. 63, § 5053 (2007), *et seq.*

434. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact on an application for any benefit or payment under the Oklahoma Medicaid program, in violation of OKLA. STAT. tit. 63, § 5053 (2007).

108

435.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or representation of material fact for use in determining rights to a benefit or payment, in violation of OKLA. STAT. tit. 63, § 5053 (2007).

436.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally concealed or failed to disclose, and may still be concealing or failing to disclose, an event with an intent fraudulently to secure the benefit or payment cither in a greater amount or quantity than is due or when no benefit or payment is authorized, in violation of OKLA. STAT. tit. 63, § 5053 (2007).

437.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly offered or paid, and may still be offering or paying, remuneration, directly or indirectly, overtly or covertly, in cash or in kind, in return for purchasing, ordering or arranging for, or recommending purchasing or ordering of, a good, supply or service for which payment was made, in whole or in part, under the Medicaid program, in violation of  OKLA. STAT. tit. 63, § 5053 (2007).

438.  The State of Oklahoma or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

109

439.  As a result of Defendants' actions, as set forth above, the State of Oklahoma or its political subdivisions has been, and may continue to be, severely damaged.

### COUNT XXV
### VIOLATION OF STATE OF RHODE ISLAND
### FALSE CLAIMS ACT, R.I. GEN. LAWS § 9-1.1-1 (2008), *et seq.*

440.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

441.  This is a civil action brought by Relator Westlock, in the name of the State of Georgia, against Defendants pursuant to the State of Rhode Island Fraud False Claims Act, R.I. GEN. LAWS § 9-1.1-1 (2008), *et seq.*

442.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact on an application for any benefit or payment under the Rhode Island Medicaid program, in violation of R.I. GEN. LAWS § 9-1.1-1 (2008).

443.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or representation of material fact for use in determining rights to a benefit or payment, in violation of R.I. GEN. LAWS § 9-1.1-1 (2008).

444.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally concealed or failed to disclose, and may still be concealing or failing to disclose, an event with an intent fraudulently to secure the benefit or payment either in a

110

Filed Under Seal
129894.00601/35873664v.4

greater amount or quantity than is due or when no benefit or payment is authorized, in violation of R.I. GEN. LAWS § 9-1.1-1 (2008).

445.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly offered or paid, and may still be offering or paying, remuneration, directly or indirectly, overtly or covertly, in cash or in kind, in return for purchasing, ordering or arranging for, or recommending purchasing or ordering of, a good, supply or service for which payment was made, in whole or in part, under the Medicaid program, in violation of R.I. GEN. LAWS § 9-1.1-1 (2008).

446.  The State of Rhode Island or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of Medicaid.

447.  As a result of Defendants' actions, as set forth above, the State of Rhode Island or its political subdivisions has been, and may continue to be, severely damaged.

### COUNT XXVI
### VIOLATION OF THE STATE OF TENNESSEE MEDICAID
### FALSE CLAIMS ACT, TENN. CODE *ANN.* § 71-5-181 *et seq.*

448.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

449.  This is a civil action brought by Relator Westlock in the name of the State of Tennessee against Defendants under the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-183(a).

450.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

111

presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee a claim for payment under the Medicaid program knowing it was false or fraudulent, in violation of TENN. CODE ANN. § 71-5-182(a)(l)(A).

451.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee with knowledge that such records or statements were false, in violation of TENN. CODE ANN. § 71-5-182(a)(l)(B).

452.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, relative to the Medicaid program, with knowledge that such records or statements were false, in violation of TENN. CODE ANN. § 71-5-182(a)(1)(D).

453.  The State of Tennessee, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of the Medicaid program.

454.  As a result of Defendants' actions, as set forth above, the State of Tennessee has been, and may continue to be, severely damaged.

112

## COUNT XXVII
## VIOLATION OF THE STATE OF TEXAS HUMAN
## RESOURCES CODE, TEX. HUM. RES. CODE § 36.001 *et seq.*

455. Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

456. This is a civil action brought by Relator Westlock in the name of the State of Texas against Defendants under the State of Texas Human Resources Code, Medicaid Fraud Prevention Chapter, TEX. HUM. RES. CODE § 36.101(a).

457. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact on an application for a contract, benefit or payment under a Medicaid program, in violation of TEX. HUM. RES. CODE § 36.002(1).

458. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact that is intended to be used, and has been used, to determine a person's eligibility for a benefit or payment under the Medicaid program, in violation of TEX. HUM. RES. CODE § 36.002(2).

459. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, caused to be made, induced or sought to induce, and may still be making, causing to be made, inducing or seeking to induce, the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal

113

**Filed Under Seal**
129894.00601/35873664v.4

or state law, rule, regulation or provider agreement pertaining to the Medicaid program in violation of TEX. HUM. RES. CODE § 36.002(4)(B).

460.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made a claim under the Medicaid program for a service or product that was inappropriate, in violation of TEX. HUM. RES. CODE § 36.002(7)(C),

461.  The State of Texas, its political subdivisions or the Department, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

462.  As a result of Defendants' actions, as set forth above, the State of Texas, its political subdivisions or the Department has been, and may continue to be, severely damaged.

### COUNT XXVIII
### VIOLATION OF THE COMMONWEALTH OF VIRGINIA FRAUD
### AGAINST TAXPAYERS ACT, VA CODE ANN. § 8.01-216.1, *et seq.*

463.  Relator Westlock incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

464.  This is a civil action brought by Relator Westlock on behalf of the Commonwealth of Virginia against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.5, *et seq.*

465.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth, a false or fraudulent claim for payment or approval, in violation of VA. CODE ANN. § 8.01-216.3(A)(l).

114

466. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth, in violation of VA. CODE ANN. § 8.01-216.3(A)(2).

467. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth, in violation of VA. CODE ANN. § 8.01-216.3(A)(7).

468. The Commonwealth of Virginia, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

469. As a result of Defendants' actions, as set forth above, the Commonwealth of Virginia, its political subdivisions or the Department has been, and may continue to be, severely damaged.

**WHEREFORE,** Relator Westlock pray for judgment against Defendants as follows:

A.     That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729, *et seq.*; ARK. CODE ANN. § 20-77-901, *et seq.*, CAL. CODE § 12650, *et seq.*, DEL. CODE ANN. tit. 6, § 1201, *et seq.*, D.C. CODE ANN. § 2-308.13, *et seq.*, FLA. STAT. ANN. § 68.081, *et seq.*, GA. CODE ANN. § 49-4-168, *et seq.*, HAW. REV. STAT. § 661-21, *et seq.*, IND. CODE ANN. § 5-11-5.5, *et seq.*, 740 ILL. COMP.

115

STAT. ANN. § 1751, *et seq.*, LA. REV. STAT. § 437.1, *et seq.*, MASS. LAWS ANN. Ch. 12, §5A**,** *et seq.*, MICH. COMP. LAWS SERV. § 400.601, *et seq.*, MONT. CODE ANN. § 17-8-401, *et seq.*, N.H. REV. STAT. ANN. § 167:61-b, *et seq.*, N.J. STAT ANN. § 265, *et seq.*, N.M. STAT. ANN. § 27-14-1, *et seq.*, N.Y. CLS ST. FIN. § 187, *et seq.*, NEV. REV. STAT. ANN. § 357.010, *et seq.*, OKLA. STAT. tit. 63, § 5053, *et seq.*, R.I. GEN. LAWS § 9-1,1-1, *et seq.*, TENN. CODE ANN. § 71-5-181, *et seq.*, TEX. HUM. RES. CODE § 36.001, *et seq.*, and. VA. CODE ANN. § 8.01-216.1, *et seq.*

B.     That judgment be entered in Relator Westlock's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.     That Relator Westlock be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and § 3730(h), ARK. CODE ANN. § 20-77-911, CAL. CODE § 12652(g), DEL. CODE ANN. tit. 6, § 1205, D.C. CODE ANN. § 2-308.15(f), FLA. STAT. ANN. § 68.085, GA. CODE ANN. § 49-4-168, HAW. REV. STAT. § 661-27, IND. CODE ANN. § 5-11-5.5-6(a), 740 ILL. COMP. STAT. ANN. 175/4(d), LA. REV. STAT. § 439.4, MASS. GEN. LAWS ch. 12, § 5F, MICH. COMP. LAWS SERV. § 400.610a(9), MONT. CODE ANN. § 17-8-410, N.H. REV. STAT. ANN. § 167:61-e, N.J. STAT ANN. § 265, N.M. STAT. ANN. § 27-14-9, N.Y. CLS St. Fin. § 190.6., NEV. REV. STAT. ANN. § 357.220, OKLA. STAT. tit. 63, §

116

5053, R.I. GEN. LAWS § 9-1,1-1, TENN. CODE ANN. § 71-5-183, TEX. HUM. RES. CODE § 36.110, and VA. CODE ANN. § 8.01-216.7.

D.       That judgment be entered in Relator Westlock's favor and against Defendants in the amount of the damages sustained by the State of Arkansas or its political subdivisions multiplied as provided for in ARK. CODE ANN. § 20-77-903(a)(l), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by  ARK. CODE ANN. § 20-77-903(a)(l), to the extent such multiplied penalties shall fairly compensate the State of Arkansas or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

E.       That judgment be entered in Relator Westlock's favor and against Defendants in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in CAL. CODE § 12651(a), plus a civil penalty of no more than ten thousand dollars ($10,000) per claim as provided by CAL. CODE § 12651(a), to the extent such multiplied penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

F.       That judgment be entered in Relator Westlock's favor and against Defendants in the amount of the damages sustained by the Government of the State of Delaware multiplied as provided for in DEL. CODE ANN. tit. 6, §1201(a), plus a civil penalty of not less than five thousand five- hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the State of Delaware False Claims and Reporting Act, as provided by DEL. CODE ANN. tit. 6, § 1201(a), to the extent such multiplied penalties shall fairly compensate the

**Filed Under Seal**
129894.00601/35873664v.4

Government of the State of Delaware for losses resulting from the various schemes undertaken

by Defendants, together with penalties for specific claims to be identified at trial after full

discovery;

G.      That judgment be entered in Relator Westlock's favor and against Defendants in

the amount of the damages sustained by the District of Columbia, multiplied as provided for in

D.C. CODE ANN. § 2-308.14(a), plus a civil penalty of not less than five thousand dollars

($5,000) or more than ten thousand dollars ($10,000) for each false claim, and the costs of this

civil action brought to recover such penalty and damages, as provided by D.C. CODE ANN. § 2-

308.14(a), to the extent such multiplied penalties shall fairly compensate the District of

Columbia for losses resulting from the various schemes undertaken by Defendants, together with

penalties for specific claims to be identified at trial after full discovery;

H.      That judgment be entered in Relator Westlock's favor and against Defendants in

the amount of the damages sustained by the State of Florida or its agencies multiplied as

provided for in FLA. STAT. ANN. § 68.082, plus a civil penalty of not less than five thousand

dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by FLA. STAT. ANN.

§ 68.082, to the extent such multiplied penalties shall fairly compensate the State of Florida or its

agencies for losses resulting from the various schemes undertaken by Defendants, together with

penalties for specific claims to be identified at trial after full discovery;

I.      That judgment be entered in Relator Westlock's favor and against Defendants in

the amount of the damages sustained by the State of Georgia or its political subdivisions

multiplied as provided for in GA. CODE ANN. § 49-4-168, plus a civil penalty of not less than

fifteen (15) percent or more than twenty five (25) percent of the proceeds per claim as provided

by GA. CODE ANN. § 49-4-168.2, to the extent such multiplied penalties shall fairly

118

compensate the State of Georgia or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

J.      That judgment be entered in Relator Westlock's favor and against Defendants in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in HAW. REV. STAT. § 661-21(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by HAW. REV. STAT. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

K.      That judgment be entered in Relator Westlock's favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in IND. CODE ANN. § 5-11-5.5-2, plus a civil penalty of at least five thousand dollars ($5,000) as provided by IND. CODE ANN. § 5-11-5.5-2, to the extent such multiplied penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

L.      That judgment be entered in Relator Westlock's favor and against Defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 ILL. COMP. STAT, ANN. 175/3(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000), and the costs of this civil action brought to recover such damages and penalty, as provided by 740 ILL. COMP. STAT. ANN. 175/3(a), to the extent such multiplied penalties shall fairly compensate the State of Illinois for losses

119

resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

M.     That judgment be entered in Relator Westlock's favor and against Defendants in the amount of the damages sustained by Louisiana's medical assistance programs, multiplied as provided for in LA. REV. STAT § 438.6(B)(2), plus a civil penalty of no more than ten thousand dollars ($10,000) per violation or an amount equal to three times the value of the illegal remuneration, whichever is greater, as provided for by LA. REV. STAT § 438.6(B)(I), plus up to ten thousand dollars ($10,000) for each false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act, as provided by LA. REV. STAT § 438.6(C)(l)(a), plus payment of interest on the amount of the civil fines imposed pursuant to Subsection B of § 438.6 at the maximum legal rate provided by La. Civil Code Art. 2924 from the date the damage occurred to the date of repayment, as provided by LA. REV. STAT. § 438.6(C)(l)(b), to the extent such multiplied fines and penalties shall fairly compensate the State of Louisiana's medical assistance programs for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

N.     That judgment be entered in Relator Westlock's favor and against Defendants for restitution to the Commonwealth of Massachusetts or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in MASS. LAWS ANN. ch. 12, 65B, multiplied as provided for in MASS. LAWS ANN. ch. 12, § 5B, plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, pursuant to MASS. LAWS ANN, ch. 12, 5B, to the extent such multiplied penalties shall fairly compensate the Commonwealth of

120

Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

O.     That judgment be entered in Relator Westlock's favor and against Defendants for restitution to the State of Michigan or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in MICH. COMP. LAWS SERV. §§ 400.603-400.606, 400.610b, in order to fairly compensate the State of Michigan or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

P.     That judgment be entered in Plaintiff's favor and against Defendants for restitution to the State of Montana or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in MONT. CODE ANN. § 17-8-403(2), multiplied as provided for in MONT. CODE ANN. § 17-8-403(2), plus a civil penalty of up to ten thousand dollars ($10,000) for each false claim, pursuant to MONT. CODE ANN. § 17-8-403(2), to the extent such multiplied penalties shall fairly compensate the State of Montana or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Q.     That judgment be entered in Relator Westlock's favor and against Defendants for restitution to the State of New Hampshire or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.H. REV. STAT. ANN. § 167:6111, multiplied as provided for in N.H. REV. STAT.

121

ANN. § 167:61II, plus a civil penalty of two thousand dollars ($2,000) for each false claim, pursuant to REV. STAT. ANN. § 167:61II, to the extent such multiplied penalties shall fairly compensate the State of New Hampshire or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

R.     That judgment be entered in Relator Westlock's favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. STAT. ANN. § 265, plus a civil penalty of not less than fifteen (15) percent or more than twenty five (25) percent per claim as provided by N.J. STAT. ANN. § 265, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

S.     That judgment be entered in Relator Westlock's favor and against Defendants for restitution to the State of New Mexico or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.M. STAT. ANN. § 27-14-4, multiplied as provided for in N.M. STAT. ANN. § 27-14-4, to the extent such multiplied penalties shall fairly compensate the State of New Mexico or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after fill discovery;

T.     That judgment be entered in Relator Westlock's favor and against Defendants for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.Y. CLS St. Fin. § 189.1., multiplied as provided for in N.Y. CLS St. Fin. § 189.1., plus a

122

civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) for each false claim, pursuant to N.Y. CLS St. Fin. § 189.l., to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

U.      That judgment be entered in Relator Westlock's favor and against Defendants for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in NEV. REV. STAT. ANN. 357.040, multiplied as provided for in NEV. REV. STAT. ANN. § 357.040(1), plus a civil penalty of not less than two thousand dollars ($2,000) or more than ten thousand dollars ($10,000) for each act, pursuant to NEV. REV. STAT. ANN. § 357.040, to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

V.      That judgment be entered in Relator Westlock's favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as provided for in OKLA. STAT. tit. 63, § 5053, plus a civil penalty of not less than fifteen (15) percent or more than twenty five (25) percent per claim as provided by OKLA. STAT. tit. 63, § 5053.4, to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

**Filed Under Seal**
129894.00601/35873664v.4

W.      That judgment be entered in Relator Westlock's favor and against Defendants in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. GEN. LAWS § 9-1,1-1, plus a civil penalty of not less than fifteen (15) percent or more than twenty five (25) percent per claim as provided by R.I. GEN. LAWS § 9-1,1-4, to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

X.                       That judgment be entered in Relator Westlock's favor and against Defendants for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in TENN. CODE ANN. § 71-5-182, multiplied as provided for in TENN. CODE ANN. § 71-5-182(a)(l), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) pursuant to TENN. CODE ANN. § 71-5-182(a)(l), to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Y.      That judgment be entered in Relator Westlock's favor and against Defendants for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in TEX. HUM. RES. CODE § 36.052(a)(l), multiplied as provided for in TEX. HUM. RES. CODE § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the payment or

124

benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to TEX. HUM. RES. CODE § 36.052(a)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each unlawful act committed that resulted in injury to an elderly or disabled person, and of not less than one thousand dollars ($1,000) or more than ten thousand dollars ($10,000) for each unlawful act committed that did not result in injury to an elderly or disabled person, pursuant to TEX. HUM. RES. CODE § 36.052(a)(3)(A) and (B), to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

     Z.     That judgment be entered in Plaintiff's favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in VA. CODE ANN. § 8.01-216.3(A), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by VA. CODE ANN. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

     AA.     That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

     BB.     That judgment be granted for Relator Westlock against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator Westlock in the prosecution of this suit; and

     CC.     That Relator Westlock be granted such other and further relief as the Court deems just and proper.

**Filed Under Seal**
129894.00601/35873664v.4

**WHEREFORE**, Relator Westlock prays for judgment against Defendants as follows:

A.     That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729;

B.     That judgment be entered in Relator Westlock's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.     That Relator Westlock be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and § 3730(h), and all State *Qui Tam* statutes;

D.     That judgment be granted for Relator Westlock to compensate for Defendant Pfizer's unlawful retaliation against him for his whistleblowing activities;

E.     That Relator Westlock be awarded compensatory and punitive damages to compensate him for his embarrassment and emotional distress;

F.     That judgment be granted for Relator Westlock against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator Westlock in the prosecution of this suit; and

G.     That Relator Westlock be granted such other and further relief as the Court deems just and proper.

126

## JURY TRIAL DEMAND

Relator Westlock demands a trial by jury of all issues so triable.

Dated: August **22** 2008

Paul F. Lynch 〃〃〃〃〃〃〃〃〃〃〃〃
65 Franklin Street, Suite 500
Boston, MA 02110
Telephone: 617 426-1120
Facsimile: 617 348-2147

W. Scott Simmer
Thomas J. Poulin
Blank Rome LLP
Watergate
600 New Hampshire Ave., NW
Washington DC 20037
Telephone: 202 772 5967
Facsimile: 202 572 8412

David B. Krangle
Parker Wachman Alonso LLP
111 Great Neck Road
Great Neck, NY 11021
Telephone: 516 466 6500
Facsimile: 516 466 6665

*Counsel for* Relator Westlock

127